**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

—————————————————————————————
§
**SECURITIES AND EXCHANGE COMMISSION,**  §
§
     **Plaintiff,**  §
§
**v.**  §**Civil No.1:09-cv-1021-SMV-WDS**
§
**CHARLES R. KOKESH**  §
§
     **Defendant.**  §
—————————————————————————————§


**PLAINTIFF'S MEMORANDUM OF LAW SUPPORTING MOTION
FOR SUMMARY JUDGMENT AS TO ALL CLAIMS
AGAINST DEFENDANT CHARLES R. KOKESH**

## TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................................................11

*Brown v. Bullock*,
294 F.2d 415 (2d Cir. 1961)...................................................................19

*Cambridge Fund, Inc. v. Abella*,
501 F. Supp. 598 (S.D.N.Y. 1980) .........................................................19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)............................................................................1, 11

*Decker v. Securities & Exchange Com.*,
631 F.2d 1380 (10th Cir. 1980) ..............................................................13

*Dreiling v. Peugeot Motors of America, Inc.*,
850 F.2d 1373 (10th Cir. 1988) ..............................................................11

*Forsyth v. Barr*,
19 F.3d 1527 (5th Cir. 1994) ..................................................................11

*Krim v. BancTexas Group, Inc.*,
989 F.2d 1435 (5th Cir. 1993) ................................................................11

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)................................................................................11

*SEC v. America Commodity Exch., Inc.*,
546 F.2d 1361 (10th Cir. 1976) ..............................................................21

*SEC v. Blackwell*,
477 F. Supp. 2d 891 (S.D. Ohio 2007) ...................................................24

*SEC v. Capital Gains Research Bureau, Inc.*,
375 U.S. 180 (U.S. 1963).......................................................................12

*SEC v. Cross Finance Services*,
908 F. Supp. 718 (C.D. Cal. 1995) .........................................................21

*SEC v. Fehn*,
97 F.3d 1276 (9th Cir. 1996) ..................................................................17

*SEC v. Ficken*,

546  F.3d 45 (1st Cir. 2008)............................................................................................12

*SEC v. First City Finance Corp., Ltd.,*
890 F.2d 1215 (D.C. Cir. 1989)...................................................................................23

*SEC v. First Jersey Securities, Inc.,*
101 F.3d 1450 (2d Cir. N.Y. 1996)..........................................................................23, 24

*SEC v. First Pacific Bancorp,*
142 F.3d at 1191 ......................................................................................................21, 24

*SEC v. Geyser Minerals Corp.,*
452 F.2d 876 (10th Cir. 1971) ................................................................................12, 21

*SEC v.Great Lakes Equities, Co.,*
775 F. Supp. 211 (E.D. Mich. 1991)...........................................................................23

*SEC v. Haswell,*
654 F.2d 698 (10th Cir. 1981) ....................................................................................22

*SEC v. J.T. Wallenbrock,*
440 F.3d 1109 (9th Cir. 2006) ...............................................................................23, 24

*SEC v. Management Dynamics, Inc.,*
515 F.2d 801 (2d Cir. 1975)........................................................................................21

*SEC v. Manor Nursing Ctrs., Inc.,*
458 F.2d 1082 (2d Cir. 1972).......................................................................................24

*SEC v. Milan Capital Group, Inc.,*
2000 U.S. Dist. LEXIS 16204 (S.D.N.Y. Nov. 8, 2000)....................................................21

*SEC v. Moran,*
944 F. Supp. 286 (S.D.N.Y.1996) ................................................................................24

*SEC v. Murphy,*
626 F.2d 633 (9th Cir. Cal. 1980)............................................................................ 20-22

*SEC v. Patel,*
61 F.3d 137 ..................................................................................................................23

*SEC v. Pros International, Inc.,*
994 F.2d 767 (10th Cir. Utah 1993).........................................................................21, 22

*SEC v. Rind,*
991 F.2d 1486 (9th Cir. 1993) .....................................................................................23

*SEC v. Suman*,
684 F. Supp. 2d 378 (S.D.N.Y. 2010) *aff'd*, 2011 U.S. App. LEXIS 9393 (2d Cir.
2011) .......................................................................................................................12

*SEC v. Unifund SAL*,
910 F.2d 1028 (2d Cir. 1990).................................................................................21

*SEC v. Wall Street Public Institute, Inc.*,
591 F. Supp. 1070 (D.D.C. 1984) ..........................................................................13

*Steadman v. SEC*,
603 F.2d 1126 (5th Cir. 1979) ..........................................................................12, 14

*TSC Industries, Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)................................................................................................13

## FEDERAL STATUTES

Section 13(a) of the Exchange Act of 1934 [15 U.S.C. § 78m] .............................2, 17, 23

Section 14(a) of the Exchange Act of 1934 [15 U.S.C. § 78n(a)] ..........................2, 16, 22

Section 37 of the Investment Company Act of 1940 [15 U.S.C. § 80a-36] ............2, 19, 22

Section 57 of the Investment Company Act of 1940 [15 U.S.C. § 80a-56] ............2, 19, 23

Section 20(a) of the Exchange Act of 1934 [15 U.S.C. §§ 78t(a)] ....................................21

Section 21(d) of the Exchange Act of 1934 15 U.S.C. §§ 78u(d) ..............................21, 25

Section 205 of the Advisers Act [15 U.S.C. § 80b-5]...................................9-10, 18-19, 22

Section 205(a)(1) of the Advisers Act [15 U.S.C. § 80b-5(a)(1)] ....................................18

Section 205(b)(3) of the Advisers Act [15 U.S.C. § 80b-5(b)(3)]................................9, 18

Sections 206 of the Advisers Act [15 U.S.C. § 80b-6] ........................................ 13-15, 22

Sections 206(1) of the Advisers Act [15 U.S.C. § 80b-6 (1)].................................2, 12, 22

Sections 206(2) of the Advisers Act [15 U.S.C. §§ 80b-5, 80b-6(2)................. 2, 12-14, 22

Rules12b-20 [17 C.F.R. §§ 240.12b-20] ..................................................................2, 17, 23

Rule 14a-9 [17 C.F.R. § 240.14a-9]..........................................................................2, 16, 22

Rule 13a-1 [17 C.F.R. §§ 240.13a-1] ............................................................. 2-3, 17, 21, 23

Rule 13a-13 [17 C.F.R. §§ 240. 13a-13]....................................................... 2-3, 17, 21, 23

Fed. R. Civ. P. 56(c) ...................................................................................................1, 11

## I.     Summary

The evidence supporting this motion for summary judgment by Plaintiff Securities and Exchange Commission ("Commission") establishes that there is no genuine dispute as to any material fact whether Defendant Charles R. Kokesh violated federal securities laws as alleged in the Commission's Complaint.[1]  Therefore, the Commission is entitled to prevail as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The evidence shows that, from 1995 through 2005, Kokesh misappropriated $41,064,736 from four Commission-registered business-development companies ("BDCs")—Technology Funding Medical Partners I ("TFMP")  ; Technology Funding Partners III, L.P. ("TFP III"); Technology Funding Partners IV, L.P. ("TFP IV"); and Technology Funding Partners V, L.P. ("TFP V").[2]

Kokesh owned and controlled two now-defunct Commission-registered investment-adviser firms, Technology Funding Ltd. ("TFL") and Technology Funding, Inc. ("TFI") (collectively, the "Kokesh Advisers"), which, in turn, controlled and provided investment advice to the BDCs pursuant to advisory agreements.  Acting by and through the Kokesh Advisers, Kokesh misappropriated the funds by causing the BDCs to pay illegal distributions, performance fees, and rent, salary, and bonus reimbursements to the Kokesh Advisers.  To conceal the scheme, Kokesh caused the Kokesh Advisers to distribute misleading proxy statements to BDC

---

[1]     References to documents previously filed in this case are to the original document with a reference to the Court's Docket Number.  References to documents filed separately are by page number within the accompanying Appendix, which includes declarations, and excerpts of transcripts, testimony exhibits, Commission filings, and other supporting documents.  The Appendix Index describes each document and its page number.  The Appendix pages are numbered serially as App. 1 through App. 283.

[2]     A BDC is a closed-end investment company—regulated under Sections 55 through 65 of the Investment Company Act—engaged in the business of investing in, and making significant managerial assistance available to, small, developing companies.  Dkt. 38 at 7.

investors and to file false Commission reports on behalf of the BDCs.

By reason of the foregoing, Kokesh violated Section 37 of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. § 80a-36] or, in the alternative, Section 57 of the Investment Company Act [15 U.S.C. § 80a-56], and aided and abetted violations of Sections 13(a) and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78m and 78n] and Rules12b-20, 13a-1, 13a-13, and 14a-9 [17 C.F.R. §§ 240.12b-20, 13a-1, 13a-13, and 14a-9] thereunder and Sections 205, 206(1), and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-5, 80b-6(1), and 80b-6(2)].

## II.    Statement of Material Facts

### A.    Kokesh controlled the Kokesh Advisers and the BDCs.

1.    TFL was registered with the Commission as an investment adviser from May 11, 1987, to January 9, 2007.  App. at 284, 253.  Kokesh owned at least 25% of TFL in 1987.  App. at 251.  His ownership interest in TFL gradually increased so that, by 2001, he owned at least than 75% of TFL.  App. at 23, 255**.**  TFI was registered with the Commission as an investment adviser from May 11, 1987, to January 3, 2007.  App. at 249; 250.  TFI was a wholly-owned subsidiary of TFL.  App. at 22.  As Managing General Partner of TFL and as President, CEO, CFO, and Chairman of TFI, Kokesh controlled the activities of TFL and TFI (the "Kokesh Advisers") throughout their existence as registered investment advisers.  App. at 252, 251; 207, 208.

2.    In the 1980s and 1990s, Kokesh and others formed four closed-end investment companies—Technology Funding Medical Partners I ("TFMP"); Technology Funding Partners III, L.P ("TFP III"); Technology Funding Partners IV, L.P. ("TFP IV"), and Technology Funding Partners V, L.P. ("TFP V").  App. at 24-27.  Each of these entities registered a class of securities with the Commission pursuant to Section 12 of the Exchange Act.  App. at 68, 99, 153, 202.

Each entity elected to be regulated as a BDC under the Investment Company Act.  App. at 69,

100, 154, 203.  From June 1987 through May 1995, the four BDCs combined raised

approximately $128 million from investors.  *Id.*

  3. The Kokesh Advisers served as investment advisers to the four BDCs, which

invested primarily in private start-up companies involved in technology, biotechnology, and

medical diagnostics.  App. at 32, 33; Dkt. 38 at 7.  Each BDC was formed as a limited-

partnership, governed by a limited-partnership agreement between the Kokesh Advisers, who

served as managing general partners, and the limited partners, who were the investors.  *Id.*  Each

limited-partnership agreement served as the investment-advisory agreement ("advisory

agreement") between the BDC and the Kokesh Advisers.  App. at 32, 36.  The advisory

agreement described the distributions the Kokesh Advisers could receive, the fees they could

earn, and the expenses they could be reimbursed from the BDC.  App. at 31, 73-79, 131-136,

177-183, 225-231.

  4. The Kokesh Advisers managed and controlled TFMP and TFP V subject to the

supervision of three independent general partners ("IGPs").  App. at 83-83.1, 234.  The Kokesh

Advisers managed and controlled TFP III and TFP IV subject to the supervision of a

management committee.  App. at 138-138.1, 187-187.1.  Each management committee consisted

of three IGPs, one representative from TFL, and one representative from TFI.  *Id.*

  **B.** **The Kokesh Advisers took distributions exceeding advisory-agreement limits.**

  5. Each limited-partnership agreement provided in Section 9.01 that the BDC was

required to pay 99% of any distribution to investors and 1% to the Kokesh Advisers until

investors received a complete return of their initial investment.  App. at 79, 136, 183, 231.

Thereafter the Kokesh Advisers were entitled to receive up to 20% of distributions, with the

balance to investors.  *Id.*; App. at 77, 134, 181-182, 229.  Under Section 9.02 of each advisory

agreement, the BDC was permitted to distribute funds to the Kokesh Advisers and investors to meet the tax liability on any net profits allocated to them from the BDC.  App. at 35, 79, 136, 183, 231.

6.      In 2000, TFP III, TFP IV, and TFP V, combined, paid $6,112,797 in so-called "tax distributions" to the Kokesh Advisers.  App. at 2, 11, 12, 13, 15, 18, 20, 90-94, 146, 195-196.  The three BDCs made no corresponding distribution to the investors.  *Id.*  Moreover, they allocated no net profits for 2000.  App. at 57-58, 3 15, 18, 20.  Because there was no net-profit allocation, the BDCs were not permitted to make tax distributions under Section 9.02 of the advisory agreements.  Consequently, the Kokesh Advisers took the $6,112,797 from TFP III, TFP IV, and TFP V, combined, in violation of the advisory agreements.  Kokesh admitted that he was involved in the decision to make the so-called tax distributions.  App. at 34, 234.

**C.      Kokesh concealed the phony tax distributions using false SEC reports.**

7.      Kokesh knew the Kokesh Advisers received $6,112,797 in phony tax distributions.  As to TFP III, which paid $2,862,928 of the total, Kokesh testified that, "as of the end of 2000," he "knew that there was no tax liability" justifying the TFP III tax distribution to the Kokesh Advisers.  App. at 91, 58, 59.  Nevertheless, on March 30, 2001, Kokesh signed TFP III's Form 10-K annual report, which contained financial statements identifying the $2,862,928 payment to the Kokesh Advisers as a "Tax distribution."  App. at 93-94.  TFP III's Form 10-K was filed with the SEC on March 30, 2001.  App. at 89.

8.      TFP IV and TFP V's 2000 Form 10-K annual reports contained similar untrue statements.  Neither TFP IV nor TFP V allocated net profits in 2000.  App. at 3, 18, 20.  Yet, on March 30, 2001, Kokesh signed TFP IV and TFP V Form 10-K reports for 2000, filed with the SEC on the same date, falsely stating these BDCs paid tax distributions in 2000 of $1,314,295 and $1,935,574, respectively.  App. at 146.1-147, 195-197.

9.      Kokesh repeated the untrue tax-distribution statement in Form 10-Q quarterly reports he signed and filed with the Commission on behalf of TFP III, TFP IV, and TFP V in 2001.  App. at 116-120, 121-125, 126-129, 168-171, 172-175,  218-220, 221-223.  He also included the untrue statement in the TFP III, TFP IV, and TFP V Form 10-K annual reports for 2001 and 2002.  App. at 95-98, 99-106, 148-152, 153-158, 198-201, 202-208.  In each of the 2002 Form 10-K annual reports, Kokesh certified that he had reviewed them, that, based upon his knowledge, they did not contain untrue or misleading statements as to material facts, and that they "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report."  App. at 105-106, 158, 208.  Kokesh knowingly made false certifications.  As shown above, Kokesh admitted to knowing no tax liability existed even before he signed the first annual report in 2001.

10.      Moreover, in each Form 10-K report filed by these BDCs for each annual period From January 1, 2000, through December 31, 2005—each of which Kokesh signed—the financial statements reflected a negative capital account for the general partners.  App. at 91, 96, 103, 108, 110, 114, 146, 149, 155, 160, 163, 166, 195, 199,   204-205, 210, 213, 216.  Kokesh admitted that a negative capital account for the general partners meant the Kokesh Advisers owed the BDC money to bring the account balance back to zero.  App. at 277.  But these reports failed to disclose that the negative equity position in the general partners' capital accounts was caused, at least in part, by unjustified tax distributions.

**D.      The Kokesh Advisers took reimbursements from the BDCs in violation of the advisory agreements.**

11.      Each advisory agreement prohibited the Kokesh Advisers from receiving reimbursement from the BDC for "rent" or for "salaries and fringe benefits incurred by or allocated to any Controlling Persons."  App. at 45, 73, 75, 131-132; 177, 179, 225, 227.

"Controlling Person" was defined in the advisory agreements as "[a]ny person, whatever his or her title, who performs functions for the Managing General Partners or their Affiliates similar to those of the chairman or member of the board of directors; executive management, such as a president, executive vice president or senior vice president, corporate secretary, or treasurer; or who holds a 5% or more equity interest in the Managing General Partners or their Affiliates or a Person having the power to direct or cause the direction of the Managing General Partners or their Affiliates, whether through the ownership of voting securities, by contract, or otherwise." App. at 73, 131, 177, 225.  Despite these contractual prohibitions, Kokesh directed the Kokesh Advisers to take reimbursements from the BDCs for rent and for controlling-person salaries and fringe benefits.  App. at 245-246.

> **a.     Rent reimbursements violated the advisory agreements.**

12.     From 1995 through 2005, the Kokesh Advisers received $5,007,441 from TFMP, TFP III, TFP IV, and TFP V, combined, in reimbursement for office-rent payments the Kokesh Advisers made in this period.  App. at 3, 10.  Because of the contractual exclusion prohibiting such reimbursements, the Kokesh Advisers received the payments in violation of the advisory agreements.

> **b.     Reimbursements for Controlling-Person pay violated the advisory agreements.**

13.     From 1995 through 2000, the Kokesh Advisers took $6,040,298 from the BDCs in reimbursement for salaries and fringe benefits paid to Kokesh, Frank Pope, Gregory George, Charles Freeman, Deborah Giambruno, Peter Bernardoni, Thomas Toy, and Jane Starrett.  App. at 2-3, 5-6.  Kokesh testified that Kokesh, Pope, and George were Controlling Persons.  App. at 44.  Freeman and Giambruno were also Controlling Persons; Kokesh testified they were Treasurer and Secretary, respectively, of TFI.  App. at 29-30, 43**.**

14. In addition, Bernardoni, Toy, and Starrett, were Controlling Persons. SEC filings establish that Bernardoni and Toy were vice-presidents and executive officers of TFI and partners of TFL and "affiliated persons of TFI and/or TFL" and listed among the TFI and TFL's "key personnel." App. at 81, 84, 111, 241-242. Starrett testified that, from 2000 to 2002, she served as a Kokesh Advisers corporate officer, holding the title "Controller" and having the authority to sign company tax returns, among other things. App. at 244.

**E.   Kokesh distributed misleading proxy statements to BDC investors.**

15. In November 2000, Kokesh distributed a proxy statement to investors to amend each BDC advisory agreement to include controlling-person salaries and fringe benefits as reimbursable operational costs. App. at 83, 87-88, 138, 143 187, 192, 233, 238. Each proxy statement provided that the proposed amendment would result in additional expense reimbursements from the BDC to the Kokesh Advisers. App. at 86, 141-142, 191, 237. But each proxy statement grossly misrepresented the extent of the changes and the potential financial impact on the BDCs.

16. First, the proxy statements falsely represented that Kokesh had been the only "controlling person" under the original terms of the advisory agreements. App. at 85-86, 140-141, 190, 236. In reality, before the proxy statements, the Controlling Persons included Kokesh, Pope, George, Freeman, Giambruno, Bernardoni, Toy, and Starrett, as demonstrated above. Second, each proxy statement omitted to disclose that, in 1998, 1999, and 2000, the BDCs had reimbursed the Kokesh Advisers for compensation paid to these controlling persons, including $593,952 to reimburse the Kokesh Advisers for compensation paid to Kokesh in 2000. App. at 2-3, 5-6. Collectively, they reimbursed the Kokesh Advisers for Controlling Person pay in the amounts of $1,013,575 in 1998, $692,658 in 1999, and $1,629,464 in 2000. *Id.*

17. Third, the proxy statements dramatically understated Kokesh's compensation in

prior years.  Collectively, they listed Kokesh's compensation as $200,783 in 1998, $165,774 in 1999, and $297,219 in 2000.  App. at 4, 86, 141-142, 191, 237.  These figures, however, included only Kokesh payments from TFI, and did not include his payments from TFL. App. at 4.  If the proxy statement had accurately included payments from TFL, Kokesh's compensation would have been listed as $644,091 in 1998, $492,813 in 1999, and $1,164,725 in 2000.  *Id.*

18.     Following the misleading proxy solicitation, the BDC shareholders approved the amendments allowing the BDCs to reimburse Controlling Person salary and fringe benefits. App. at 65, 92, 145, 194.  The Kokesh Advisers then began openly receiving reimbursement for payments to Kokesh.  From 2001 through 2005, the Kokesh advisers took $15,153,257 in reimbursements from the BDCs for salary and fringe-benefits paid to Controlling Persons Kokesh, Bernardoni, Freeman, Giambruno, Starrett, and Ken Stevens, who served as Controller for the Kokesh Advisers after Starrett's departure.  App. at 3, 7-8, 37-38.

19.     But neither Kokesh nor the Kokesh Advisers disclosed to the IGPs any of the Controlling Person reimbursements that had been taken before the 2000 advisory-agreement amendments.  App. at 267, 270-276.  Moreover, after the amendments, they did not disclose to the IGPs any of the reimbursements taken from 2001 through 2005 for any Controlling Person other than Kokesh.  *Id.*; 257-259.  Finally, the BDCs SEC reports did not include disclosure of any Controlling Person payment reimbursements, except those relating to Kokesh.

**F.     The Kokesh Advisers entered advisory agreements providing for illegal performance fees.**

20.     Section 205 of the Advisers Act generally prohibits investment advisers from entering into advisory agreements that provide for compensation based on a share of capital gains upon, or capital appreciation of, a client's assets ("performance fees").  15 U.S.C. § 80b-5. Under Section 205(b)(3) of the Advisers Act, however, an investment adviser may enter into a

contract with a BDC that provides for performance fees if "the compensation provided for in such contract does not exceed 20 per centum of the realized capital gains upon the funds of the business development company, computed net of all realized capital losses and unrealized capital depreciation."  15 U.S.C. §§ 80b-5(b)(3)

21.     Here, the advisory agreements provided that the Kokesh Advisers were entitled to receive 20% of the "Net Profit of the Partnership."  App. at 77, 134, 181-182, 229.  The advisory agreements defined net profit to include "all items of Partnership income and gain."  App. at 73-74, 132,178, 226.  Because the advisory agreements did not exclude unrealized income and unrealized gain from the net-profit definition, they provided for performance fees exceeding limits provided for Section 205(b)(3) of the Advisers Act.

22.     In an application for exemptive relief, the Kokesh Advisers represented to the SEC they would obtain an opinion of counsel that the allocations provided for in the advisory agreements were permissible under Section 205 and Rule 205-3.  App. at 55-56.  But the Kokesh Advisers never obtained such an opinion.

  **G.**  **The Kokesh Advisers Took Bonus Payments from the BDCs that were not listed in the advisory agreements.**

23.     The Kokesh Advisers also received other illegal performance fees from the BDCs, including payments for a profit-sharing plan for employees of the Kokesh Advisers called the Fund Participation Plan ("FPP").  App. at 39-40, 62-63.  The FPP provided for the payment of bonuses from the BDCs if the BDCs performed well.  *Id.*

24.     In addition, from 1998 through 2005, the Kokesh Advisers took money from TFP III, TFP IV, and TFP V to cover more than $8.75 million in bonuses paid to Kokesh, Bernardoni, and the Kokesh Advisers.  App. at 3, 9.  Kokesh personally received at least $4,416,979 of these bonus payments, which were based, at least in part, on the performance of the BDCs.  *Id.*; App.

at 45-46.

25.    These bonus payments, which were not described in the advisory agreements, were taken in addition to the performance fees (that is, the 20% net-profit allocation) provided for in the advisory agreements.  Kokesh testified that, from 1997 forward, Kokesh determined the amount of the bonus payments.  App. at 47-48, 52-53.  Moreover, Kokesh did not disclose the bonus payments to the IGPs.  App. at 260-261, 265-267, 277-280.  Finally, the BDCs SEC reports did not disclose the bonus payments.

III.    **Argument and Authorities**

A.    **The Court should enter summary judgment against Kokesh because no genuine issue of material fact exists.**

1.    **Legal Standard for Summary Judgment**

Summary judgment is appropriate when the pleadings, affidavits, and other supporting papers permitted by Rule 56 of the Federal Rules of Civil Procedure demonstrate that there is no genuine issue of material fact, and the moving party is entitled to prevail as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 (1986).  A genuine issue of material fact exists when, after viewing the record and making all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *Dreiling v. Peugeot Motors of Am., Inc*., 850 F.2d 1373, 1377 (10th Cir. 1988).

Once the moving party has met its initial burden of identifying the absence of a genuine issue of material fact, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  The opposing party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts

showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Anderson*, 477 U.S. at 252, (1986).

Summary judgment is appropriate, "even in cases where elusive concepts such as motive or intent are at issue . . . if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Forsyth* v. *Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) (quoting *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993)). Thus, the element of *scienter* may be appropriately decided on summary judgment. *SEC v. Ficken*, 546 F.3d 45, 51 (1st Cir. 2008); *SEC v. Suman*, 684 F. Supp. 2d 378, 389-90 (S.D.N.Y. 2010) *aff'd*, 2011 U.S. App. LEXIS 9393 (2d Cir. 2011) (granting summary judgment to SEC in insider trading case alleging violation of Exchange Act Section 10(b) and Rule 10b-5).

Where, as here, the government sues under a prophylactic or remedial statute for the vindication of the public interest, summary judgment is an effective tool which enables an enforcement agency with limited resources to police serious violations of the law where no contested, material evidentiary facts exist. *See, e.g., SEC v. Geyser Minerals Corp.*, 452 F.2d 876 (10th Cir. 1971).

2.      **Anti-Fraud Violations:  Kokesh Aided and Abetted Violations of Section 206(1) and 206(2) of the Advisers Act**

An investment adviser is a fiduciary who owes an affirmative duty of utmost good faith and full and fair disclosure of all material facts to clients and prospective clients as well as an affirmative obligation to employ reasonable care to avoid misleading them. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (U.S. 1963). Sections 206(1) and 206(2) of the Advisers Act make it unlawful for an investment adviser (1) to employ any device, scheme, or artifice to defraud any client or prospective client or (2) to engage in any transaction, practice, or

course of business which operates as a fraud or deceit upon any client or prospective client, respectively.  15 U.S.C. § 80b-6 (1) and (2); *Steadman v. SEC*, 603 F.2d 1126, 1134 (5th Cir. 1979).

To establish a violation of 206(1), the SEC must show (1) the violator is an investment adviser; (2) the investment adviser used the mails or interstate commerce to employ a device, scheme, or artifice; (3) the device, scheme, or artifice violated the investment adviser's fiduciary duty by making misleading statements of material fact; and (4) Defendant has acted with *scienter*. *SEC v. Wall Street Pub. Institute, Inc*., 591 F. Supp. 1070, 1083 (D.D.C. 1984).  To establish a violation of Section 206(2), proving scienter is not required.  *Id*.  Showing non-disclosure of material facts suffices.  *Id*.

*Scienter* is established by showing "intentional, knowing, or reckless conduct resulting in the alleged fraud or deceit." *SEC v. Wall Street Publishing Inst., Inc.*, 591 F. Supp. at 1084.  The fraudulent conduct must also concern material facts.  *See Wall Street Publishing Inst.,* 591 F. Supp. at 1084.  A statement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision.  *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

To establish aiding and abetting liability, three elements must be proven: (1) another party has committed a securities law violation; (2) the accused aider and abetter had a general awareness that his role was part of an overall activity that was improper; and (3) the accused aider and abetter knowingly and substantially assisted the principal violation.  *Decker v. Securities & Exchange Com*., 631 F.2d 1380, 1388 (10th Cir. 1980).  The general awareness element may be satisfied by showing reckless conduct.  *Id*. at n. 16.

a.   **The so-called tax distributions violated Section 206 of the Advisers Act**

The Kokesh Advisers violated Section 206 of the Advisers Act.  In 2000, they were investment advisers.  In that year, they took $6,112,797 in payments misclassified as tax distributions from BDCs TFP III, TFP IV, and TFP V, collectively.  By taking the payments without justification, the Kokesh Advisers breached their fiduciary duty to the BDCs.  The Kokesh Advisers omitted to disclose to the BDCs that the tax distributions were not justified under the advisory agreements.

To establish the Kokesh Advisers' violation of Section 206 of the Advisers Act, Kokesh's *scienter* may be imputed to them.  *Steadman v. SEC*, 603 F.2d  at 1134.  Kokesh admitted that he was involved in the decision to make the so-called tax distributions.  And he admitted knowing there was no tax liability justifying TFP III's $2,862,928 distribution to the Kokesh Advisers in 2000.  Despite this knowledge, he signed TFP III's Form 10-K annual report on behalf of the Kokesh Advisers, concealing the illegal payment by misclassifying it as a tax distribution.

Likewise, Kokesh signed TFP IV and TFP V 10-K reports for 2000, falsely stating these BDCs paid tax distributions in 2000 of $1,314,295 and $1,935,574, respectively.  As to the TFP IV and TFP V payments, Kokesh knew, or was reckless in not knowing, that no net profits had been allocated to justify any tax distribution.  Therefore, the Kokesh Advisers violated Section 206 of the Advisers Act.

Kokesh aided and abetted the Kokesh Advisers violations of Section 206 of the Advisers Act.  The Kokesh Advisers' primary violation establishes the first element of aiding and abetting.  Kokesh's knowledge that no tax liability existed establishes the second element.  Finally, he knowingly and substantially assisted the principal violation by participating in the decision to make the distributions and by signing the falsified SEC reports, which establishes the third

element.

### b.   The rent and controlling-person payments violated Section 206 of the Advisers Act.

Second, the Kokesh Advisers violated Section 206 by taking $6,040,298 in reimbursement from the BDCs for salaries and fringe benefits paid to Controlling Persons from 1995 through 2000 in violation of the advisory agreements.  Kokesh signed the advisory agreements.  He knew about the prohibition on such reimbursements.  And he directed the reimbursement process.  Therefore, he knew or was reckless in not knowing that controlling persons' salary and fringe benefits were being reimbursed by the BDCs.  And he signed quarterly and annual reports and other SEC filings on behalf of the Kokesh Advisers that omitted to identify the reimbursements.  The Kokesh Advisers therefore violated Section 206.

Kokesh aided and abetted the Kokesh Advisers violations.  He signed the advisory agreements and SEC filings on behalf of the Kokesh Advisers.  He knew about the prohibition on such reimbursements.  And he directed the reimbursement process.  Therefore, he knew or was reckless in not knowing that controlling persons' salary and fringe benefits were being reimbursed by the BDCs.

### c.   The bonuses to violated Section 206 of the Advisers Act

Third, the Kokesh Advisers violated Section 206 by taking funds from the BDCs to pay bonuses to Kokesh and others.  The advisory agreements did not provide for such payments.  The Kokesh Advisers did not disclose the bonus payments to the BDCs.  Kokesh admitted that he was involved in deciding all bonus payments and that, from 1997 forward, he was the sole decision maker.  He knew or was reckless in not knowing the bonus payments were not provided for in the advisory contracts and not otherwise disclosed to the BDCs.  The BDCs SEC reports omitted to disclose the bonus payments.  By taking the payments without disclosure, the Kokesh

advisers breached their fiduciary duties to the BDCs, violating Section 206.

Kokesh aided and abetted the Kokesh Advisers violations.  As a signatory to the advisory agreements, he knew or was reckless in not knowing they did not provide for bonus payments. And he knew or was reckless in not knowing the bonus payments were not disclosed to the BDCs.  He was involved in deciding all bonus payments and, from 1997 forward, he was the sole decision maker.  Therefore, Kokesh aided and abetted the Kokesh Advisers violations.

### 3.   Proxy Violations:  Kokesh aided and abetted violations of Section 14(a) and Rule 14a-9 of the Exchange Act.

Section 14(a) of the Exchange Act makes it unlawful to solicit any proxy in respect of any security registered pursuant to Section 12 of the Exchange Act in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.  15 U.S.C. §78n.  Exchange Act Rule 14a-9 prohibits the solicitation by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement that, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or that omits to state any material fact necessary in order to make the statement therein not false or misleading or necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.  17 C.F.R. § 240.14a-9

The Kokesh Advisers violated Section 14(a) of the Exchange Act and Rule 14a-9 in the 2000 proxy solicitations to amend the advisory agreements.  The proxy statements were misleading as to material facts.  They falsely stated that Kokesh had been the only Controlling Person under the original terms of the advisory agreements, omitted to disclose that the BDCs

had reimbursed the Kokesh Advisers for compensation received by other Controlling Persons, grossly understated the amount of compensation paid to Kokesh in prior years, and misrepresented the financial impact the amendments would have on the BDCs.  Therefore, the Kokesh Advisers violated Section 14(a) of the Exchange Act and Rule 14a-9.

Kokesh aided and abetted the Kokesh Advisers violations.  He knew or was reckless in not knowing that other Kokesh Advisers personnel were Controlling Persons, that the BDCs had reimbursed for compensation paid to other Controlling Persons, that the proxies grossly understated his prior-year compensation, and that the proxies misrepresented the financial impact the amendments would have on the BDCs.  He provided substantial assistance to the Kokesh Advisers by participating in the drafting of the proxy statements, by signing them, and distributing them.  Therefore, he aided and abetted the Kokesh Advisers' violations.

4.     **Issuer-Reporting Violations:  Kokesh aided and abetted violations of Section 13(a) of the Exchange Act and Rules 13a-1, 13a-13, and 12b-20.**

Section 13(a) of the Exchange Act, and Rules 13a-1 and 13a-13 thereunder, require the filing of annual reports and quarterly reports, respectively.  15 U.S.C. § 78m; 17 C.F.R. §§ 240.13a-1 and 13a-13.  Exchange Act Rule 12b-20 requires that, in addition to information expressly required to be included in a statement or report, there shall be added such further material information as may be required to make the statements, in the light of the circumstances under which they are made, not misleading.  17 C.F.R. § 240.12b-20.  The BDCs were subject to the Exchange Act reporting requirements because they had securities registered under Section 12(g).

Under Section 20(e) of the Exchange Act, any person who knowingly provides substantial assistance to another's violation of any Exchange Act provision or rule thereunder can be liable as an aider and abettor.  *See also SEC v. Fehn*, 97 F.3d 1276, 1288 (9th Cir. 1996)

(noting that Congress effectively adopted language identical to that previously used by federal courts in articulating the elements of aiding and abetting).

The BDCs violated Section 13(a) of the Exchange Act and Rules 13a-1, 13a-13, and 12b-20 by filing annual and quarterly SEC reports that mischaracterized payments to the Kokesh Advisers as tax distributions.  These misleading statements were material, serving to conceal improper payments in 2000 of $2,862,928, $1,314,295, and $1,935,574, from TFP III, TFP IV, and TFP V, respectively, in violation of the advisory agreements.  Because the Kokesh Advisers did not repay the improper payments, they owed the BDCs amounts equal to the improper payments.  The BDCs' reports omitted to disclose the debts owed by the Kokesh Advisers.

Kokesh aided and abetted the BDCs' violations.  He knew or was reckless in not knowing the payments violated the advisory agreements.  And he knew the Kokesh Advisers had not repaid the funds.  Yet he signed the BDCs' reports for each annual and quarterly period from December 31, 2000, through December 31, 2005.

### 5.    Performance-Fee Violations:  Kokesh aided and abetted violations of Section 205 of the Advisers Act.

Section 205(a)(1) of the Advisers Act prohibits investment advisers from entering into advisory contracts that provide for compensation based on a share of capital gains upon, or capital appreciation of, the assets of a client.  15 U.S.C. § 80b-5(a)(1).  Under Section 205(b)(3), however, an investment adviser may enter into an advisory contract with a BDC for a performance-based fee if (1) "the compensation provided for in such contract does not exceed 20 per centum of the realized capital gains upon the funds of the business development company over a specified period or as of definite dates, computed net of all realized capital losses and unrealized capital depreciation; and (2) does not have a profit sharing plan."  15 U.S.C. § 80b-5(a)(3).

Here, the Kokesh Advisers entered advisory agreements provided that they were entitled to receive 20% of the "Net Profit of the Partnership." The advisory agreements defined net profit to include "all items of Partnership income and gain." Because the advisory agreements did not exclude unrealized income and unrealized gain from the net-profit definition, the contract provided for performance fees exceeding limits provided for Section 205(b)(3) of the Advisers Act. Moreover, the FPP served as the profit-sharing plan for each BDC. Because of the BDCs had a profit sharing plan and because of the excessive performance-fee formula, the Kokesh Advisers violated Section 205 of the Advisers Act.

Kokesh aided and abetted the Advisers' violations of the Advisers Act by failing to ensure that the performance-fee structure complied with Section 205(a). Kokesh failed to ensure the Kokesh Advisers obtained an opinion of counsel that the allocations provided for in the advisory agreements were permissible under Section 205 and Rule 205-3. As the managing general partner of TFL and the president of TFI, Kokesh knew or was reckless in not knowing the formula provided for excessive fees and that the legal opinion had not been obtained. Moreover, Kokesh knew the Kokesh Advisers were taking additional performance-based compensation from the BDCs in the form of the FPP program and bonuses. Therefore, he aided and abetted violations of Section 205.

6. **Conversion or Illegal Borrowing: Kokesh violated Section 37 of the Investment Company Act, or in the alternative, Kokesh violated Section 57 of the Investment Company Act.**

Section 37 of the Investment Company Act imposes liability on anyone who steals, unlawfully abstracts, unlawfully and willingly converts to his own use or to the use of another, or embezzles any of the moneys, funds, securities, credits, property, or assets of any registered investment company. 15 U.S.C. § 80a-36. Even though Section 37 is a criminal provision, plaintiffs may also bring claims under it in civil suits. *See Brown v. Bullock*, 294 F.2d 415, 420

(2d Cir. 1961).  A Section 37 conversion claim requires a showing that the defendant converted assets "knowingly and willfully."  *Cambridge Fund, Inc. v. Abella*, 501 F. Supp. 598, 629 (S.D.N.Y. 1980) (citing *Brown v. Bullock*, 294 F.2d  at 419)).  In the context of Section 37, an act is "willful" if it is "done with a bad purpose," "without ground for believing it is lawful," or with careless disregard for "whether or not one has the right so to act."  *Id*.

In 2000, the Kokesh Advisers, then owned and controlled by Kokesh, took $6,112,797 in phony tax distributions from three BDCs combined.  In the case of TFP III, he admitted knowing the payment was not related to any tax liability.  As for the other two, Kokesh had no ground for believing the payments to be lawful.  Indeed, in all three cases, no net profit had been allocated to the Kokesh Advisers, a condition for any tax distribution.  By receiving and retaining the money without justification, Kokesh knowingly and willfully converted assets in violation of Section 37.

In the alternative to Section 37, the Commission alleges Kokesh violated Section 57(a)(3) of the Investment Company Act, which makes it unlawful for any controlling or person related to a BDC to knowingly borrow money or property from such BDC.  15 U.S.C. § 80a-56(a)(3).  Kokesh admitted that a negative balance in the Kokesh Advisers capital account in the BDC financial statements meant the Kokesh Advisers owed the BDC the sum necessary to bring the account back to zero.

Kokesh knew that the Kokesh Advisers took a tax distribution in 2000 when no tax liability existed.  The financial statements for the BDCs clearly showed the capital accounts for the managing general partners were negative.  Kokesh knew he was not entitled to retain these distributions.  Therefore, he borrowed money from the BDCs in violation of Section 57(a)(3).  15 U.S.C. § 80a-56(a)(3).

**B.     The Court should impose the relief sought by the Commission.**

**1.     Permanent injunctions are appropriate.**

Once the district court has found federal securities law violations, it has broad equitable

power to fashion appropriate remedies. *SEC v. First Jersey Sec., Inc*., 101 F.3d 1450, 1474 (2d

Cir. N.Y. 1996). The Court may grant permanent injunctions against future violations of the

securities laws on a motion for summary judgment. *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir.

Cal. 1980); *SEC v. Am. Commodity Exch., Inc*., 546 F.2d 1361, 1365 (10th Cir. 1976); *Geyser

Minerals*, 452 F.2d 876 (10th Cir. 1971). Section 21(d) of the Exchange Act, Section 209(d) of

the Advisers Act and Section 42(d) of the Investment Company Act authorize the Commission to

seek permanent injunctive relief upon a proper showing that a person has engaged or is about to

engage in acts or practices constituting violations of the federal securities laws. 15 U.S.C. §§

78u(d); 80b-9(d); and 80a-41(d). Additionally, Section 20(a) of the Exchange Act and Section

209(d) of the Advisers Act authorize the Commission to file an injunctive action against any

person who aids and abets any violation of any provision of those Acts or any rule or regulation

promulgated thereunder. 15 U.S.C. §§ 78t(a) and 80b-9(d).

In remedial actions such as this case, the Commission appears "not as an ordinary

litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the

securities laws." *SEC v. Management Dynamics, Inc*., 515 F.2d 801, 808 (2d Cir. 1975). Thus,

it has long been established that the Commission, unlike private litigants, is not required to show

risk of irreparable injury or balance of the equities in its favor to make the statutory "proper

showing" for an injunction. *SEC v. Unifund SAL*, 910 F.2d 1028, 1036 (2d Cir. 1990). In order

to make the "proper showing" required by statute, the Commission must establish that there is a

substantial likelihood of future violations. *SEC v. Pros Int'l, Inc*., 994 F.2d 767, 769 (10th Cir.

Utah 1993); Murphy, 626 F.2d at 655.

When determining the likelihood of future violations, the courts should evaluate the totality of the circumstances. *Id.* Foremost among these circumstances is the defendant's past illegal conduct, is highly suggestive of the likelihood of future violations *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975). Past conduct amounting to "systematic wrong doing rather than an isolated occurrence" may be "particularly appropriate" for a permanent injunction. *SEC v. Milan Capital Group, Inc.*, 2000 U.S. Dist. LEXIS 16204 (S.D.N.Y. Nov. 8, 2000). Furthermore, several factors used to determine the likelihood of future violations include "the seriousness of the violation, the degree of scienter, whether the defendant's occupation will present opportunities for future violations, and whether defendant has recognized his wrongful conduct and gives sincere assurances against future violations." *SEC v. Pros Int'l*, 994 F.2d at 769. No single factor is considered dispositive when evaluating the likelihood of a future violation, but the degree of *scienter* does bear heavily on the decision. Id. (citing *SEC v. Haswell*, 654 F.2d 698, 699 (10th Cir. 1981)). It is not necessary that the Commission prove the existence of every one of these factors to establish a proper showing and obtain an injunction. *SEC v. Murphy*, 626 F.2d at 656 (noting that the "factors are not individual prerequisites" to issuance of a permanent injunction by summary judgment).

Applying these factors to Kokesh's violations shows that he deserves permanent injunction. Through the Kokesh Advisers, he carried out an extremely egregious scheme to systematically loot four BDCs from 1995 through 2005. Under his close control, the Kokesh Advisers took reimbursements for rent and Controlling-Person payments, took tax distributions, and took bonus payments—all of which violated the advisory agreements he signed. The illegal payments to the Kokesh Advisers totaled at least $41,064,736. Kokesh signed falsified annual and quarterly reports from 2001 through 2005 in an effort to conceal the tax-distribution scheme. Although Kokesh presently is not associated with an investment adviser, he is presently under no

legal impediment from becoming associated with an investment adviser at any time.  And he has neither recognized his wrongful conduct nor given assurances against future violations.

For these reasons, the Court should impose permanent injunctions against him from violating and Sections 205, 206(1), and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-5, 80b-6(1), and 80b-6(2)]; Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9]; and Section 37 of the Investment Company Act [15 U.S.C. § 80a-36] or, in the alternative, Section 57 of the Investment Company Act [15 U.S.C. § 80a-56]; and from aiding and abetted violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m] and Rules12b-20, 13a-1, and 13a-13, [17 C.F.R. §§ 240.12b-20, 13a-1, and 13a-13] thereunder..

## 2.    The Court should order Kokesh to pay disgorgement.

A disgorgement order is an appropriate equitable remedy for violations of the anti-fraud and securities-registration provisions of the federal securities laws.  *See SEC v. J.T.Wallenbrock*, 440 F.3d 1109, 1113 (9th Cir. 2006); *SEC v. First Pacific Bancorp*,142 F.3d at 1191; *SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993).  In contrast to damages, which are designed to compensate fraud victims, disgorgement is designed to force a defendant to surrender his unjust enrichment, eliminating any incentive for violating the law.  *Rind*, 991 F.2d at 1491, 1493; *First Pacific Bancorp*, 142 F.3d at 1191.  The amount of disgorgement should include all gains flowing from illegal activities.  *See SEC v. Cross Fin. Servs*., 908 F. Supp. 718, 726 (C.D. Cal. 1995).

In calculating disgorgement, the Commission need only show a reasonable approximation of profits causally connected to the violation.  *First Pacific Bancorp*, 142 F.3d at 1192 n.6.  The Commission is not required to trace every dollar of the proceeds or to identify moneys which have been commingled.  *SEC v.Great Lakes Equities, Co.*, 775 F. Supp. 211, 214 at n.21 (E.D. Mich. 1991).  Any uncertainty in the calculation of disgorgement "should fall on

the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Patel*, 61 F.3d 137, 140

(2d Cir. 1995) (citation omitted); *SEC v. First Jersey Secs., Inc.*, 101 F.3d at 1475,

*cert. denied* 522 U.S. 812 (1997). Once the Commission has shown a reasonable approximation

of profits, the burden shifts to the defendant to show that the Commission's proposed

disgorgement is not a reasonable approximation. *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d

1215, 1232 (D.C. Cir. 1989).

 An order of disgorgement should include prejudgment interest to ensure that the

wrongdoer does not profit from the illegal activity. *See SEC v. Manor Nursing Ctrs., Inc.,* 458

F.2d 1082, 1104 (2d Cir. 1972). Ordering prejudgment interest prevents a defendant from

obtaining the benefit of what amounts to an interest free loan on the proceeds of an illegal

activity. *SEC v. Blackwell,* 477 F. Supp. 2d 891, at 913 (S.D. Ohio 2007) (*citing SEC v. Moran,*

944 F. Supp. 286, 295 (S.D.N.Y.1996)). "The calculation of prejudgment interest follows the

delinquent tax rate for unpaid taxes as determined by the Internal Revenue Service, and is

assessed on a quarterly basis." *Id*. (*citing First Jersey,* 101 F.3d at 1476).

 "[W]here two or more individuals or entities collaborate or have a close relationship in

engaging in the violations of the securities laws, they [may be] held jointly and severally liable

for the disgorgement of illegally obtained proceeds." *SEC v. JT Wallenbrock & Assocs.*, 440

F.3d at 1117 (quoting *SEC v. First Pacific Bancorp*, 142 F.3d at 1191). Kokesh is liable for the

ill-gotten gains the Kokesh Advisers received. The Commission has shown that Kokesh and the

Kokesh Advisers violated the securities laws in an egregious scheme exceeding a decade.

Kokesh owned and controlled the Kokesh Advisers throughout that time. Given their

collaboration and close relationship in violating the securities laws, joint-and-several liability for

disgorgement is warranted.

 The Commission has shown that Kokesh orchestrated the Kokesh Advisers scheme to

loot the BDCs.  The Commission has shown that the Kokesh Advisers received $41,064,736  in illegal payments flowing from the violations.  Because Kokesh owned and controlled the Kokesh Advisers, $41,064,736 represents a reasonable approximation of Kokesh's ill-gotten gains. Accordingly, the Commission requests that the Court order Kokesh to disgorge the $41,064,736, plus prejudgment interest of $16,053,507.66 —calculated as of December 31, 2005—for a total of $57,118,243.66.  A pre-judgment interest report is filed herewith, showing the pre-judgment interest calculation.  App. at 283.

### 3.  The Court should order Kokesh to pay a civil money penalty.

Section 21(d) of the Exchange Act, Section 209(e) and (f) of the Advisers Act, and Section 42(e) of the Investment Company Act authorize the Commission to seek civil penalties in district court actions from those persons who have violated any provision of those Acts or have aided and abetted violations of the Exchange Act or the Advisers Act.  15 U.S.C. §§ 78u(d); 80b-9(e) and (f), and 80a-41(e).  The same provisions authorize the Commission to seek, and the Court to impose, a "third-tier" civil money penalty if the defendant's violation (1) "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and (2) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  Under Sections 21(d) of the Exchange Act, 209(e)) of the Advisers Act, and 42(e) of the Investment Company Act, third-tier civil penalties for a natural person shall not exceed the greater of $130,000 (per the inflation adjustment specified by 17 C.F.R. § 201.1003) or the gross amount of pecuniary gain to such defendant as a result of the violation.  15 U.S.C. §§ 78u(d); 80b-9(e), and 80a-41(e).

Because of his egregious scheme and utter disregard of the issuer-reporting and anti-fraud regulatory requirements, Kokesh's misconduct directly and indirectly resulted in investor losses of $41,064,736.  Accordingly, the Commission requests that the Court order Kokesh to pay a

third-tier civil penalty not to exceed his pecuniary gain of $41,064,736 as a result of the

violation.

DATED:  January 25, 2013                     *s/Timothy S. McCole*_____
                                             TIMOTHY S. McCOLE
                                             Mississippi Bar No. 10628
                                             United States Securities and Exchange Commission
                                             Burnett Plaza, Suite 1900
                                             801 Cherry Street, Unit 18
                                             Fort Worth, Texas 76102
                                             Telephone:  (817) 978-6453
                                             FAX:  (817) 978-4927
                                             E-mail:  McColeT@SEC.gov
                                             For Plaintiff

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 25, 2013, I electronically filed the foregoing document with the Clerk of the Court for the District of New Mexico by using the CM/ECF system which will send a notice of electronic filing to the following CM/ECF participants,

Clinton W. Marrs:   cmarrs@smidtlaw.com, melissa@smidtlaw.com
*Counsel for Defendant Charles R. Kokesh*


DATED:  January 25, 2013                    */s/Timothy S. McCole*
                                            Timothy S. McCole