IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.                                  Case No.: 1:09-cv-1021-SMV-WDS

CHARLES R. KOKESH

     Defendant.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT ON PLAINTIFF'S SECOND AND THIRD CLAIMS

Defendant Charles R. Kokesh has moved for summary judgment on plaintiff Securities and Exchange Commission's claims for a permanent injunction, civil monetary penalty, and disgorgement arising from the Second and Third Claims of its complaint [Doc. 1 ¶¶ 3, 25-29, 37-39, 42-44, 54-56].

### STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     Plaintiff's Third Claim contends that four business development companies ("*BDCs*") wrongfully solicited proxies on November 8, 2000. The four BDCs are:

     a.     Technology Funding Medical Partners I, L.P. ("*TFMP-I*");

     b.     Technology Funding Partners III, L.P. ("*TFP-III*");

     c.     Technology Funding Venture Partners IV, An Aggressive Growth Fund, L.P. ("*TFVP-IV*");

     d.     Technology Funding Venture Partners V, An Aggressive Growth Fund, L.P. ("*TFVP-V*").

2.     The four BDCs were organized between 1987 and 1992 as limited partnerships under the Delaware Revised Uniform Limited Partnership Act and elected the status of a "business development company" under § 54 of the Investment Company Act of 1940 [15 U.S.C. § 80a-54]. [DOC. 1 ¶ 13.] [DECLARATION OF CHARLES KOKESH ¶¶ 2, 3, filed concurrently herewith as **Exhibit A**.]

3.     Under the terms of each BDC's limited partnership agreement, from time to time the BDC's limited partners elected three Individual General Partners and two Managing General Partners, Technology Funding, Inc. ("*TFI*") and Technology Funding, Ltd. ("*TFL*"). Each BDC was governed by the three Individual General Partners (in the case of TFVP-V and TFMP-I) or a Management Committee (in the case of TFP-III and TFVP-IV) consisting of the three Individual General Partners and one representative from each of the two Managing General Partners (in the case of TFP-III and TFVP-IV). The Individual General Partners or the Management Committee in turn supervised TFI and TFL in their capacity as Managing General Partners. Subject to the Individual General Partners' or the Management Committee's supervision, the Managing General Partners were responsible for the day-to-day management of the BDC's business and affairs. [KOKESH DECL. ¶ 4.]

4.     Mr. Kokesh was never an Individual General Partner of any of the BDCs. [KOKESH DECL. ¶ 5.]

5.     Each BDC's limited partnership agreement provided that the company would terminate on or before December 31, 2002, subject to the right of the Individual General Partners to extend the term of a partnership. TFMP-I was allowed to terminate as of December 31, 2002; for the remaining three BDCs, the Individual General Partners were authorized to extend the term up to, but not beyond, December 31, 2006. [KOKESH DECL. ¶ 6.]

6.     TFP-III first registered with the SEC as an issuer of securities under the Investment Company Act of 1940 [15 U.S.C. § 80a-8b] when it filed its registration statement in 1986. [KOKESH DECL. ¶ 7.]

7.     TFP-III's limited partnership agreement vested governance of the partnership exclusively in a Management Committee composed of three Individual General Partners, one representative of Technology Funding, Inc., and one representative of Technology Funding, Ltd. [App. at 131.1 (§ 3.01).][1] The Management Committee structure was the result of discussions with the SEC when the company's initial registration statement was filed. The Individual General Partners were intended to function as independent directors of the BDCs. [Deposition of Charles R. Kokesh, In the Matter of Technology Funding, Limited, SEC File No. FW-030440A, taken October 23 and 24, 2007, App. at 27.1, 27.2 (26:18-21, 27:4-8, 11-13, 15-19).][2]

8.     Section 3.04 of the partnership agreement prescribed the scope of the Management Committee's power and authority generally as follows:

> "[T]he Management Committee shall have full, exclusive, and complete discretion in the management and control of the affairs of the Partnership, shall make all decisions affecting Partnership affairs and *shall have all of the rights, powers, and obligations of a general partner of a limited partnership under DRULPA* [i.e., the Delaware Revised Uniform Limited Partnership Act] and otherwise as provided by law. The members of the Management Committee shall provide overall guidance and supervision with respect to the operations of the Partnership, *shall have all of the responsibilities, obligations, and fiduciary duties imposed by the 1940 Act upon directors of a business development company in corporate form*, and shall monitor the activities of Persons in which the

---

[1] The "App." citation cites to the sequentially numbered pages of the SEC's Appendix of documents. To reduce the duplication of exhibits, the Appendix includes documents used by the SEC as well as by Mr. Kokesh in support of their respective motions. To this end, Mr. Kokesh concurred in the Appendix exceeding LR-CV10.5's page limit.

[2] The "App." parenthetical citations identify the cited testimony by the deposition transcript's page and line numbers. A transcript of a deposition taken by the SEC in the course of an administrative investigation may be used as a substitute for an affidavit under Rule 56. SEC v. American Commodity Exch., Inc., 546 F.2d 1361, 1369 (10th Cir. 1976). In using such a transcript in support of his motion for summary judgment, Mr. Kokesh reserves his right to object to the SEC's use at trial of any such transcripts.

Partnership has invested. Except as otherwise expressly provided in this Agreement, the Management Committee is hereby granted the right, power, and authority to do on behalf of the Partnership all things which, in its sole judgment, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership . . . ."

[App. at 131.2 (§ 3.04 (emphasis and bracketed material added).]

9.      Under §§ 3.05(a) and –(b) of the limited partnership agreement, a Managing General Partner was granted "exclusive power and authority" to manage TFP-III's investment portfolios, subject, however, to the Management Committee's supervision. Section 3.05 of the agreement thus provided that "The grant of exclusive power and authority to the Managing General Partners under this Section 3.05 *in no way limits* the rights, powers, or authority of the Management Committee under this Agreement, DRULPA [i.e., the Delaware Revised Uniform Limited Partnership Act], or as otherwise provided by law." [App. at 131.4 (emphasis and bracketed material added.)]

10.      TFP-III's limited partnership agreement provided that the term of the partnership would end on December 31, 2004, subject to the right of the Individual General Partners to extend the term of a partnership to no later than December 31, 2006. The limited partners held a Special Meeting and voted to terminate the partnership on July 7, 2006. [App. at 284-287] TFP-III and its registration with the SEC were terminated. [KOKESH DECL. ¶ 8.]

11.      TFVP-IV first registered with the SEC as an issuer of securities under the Investment Company Act of 1940 when it filed its registration statement in 1987. [KOKESH DECL. ¶ 9.]

12.      The governance structure of TFVP-IV's limited partnership agreement, including §§ 3.01, 3.04, and 3.05, is substantively identical to the governance structure of TFP-III's agreement. [KOKESH DECL. ¶ 10.]

13.     TFVP-IV's limited partnership agreement provided that the term of the partnership would end on December 31, 2002, subject to the right of the Individual General Partners to extend the term of a partnership to no later than December 31, 2005. The partnership agreement was amended October 10, 2002 to allow for termination on December 31, 2006. The limited partners subsequently voted to terminate the partnership on July 7, 2006. [App. at 288-291] TFVP-IV and its registration with the SEC were terminated. [KOKESH DECL. ¶ 11.]

14.     TFVP-V first registered with the SEC as an issuer of securities under the Investment Company Act of 1940 when it filed its registration statement in 1989. [KOKESH DECL. ¶ 12.]

15.     Between 1988, when TFP-IV was organized, and 1990, when TFVP-V was organized, the SEC changed its approach to the management of BDCs organized in partnership form (as opposed to corporate form). For this reason, the "Management Committee" governance structure of TFP-III and TFVP-IV was not incorporated into the limited partnership agreement for TFVP-V. In place of a Management Committee, TFVP-V's partnership agreement vested governance of the partnership entirely in three Individual General Partners, each of whom was required to be a natural person. [App. at 131.1 and 27.3 (29:1-5)] Mr. Kokesh never served as an Individual General Partner. Likewise, no other representative of TFI or TFL served as an Individual General Partner. [KOKESH DECL. ¶ 13.]

16.     Section 3.04 of TFVP-V's limited partnership agreement prescribed the scope of the Individual General Partners' power and authority generally as follows:

> "[T]he Individual General Partners shall have full, exclusive, and complete discretion in the management and control of the affairs of the Partnership, shall make all decisions affecting Partnership affairs and shall provide overall guidance and supervision with respect to the operations of the Partnership, *shall perform the same functions and have the same duties, responsibilities and obligations imposed by the 1940 Act on the directors of business development companies*

*organized in corporate form*, and shall monitor the activities of Persons in which the Partnership has invested. . . . Except as otherwise expressly provided in this Agreement, the Individual General Partners are hereby granted the right, power, and authority to direct the Managing General Partners to do on behalf of the Partnership all things which, in their sole judgment, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership . . . ."

[App. at 226.2 (emphasis added).]

17.     Under §§ 3.05(a) and –(b) of the limited partnership agreement, a Managing General Partner was granted "exclusive power and authority" to manage TFVP-V's investment portfolios, subject, however, to the Individual General Partners' supervision. Section 3.05 of the agreement thus provided that "The grant of exclusive power and authority to the Managing General Partners under this Section 3.05 *in no way limits* the rights, powers, or authority of the Individual General Partners under this Agreement, DRULPA [i.e., the Delaware Revised Uniform Limited Partnership Act], or as otherwise provided by law." [App. at 226.4 (Emphasis and bracketed material added).]

18.     TFVP-V's limited partnership agreement provided that the term of the partnership would end on December 31, 2002, subject to the right of the Individual General Partners to extend the term of a partnership to no later than December 31, 2006. The limited partners subsequently voted to terminate the partnership on July 7, 2006. [App. at 288-291] TFVP-V and its registration with the SEC were terminated. [KOKESH DECL. ¶ 14.]

19.     TFMP-I first registered with the SEC as an issuer of securities under the Investment Company Act of 1940 when it filed its registration statement in 1993. [KOKESH DECL. ¶ 15.]

20.     The governance structure of TFMP-I's limited partnership agreement, including §§ 3.01, 3.04, and 3.05, is materially identical to the governance structure of TFVP-V's agreement. [KOKESH DECL. ¶ 16.]

21.     Pursuant to its limited partnership agreement, TFMP-I's term as a partnership ended December 31, 2002 and in accordance with the provisions of §15.01 of the agreement, TFMP-I was dissolved effective as December 31, 2002. The partnership terminated November 8, 2004. [App. at 296. ] TFMP-I and its registration with the SEC were terminated. [KOKESH DECL. ¶ 17.]

22.     Technology Funding, Inc. ("*TFI*"), a California corporation, was organized in1979 as a successor to business associations originally formed by Mr. Kokesh, Frank R. Pope, and several outside and unaffiliated investors.  At all times material herein, Mr. Kokesh was TFI's president and a member of its board of directors. [KOKESH DECL. ¶ 18.]

23.     On May 11, 1987, TFI registered with the SEC as an investment adviser. Its investment adviser registration terminated on January 9, 2007. [KOKESH DECL. ¶ 19.]

24.     In 1996, TFI formed a wholly-owned subsidiary Technology Funding Capital Corporation ("*TFCC*"), a California corporation with its principal place of business in New Mexico. TFCC provided administrative services to the BDCs pursuant to a written agreement approved unanimously by the BDCs' Independent General Partners. [App. at 22.1, 27.3, 27.4 (15:6-10, 29:12-25, 30:1-9).]

25.     In 1980, Technology Funding, Ltd. ("*TFL*") was organized as a limited partnership under California law. At all times material herein, Mr. Kokesh was TFL's managing general partner. TFI became a wholly-owned subsidiary of TFL in September 1993 when the

shareholders of TFI exchanged shares in TFI for partnership interests in TFL. [KOKESH DECL. ¶ 20.]

26.     On May 11, 1987, TFL registered with the SEC as an investment adviser. Its investment adviser registration terminated on January 9, 2007. [KOKESH DECL. ¶ 21.]

27.     TFL and TFI conducted the day to day operations of the BDCs. Generally TFI and TFL, as Managing General Partners for the BDCs, made recommendations to the BDCs' Individual General Partners or Management Committees for their approval. [App. at 27.3, 34 (29:6-9; 100:4-19).]

28.     Prior to his resignation in 1995, Mr. Pope, in his capacity as Executive Vice President of TFI and General Partner of TFL, was primarily responsible for handling the BDCs' filings with the SEC, including their Forms 8-K, 10-Q, and 10-K. [App. at 30.1, 33.1 (49:21-23, 64:12-23).] Mr. Pope was assisted by John Grady, a securities attorney for the BDCs who was a partner in the Washington, D.C.-based law firm of Morgan, Lewis & Bockius ("*Morgan Lewis*"). After Mr. Pope resigned, his responsibility for handling the BDCs' securities compliance matters passed to a number of TFCC's employees, including TFCC's controller and in-house legal counsel. None of these responsibilities passed to Mr. Kokesh. [KOKESH DECL. ¶ 22.]

29.     Periodically Morgan Lewis sent a team of lawyers to TFI and TFL for purposes of conducting a "spot-audit" of TFI and TFL's conduct of the BDCs business and affairs, including the accounting functions involved with BDCs' reimbursements to TFI and TFL for those companies' expenses. [App. at 33.2, 33.3, 33.4 (73:16-25; 74:1-15; 75:1-4).]

30.     The four BDCs engaged Morgan Lewis as their legal counsel, among other things, for corporate and securities law compliance matters. [KOKESH DECL. ¶ 23; App. at 33.1 (64:12-23).] Morgan Lewis was, and remains, a global law firm with offices in the United States,

Europe, and Asia employing more than a thousand attorneys with a national and international legal practice. [http://www.morganlewis.com, accessed January 23, 2013.]

31.     The four BDCs also engaged the national accounting firm originally known as Peat, Marwick, Mitchell and Co. (and subsequently reorganized and named KPMG Peat Marwick or KPMG LLP) ("*KPMG*") as the companies' independent auditor. KPMG audited the BDCs' financial statements through the period ending December 31, 1999 that accompanied the BDCs' December 31, 2000 Forms 10-K and reviewed the BDCs' Forms 10-Q for the quarterly periods ended March 31, 2000.   [App. at 65.1-65.3, 90.1-90.3, 145.1-145.4, 194.1-194.3; KOKESH DECL. ¶ 24.]

32.     After KPMG's resignation effective September 5, 2000, the BDCs appointed Arthur Andersen LLP ("*Arthur Andersen*") as their independent public accountant. Arthur Andersen audited the BDCs' financial statements accompanying the companies' December 31, 2000 Forms 10-K [App. at 65.1-65.3, 90.1-90.3, 145.1-145.4, 194.1-194.3; KOKESH DECL. ¶ 25.]

33.     Among other Morgan Lewis lawyers, the BDCs relied particularly on the advice of Kathryn B. McGrath, an investment management company attorney who, before joining Morgan Lewis in 1990, served as Director of the SEC's Division of Investment Management and as an Associate General Counsel for the SEC. Ms. McGrath was the Morgan Lewis partner in charge of the engagement. [KOKESH DECL. ¶ 26.]

34.     On or about September 28, 2000, the BDCs' Individual General Partners retained as their independent legal counsel the law firm of Patton Boggs, LLP ("*Patton Boggs*"), a national law firm with extensive experience in securities matters. Patton Boggs did not represent the BDCs, TFI, or TFL. [KOKESH DECL. ¶ 27.]

35.     In reliance on the advice and direction of Morgan Lewis, the Management Committees for TFP-III and TFVP-IV and the Individual General Partners for TFVP-V and TFMP-I directed that drafts of what became the November 8, 2000 proxy statements be filed with the SEC. The first drafts of the proposed proxy solicitation for each BDC, in the form known as a "PRE14A", were submitted to the SEC on or about August 16, 2000. At or about that time the PRE14As were circulated to the BDCs' Individual General Partners and to KPMG for review. At a September 2000 quarterly meeting, the Individual General Partners were provided an update regarding the SEC's comments to Morgan Lewis on the PRE14A filings.  [KOKESH DECL. ¶ 28.]

36.     The financial disclosures in the drafts of what became the November 8, 2000 proxy statements were circulated to Patton Bogg for its own independent review on behalf of its clients—the BDCs' Individual General Partners. Patton Boggs did not communicate any concerns regarding the changes in the form of the proxy solicitation from the August 2000 PRE14A filings to the final November 8, 2000 filing. [KOKESH DECL. ¶ 29.]

37.     Morgan Lewis lawyers acting under the supervision of Ms. McGrath and others at Morgan Lewis prepared the August 2000 draft proxy solicitations and subsequent drafts of the solicitations and submitted these drafts to the SEC for consideration by the reviewing staff of the SEC's Division of Investment Management. The reviewing staff commented on these drafts and Morgan Lewis lawyers responded to the comments. This comment-response process culminated in the SEC's acceptance of the definitive (*i.e.,* final) version of the proxy solicitation, known as a "DEF14A". [KOKESH DECL. ¶ 30.]

38.     The comment-response process concluded in early November 2000 when the SEC's reviewing staff informed Morgan Lewis that it had no further comments and the

Commission had no objection to the BDCs filing the definitive version of the proxy solicitation. Julie Anne Overton, an employee of TFCC, caused the definitive form of the proxy solicitations (*i.e.,* the DEF14As) to be prepared and filed electronically with the SEC from the BDCs' principal place of business in California on November 8, 2000. At this time the definitive proxy solicitations were furnished to the BDCs' Individual General Partners and limited partners. As well as to Patton Boggs and Arthur Andersen. The proxy solicitations were signed electronically by Kokesh under the heading "By order of" the Management Committee or Individual General Partners. [KOKESH DECL. ¶ 31.]

39.     Each of the four November 8, 2000 proxy solicitations notified the limited partners that the companies' partners would meet on December 8, 2000 to consider and vote on a number of proposals, including a proposal known as "Proposal 4". [KOKESH DECL. ¶ 32.]

40.     In each of the four proxy solicitations, the limited partner meeting notice summarized Proposal 4 by stating that the BDCs partnership agreement would be amended:

> "to delete references to 'Controlling Person' in the definition of 'General Partner Overhead' so that the salary and fringe benefits of a Controlling Person of a Managing General Partner directly involved in the carrying out of the business of the Partnership are expenses of the Partnership[.]"

[App. at 83, 138, 187, 233.]

41.     The body of the proxy solicitation included a detailed explanation of Proposal 4, entitled "Increase in Partnership Expenses by Redefining 'General Partner Overhead'". The explanation identified Mr. Kokesh as the only "Controlling Person" for each of the BDCs and stated that the Individual General Partners (in the case of TFVP-V and TFMP-I) and the Management Committee (in the case of TFP-III and TFVP-IV):

> "propose to amend the definition of General Partner Overhead to delete references to 'Controlling Person' so that the Partnership is permitted to pay for the

expertise, time, and management services directly provided to it by a Controlling Person in carrying out the business of the Partnership".

[App. at 86, 141, 191, 237]

Proposal 4's explanation stated further that:

"If the Limited Partners approve this proposed amendment, the Partnership will incur the expenses related to the management of the activities and investments of the Partnership by Mr. Kokesh or any other Controlling Person whose salary and fringe benefits are paid by TFI."

[Id.]

42.     At the December 8, 2000 meeting of the BDCs' limited partners, the Management Committees for TFP-III and TFVP-IV, the Individual General Partners for TFVP-V and TFMP-I, and the limited partners for all four BDCs approved all the proposals, including Proposal 4. [KOKESH DECL. ¶ 33.]

43.     The financial disclosures in the proxy solicitations, including those in connection with Proposal 4, were prepared by the accounting staff of TFCC and circulated for review by the BDCs' Individual General Partners, Patton Boggs, Morgan Lewis, and Arthur Andersen for their independent review. [KOKESH DECL. ¶ 34.]

44.     Mr. Kokesh played no substantive role in preparing the initial proxy filings (the PRE14As) or the November 8, 2000 proxy solicitations (the DEF14As). He had no contact with the SEC's reviewing staff regarding their comments on the drafts of the form of proxy solicitation. He did not direct any of the Morgan Lewis lawyers in preparing replies to the SEC's comments. He did not prepare any of the financial disclosures in the November 8, 2000 proxy solicitations. He did not communicate with the BDCs' Individual General Partners or Patton Boggs or Arthur Andersen regarding their respective reviews of the financial disclosures. [KOKESH DECL. ¶ 35.]

45.     Mr. Kokesh is not a tax expert. [KOKESH DECL. ¶ 36;  App. at 33.5 (84:24).] As the chief executive for TFI and TFL, he relied on the companies' controllers, accounting personnel, and their independent auditors (*e.g.*, KPMG or Arthur Andersen) to ensure that the BDCs' financial transactions and disclosures were correct. To this end, he directed the outside "audit manager and the audit partner" to satisfy themselves "that they had no reservations" about the BDCs' SEC filings that were submitted to him for his signature. His direction included instructing the auditors to ensure that BDC reimbursements to TFI and TFL were handled correctly. KOKESH DECL. ¶ 36; App. at 35.1, 35.2, 36.1, 36.2, 36.3, 37, 43.1, 43.2, 48.1, 48.2, 51.1, 51.2, 51.3, 51.4, 51.5, 51.6, 53.3, 54 (105:12-25; 106:1-3; 132:5-25; 133:1-25; 134:1-25; 135:1-6; 168:5-23; 169:20-25; 195:14-25; 196:1-5; 217:20-25; 218:1-19; 220:3-25; 221:1-25; 222:1-25; 223:1-12; 241:16-25: 242:1-4).]

46.     To Mr. Kokesh's knowledge, prior to December 8, 2000 the BDCs did not reimburse TFI or TFL for the salary that was paid to him and the other control persons of TFI and TFL for prior periods. [App. at 40.1, 42.1, 42.2, 52 (143:8-12; 158:1-22; 159:1-7; 225:2-3, 20-21).] If any portion of his or any other control person's salary was reimbursed, Mr. Kokesh was unaware of it at the time and remains unaware of it today. [App. at 45.1, 48.2, 53.1, 53.2 (189:11; 196:6-23; 229:20-25; 230:1-3); KOKESH DECL. ¶ 37.]

47.     TFP-III, TFVP-IV, and TFVP-V filed their Forms 10-K for the calendar year ended December 31, 2000 on March 30, 2001. The Forms 10-K included the companies' financial statements that had been audited by KPMG in prior years as the companies' independent auditor and by Arthur Andersen for 2000 and later as the companies' independent public accountants. [KOKESH DECL. ¶ 38.]

48.    Mr. Kokesh was not involved in the preparation of the Forms 10-K, but reviewed them. The financial data disclosed in the Forms 10-K was prepared by Arthur Andersen using workpapers prepared by TFCC's accounting staff. Mr. Kokesh did not review this data. [KOKESH DECL. ¶ 39; App. at 56.1, 56.2, 56.3 (252:1-25; 253:1-25; 254:1-2).]

49.    KPMG stated its opinion that the financial statements for TFP-III, TFVP-IV, TFVP-V, and TFMP-I for the calendar years ended December 31, 1998 and December 31, 1999 "present fairly, in all material respects" the companies' "financial position" as of December 31, 1999 and the results of the companies' operations and cash flows for the 1998 and 1999. In support of its opinion, KPMG stated in pertinent part that:

> We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. . . . An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion."

[App. at 65.2-65.3, 90.3, 145.3-145.4, 194.1-194.2]

50.    Arthur Andersen in turn stated its opinion that the financial statements for TFP-III, TFVP-IV, TFVP-V, and TFMP-I for the calendar year ended December 31, 2000 "present fairly, in all material respects" the companies' "financial position" as of December 31, 2000 and the results of the companies' operations and cash flows for the year 2000. Arthur Andersen included a statement virtually identical to KPMG's statement. [App. at 65.1-65.2, 90.2, 145.2-145.3, 194.2-194.3]

51.    The audited financial statements that accompanied the Forms 10-K for the year 2000 included Statements of Partners' Capital. These statements reported "tax distributions" to

14

TFP-III, TFVP-IV, and TFVP-V's General Partners (e.g., TFL and TFI) for 2000 in the total amount of $ 6,112,797.

52.     The distributions and their characterization as "tax distributions" were made on the advice of KPMG for 1998 and 1999 and on the advice of Arthur Andersen for 2000. In Mr. Kokesh's understanding, the distributions were made on an interim basis to satisfy his and TFI or TFL's other principals' quarterly estimated income tax payment obligations under the Internal Revenue Code. [App. at 56.4, 56.5, 56.6, 57 (256:3-7; 259:10-18; 273:5-7; 276:2-4); KOKESH DECL. ¶ 40.]

53.     Mr. Kokesh relied on KPMG and Arthur Andersen to fulfill their respective audit and accounting roles, believed that they in fact had fulfilled these roles, and relied on their opinions that the financial disclosures in the Forms 10-K were accurate and not false or misleading. The distributions would not have been made, and would not have been characterized as tax distributions, without Arthur Andersen's concurrence. KPMG and Arthur Andersen in turn would not have issued their opinions if, in their opinion as independent auditor and public accountant, the distributions or their characterization were false or misleading or otherwise improper. [KOKESH DECL. ¶ 41.]

54.     In the course of winding up the business and affairs of the three BDCs, including the liquidation of their assets and payment of the companies' final expenses, TFI and TFL's capital accounts in respect of each BDC were adjusted. Amounts distributable to TFI and TFL in liquidation were allocated to their capital accounts in order to repay the amounts distributed to them in 1998, 1999, and 2000 as tax distributions. At the end of the winding up process, TFI and TFL still owed TFP-III and TFVP-V approximately $95,000 to $100,000, which was repaid in

cash. [App. at 59.1-59.5 (310:23-25; 314:15-18; 316:19-25; 317:1-13318:15-23); KOKESH DECL. ¶ 42.]

55.     The Forms 10-K for the year ended December 31, 2000 for TFP-III, TFVP-IV, and TFVP-V disclosed that TFI and TFL's year-end capital account balances were negative. These balances would have been negative even in the absence of the tax distributions, as follows:

|  | **TFP-III** | **TFVP-IV** | **TFVP-V** |
|---|---|---|---|
| Negative Capital (Year-End) | ($3,189,411) | ($2,225,520) | ($3,285,924) |
| Tax Distribution | 2,862,928 | 1,314,295 | 1,935,574 |
| Negative Capital Excluding Tax Distribution | ( 326,483) | ( 911,225) | ( 1,350,350) |

[App. at 91, 145.5, 145.6, 146, 146.1, 195, 196.]

56.     Mr. Kokesh is 65 years old. His wife is 56 years old. They have five children, three of whom are in college or high school. Mr. and Mrs. Kokesh are unemployed. Mr. Kokesh and his family reside in a home in Santa Fe that is the subject of mortgage foreclosure proceedings in U.S. Bank N.A. v. Charles R. Kokesh et al., Case No. D-101-cv-2008-02263 (First Judicial Dist. Ct., New Mexico). In 2009 the mortgage foreclosure judgment was entered against them in the amount of $3,900,000. The judgment foreclosed the first priority lien and ordered that the home be sold. After the sale was noticed and postponed a number of times, the home finally sold late in 2009. An order approving the sale and the special master's report of the sale was filed in December 2009. Since that time Mr. Kokesh has attempted (so far without success) to reopen the foreclosure judgment after discovering that evidently the foreclosing plaintiff did not hold the original of the promissory note. During this time Mr. Kokesh and his family occupied the home, but are subject to eviction. Mr. and Mrs. Kokesh have no substantial assets and they are insolvent. [KOKESH DECL. ¶ 43.]

57.     To Mr. Kokesh's knowledge, no limited partner of TFP-III, TFVP-IV, TFVP-V, and TFMP-I ever commenced a state or federal action asserting any securities or other claims against TFI, TFL, or him. [KOKESH DECL. ¶ 44.]

## ARGUMENT

In its headline-grabbing summary of its complaint, the SEC alleges that Mr. Kokesh "systematically misappropriated approximately $45 million" from the four BDCs "by causing the BDCs to pay illegal distributions, performance fees, and expense reimbursements" to TFI and TFL. [DOC. 1 ¶ 1.] It sensationistically alleges he "conceal[ed] the scheme" by causing TFI and TFL "to distribute misleading proxy statements to BDC investors and to file false Commission reports on behalf of the BDCs." [Id.] Sensationalism might suffice for pleading in a complaint, but it cannot survive the burden, under which the SEC labors, to prove that the complaint's allegations are true.

## I.

## THE SECOND AND THIRD CLAIMS ARE BARRED BY THE FIVE-YEAR STATUTE OF LIMITATIONS IN 28 U.S.C. § 2462

The SEC's Third Claim alleges that on or before November 8, 2000 Mr. Kokesh "aided and abetted" the solicitation of proxies in violation of §14(a) of the Securities Exchange Act of 1934 [15 U.S.C. § 78n] and Rule 14a-9 [17 CFR § 240.14a-9]. [DOC. 1 ¶¶ 25-27 and 42-44.] Its Second Claim alleges that he aided and abetted the filing of misleading Forms 10-K and Forms 10Q in violation of §13(a) of the Securities Exchange Act of 1934 [15 U.S.C. § 78m(a)] and Rule 14a-9 [17 CFR §§ 240.12b-20, 240.13a-1, and 240.13a-13]. [DOC. 1 ¶¶ 28, 29 and 37-39.] The SEC contends the proxy solicitations misrepresented the amount of compensation paid to Mr. Kokesh in the years 1998, 1999, and 2000 and that the annual and quarterly reports reported a "phony" $6 million tax distribution allegedly made in 2000. [DOC. 1 ¶ 28.] It seeks an award of

a civil monetary penalty under § 21(d) (3)(B) of the Exchange Act [15 U.S.C. § 78u(d)(3)(B)], disgorgement, and a permanent injunction. [Id. ¶¶ 54-56.]

The Second and Third Claims are barred by 28 U.S.C. § 2462, which provides in pertinent part that an action "for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise" shall not be entertained if the action is commenced after five years from the date when the claim first accrued." The SEC commenced this action on October 27, 2009, or nine years and eleven months *after* the November 8, 2000 proxy solicitations and nine years and six months after the March 31 2001 filing of the December 31, 2000 Forms 10-K.

The amount of the civil monetary penalty for violating §§ 13(a) and 14(a) is either a statutory minimum or the "pecuniary gain" to the violator, whichever is greater. 15 U.S.C. § 78u(d)(3)(B). The SEC has not alleged the amount of pecuniary gain Mr. Kokesh actually received as a result of alleged §§ 13(a) and 14(a) wrongdoing. More to the point, the statute's plain language compels the conclusion that the SEC's October 2009 claim for enforcement of statutory monetary penalties under 15 U.S.C. § 78u(d) is time barred. SEC v. Jones, 476 F.Supp.2d 374, 381 (S.D.N.Y. 2007).

Disgorgement and a permanent injunction can qualify as punitive measures for § 2462. The Tenth Circuit in United States v. Telluride Co., 146 F.3d 1241, 1245 (10th Cir. 1998) held that § 2462's phrase "pecuniary or otherwise" modifies both the terms "penalty" and "forfeiture". Id. Hence, the Tenth Circuit concluded that § 2462 applies to both monetary and *non-monetary* penalties. Id. While generally a claim for equitable relief is distinguished from a claim for a penalty, depending on the circumstances an equitable-relief claim may be in penal in nature, and, therefore, governed by § 2462. A monetary charge and a claim for a permanent injunction are impermissible punitive measures under § 2462 if they are imposed as "a form of

punishment" that "goes beyond remedying" the damage allegedly caused by the defendant. Johnson v. SEC, 87 F.3d 484, 488 (D.C. Cir. 1996). Relying on Johnson, the Tenth Circuit in Telluride held that a § 2462 "penalty" is a "sanction or punishment imposed for violating a public law which goes beyond compensation for the injury caused by the defendant." 146 F.3d at 1246. In Jones, the federal district court relied on Johnson to hold that the limitations period of § 2462 applies to relief that is nominally equitable but in fact does not seek to undo past damage or protect the public from future harm. In these circumstances, when relief neither seeks to undo past damage nor deter future harm, it does not serve as a "remedial measure" and instead "seeks to punish". As such, the relief is punitive and is governed by § 2462. 476 F.Supp.2d at 380-81.

The Johnson court of appeals distinguished a "remedial measure" from a punitive sanction on the basis that a remedial measure is designed to restore the wronged party to the status quo as it existed before the wrong. The Tenth Circuit in Telluride embraced this distinction, holding that a penalty "goes beyond making the plaintiff whole." 146 F.3d at 1246 & n. 6. The dispositive issue under Telluride, therefore, is how to characterize the SEC's demand in the case *sub judice* for disgorgement, where, in view of the undisputed evidence of Mr. Kokesh's present insolvency and meager prospects of recovering from insolvency and the substantial passage of time since the alleged harm was done (e.g., as early as 1995, 1998, 1999, and 2000), there is no possibility of restoring the status quo *ante*.

With the passage of time since the 2000, *e.g.*, the profound changes in the capital markets after the so-called "dotcom" speculative bubble burst in 2000, the ensuing market downturn through 2002, the world-wide economic collapse in and after 2008, and the wrenching collapse of Mr. Kokesh's financial circumstances, no equitable purpose can be served by the SEC first asserting a claim for disgorgement in October 2009 for conduct that it alleges occurred as early

as 1995 and in any event almost ten years prior to its commencement of this action. The investors in the BDCs, who can be counted on to police their own interests, never sued Mr. Kokesh. Mr. Kokesh is now unemployed. His home has been foreclosed. He is insolvent. Given the impossibility of restoring the status quo ante—that is, of making the allegedly injured parties "whole" (who, it bears noting, have never asserted any claims)—and given that there is no reasonable prospect of future harm, the SEC's demands for disgorgement and a permanent injunction serve only to penalize Mr. Kokesh.

The Court in the case *sub judice* should follow the lead of the D.C. Circuit Court of Appeals in <u>Johnson</u> by considering the crushing financial consequences to Mr. Kokesh of ordering disgorgement of money allegedly paid to him in 1998, 1999, and 2000 and by examining whether there is any evidence demonstrating a likelihood of recurrence. Mr. Kokesh already faces the financial burden of insolvency. Suffocating him under a pile of additional millions of dollars in uncollectible debt can serve no equitable purpose; it can serve only a punitive purpose.  In these circumstances, disgorgement of gains allegedly received over a decade ago or a permanent injunction based on allegations over a decade old in substance could be nothing other than punitive in nature, and consequently, barred under § 2462.

To make a prima facie showing of the risk of likely recurrence in connection with a disgorgement claim, the SEC must "go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence." <u>SEC v. Commonwealth Chem. Sec., Inc.</u>, 574 F.2d 90, 99 (2d Cir. 1978). In <u>Commonwealth Chemical</u>, the Second Circuit identified several factors relevant to the evaluation of a defendant's likelihood or not of committing future wrongs. These factors weigh in Mr. Kokesh's favor. In the first place, the SEC has not alleged primary liability. The SEC alleges instead that Mr. Kokesh acted secondarily as an aider and abettor. Scienter, or

the specific intent to deceive, has not been pled as an element of the SEC's claims. Hence, within the scope of the SEC's own allegations, Mr. Kokesh's alleged culpability falls on the lowest end of the scale. Secondly, because of his age and insolvency, and the dramatic and bearish changes in the capital markets, there is no realistic basis to expect future violations by Mr. Kokesh. Thus, no equitable purpose can be served by crushing him even further underfoot by an order of impossible disgorgement. The SEC's demand for disgorgement of money Mr. Kokesh allegedly received between nine and eleven years (e.g., in 1998, 1999, and 2000) before it brought suit in 2009 is tantamount to a demand for payment of a penalty.

## II.

### THERE IS NO ADMISSIBLE EVIDENCE THAT MR. KOKESH AIDED AND ABETTED THE ALLEGEDLY WRONGFUL PROXY SOLICITATIONS OR PERIODIC REPORTS

The SEC alleges that the BDCs' November 8, 2000 proxy solicitations and their annual and quarterly reports were "false and misleading" and that Mr. Kokesh aided and abetted the solicitations by "knowingly or recklessly" giving "substantial assistance" to the BDCs in the making of the solicitations and in filing the reports. [DOC. 1 ¶¶ 25-27, 37-39, 42-44.]

To establish aider-and-abettor liability, the SEC is required to prove (1) the BDCs' "primary violation" of §§ 13 and 14, (2) Mr. Kokesh's knowledge of the primary violations, and (3) Mr. Kokesh's "substantial assistance" of the BDCs in their primary violations. Anixter v. Home-Stake Production, 77 F.3d 1215, 1225 (10th Cir. 1996); First Interstate Bk. of Denver, N.A. v. Pring, 969 F.2d 891 (10th Cir. 1992), rev'd on other grounds sub nom. Central Bank v. First Interstate Bank, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

Even assuming that one or more of the BDCs violated §§ 13 or 14 by soliciting their limited partners' proxies or filing the periodic reports based on material misrepresentations, the

SEC cannot carry its burden of proving that Mr. Kokesh knew of the misrepresentations or that he substantially assisted the BDCs' primary violations. The power to control the BDCs was vested in their own Management Committees and Individual General Partners. Mr. Kokesh never served as an Individual General Partner and never held a majority of voting power on a Management Committee. There is no evidence to support the SEC's allegation [Doc. 1 ¶ 25] that Mr. Kokesh distributed "a proxy statement to BDC investors in 2000." In fact, the SEC admits that "the BDCs solicited" the proxies and filed the periodic reports. [Doc. 1 ¶¶ 37, 42.] The BDCs retained national securities law counsel. These lawyers shepherded the proxy solicitations and reports through the SEC's review and comment process and, in conjunction with the BDCs' management teams, they guided the distribution of the solicitations to the BDCs' limited partners. The financial statements accompanying the BDCs' Forms 10-K were audited and reviewed by independent auditors and independent public accountants—KPMG and Arthur Andersen, respectively. Even if the SEC's allegations that the proxy solicitations and reports misrepresented various facts were taken as true for purposes of this motion, there is no evidence that Mr. Kokesh knew or recklessly disregarded that the facts had been misrepresented. There is no evidence that he assisted anyone who made the misrepresentations. While it is true, as the SEC alleges [Doc. 1 ¶ 25] that Mr. Kokesh signed the proxy solicitations, his signature does not signify knowledge of the alleged misrepresentations, and, without more, his signature does not amount to "substantial assistance". The undisputed evidence shows that Mr. Kokesh did not prepare the filings or participate in the SEC's review and comment process. In short, there is no admissible evidence that Mr. Kokesh knew of the alleged misrepresentations or that he substantially assisted the BDCs in making the misrepresentations. Consequently, he is not liable as an aider and abettor.

With respect to its allegation that Mr. Kokesh aided and abetted TFP-III, TFVP-IV, and TFVP-V's filing of a "false and misleading" 2000 Form 10-K, the SEC contends the tax distributions of "approximately $6 million" were "phony" because "there was no taxable event to warrant such payments" and "no tax liabilities to justify such payments". [DOC. 1 ¶¶ 21, 28, 29.] Assuming *arguendo* that, in the SEC's words, "there was no taxable event to warrant" the payments, the SEC today faces the insurmountable burden of proving that Mr. Kokesh (1) knew in 2000 that the distributions were "phony" and that "there was no taxable event to warrant" the distributions and (2) substantially assisted TFP-III, TFVP-IV, and TFVP-V in making the so-called "phony" distributions. The Court may take judicial notice of the Forms 10-K for the purpose of determining what statements the documents contain. Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1278 (11th Cir. 1999). The audited financial statements characterized the distributions as "tax distributions". The Forms 10-K for the year 2000 included the statements by KPMG and Arthur Andersen that, in their opinion, the financial statements, including the Statements of Partners' Capital, "presented fairly, in all material respects" the BDCs' financial position. The evidence is undisputed that Mr. Kokesh relied on KPMG and Arthur Andersen to fulfill their audit and accounting roles, believed that they in fact had fulfilled these roles, and relied on their opinions accompanying the Forms 10-K. There is no evidence that Mr. Kokesh knew or had reason to know that there was "no taxable event to warrant" the characterization of the distributions as "tax distributions".

In an attempt to bootstrap its tax-distribution allegations into future years, the SEC contends that the companies' quarterly and annual reports through December 31, 2006 disclosed a negative balance in TFL and TFI's capital account, but did not disclose that "this negative balance was caused by a phony tax distribution" and that the negative balance "constituted a debt

owed by parties related to the BDCs." [Doc. 1 ¶ 29.] Notably, the SEC does not allege that the subsequent reports were false; instead, it alleges only that the disclosures were "misleading". [Id.] Absent any reason to question KPMG and Arthur Andersen's characterization of the distributions as tax distributions, Mr. Kokesh did not know that the subsequent reports, in the SEC's words, "did not disclose that this negative balance was caused by a phony tax distribution" and did not substantially assist with the alleged non-disclosure. In short, he is not subject to aider-and-abettor liability under the Second or Third Claims.

Moreover, the SEC overlooks that fact that as a result of other accounting adjustments (*e.g.*, net realized losses and net decreases in unrealized appreciation), TFI and TFL's year-end capital account balances would have been negative even in the absence of tax distributions. These negative capital account balances for 2000 would have ranged from ($326,483) for TFP-III to ($1,350,350) for TFVP-V. Absent any competent evidence that the increases in the negative account balances resulting from the tax distributions were material, the SEC cannot sustain its burden of showing that, in the first instance, the BDCs filed "false and misleading" annual and quarterly reports. Without proof of a primary violation, the SEC cannot make a prima facie showing of aider-and-abettor liability.

**III.**

**THERE IS NO ADMISSIBLE EVIDENCE THAT
MR. KOKESH MISAPPROPRIATED $45 MILLION**

The SEC alleges that Mr. Kokesh misappropriated "approximately $45 million" from the four BDCs. [Doc. 1 ¶ 1.] The allegation is preposterous—Mr. Kokesh categorically denies that he received $45 million. Although its complaint is not a model of clarity, it is clear that the SEC itself does *not* really mean that the BDCs actually paid this money to him. Instead, the SEC alleges that the money was paid to TFL and TFI. It alleges that TFL and TFI received this money

(a) as rent and for salary, and fringe benefits for an unspecified number of "Controlling Persons" "between 1995 and 2000" and "in 2000 and 2002", (b) as distributions to cover tax liabilities "[f]rom 1995 through 1999" and in 2000, and (c) as "performance fees" and bonuses for TFL and TFI's "employees" and "other officers" "from 2000 to 2005". [DOC. 1 ¶¶ 18-24.] In essence, the SEC seeks to impute to Mr. Kokesh *individually* the gross amount of money the BDCs allegedly paid to TFL and TFI between 1995 and 2005 without any allegation of the amount, if any, that TFL or TFI in turn paid to Mr. Kokesh and without any allegation of when anything was paid to him individually. Leaving aside that amounts allegedly paid as long ago as 1995 are immaterial to a claim for civil penalties because of the time-bar, the SEC suffers from the additional problem that it has no admissible evidence (1) of the amounts each BDC paid to TFL and TFI and when each such amount was paid to TFL and TFI, (2) of the amounts TFL or TFI paid to Mr. Kokesh and when such amounts were paid to him, and (3) what amounts were paid to him in connection with the alleged §§ 13(a) and 14(a) violations. Absent this proof, the SEC cannot demonstrate how much money should be disgorged on the basis of the alleged §§ 13(a) and 14(a) violations. It cannot demonstrate the amounts or dates of Mr. Kokesh's alleged pecuniary gain arising from these alleged violations. The Court and Mr. Kokesh should not be left to speculate. It follows, then, that the SEC's disgorgement and monetary penalty claims of the basis of alleged §§ 13(a) and 14(a) violations must be denied.

## IV.

### THERE IS NO WARRANT FOR INJUNCTIVE RELIEF

The SEC also seeks an order permanently enjoining Mr. Kokesh "from any more violations" of §§ 13(a) and 14(a). [DOC. 1 ¶¶ 3, 54.] The purpose of injunctive relief is not to punish a defendant, but to deter him from violating the securities laws in the future. SEC v.

Bonastia, 614 F.2d 908, 912 (3rd Cir. 1980). For this reason, a permanent injunction is not permitted absent the SEC's showing that there is "a reasonable and substantial likelihood" that Mr. Kokesh, if not enjoined, will violate §§ 13(a) or 14(a) in the future. SEC v. Pros Intern., Inc., 994 F.2d 767, 769 (10th Cir. 1993). In gauging the "reasonable and substantial likelihood" of future violations, a Court considers such factors as the seriousness of the securities violations that the SEC proves, the degree of scienter involved, and whether the defendant's occupation and other circumstances suggest opportunities for future violations. Id. Although no single factor is dispositive, the degree of scienter "bears heavily" on the decision whether future violations are so likely that a permanent injunction should issue. SEC v. Haswell, 654 F.2d 698, 699 (10th Cir. 1981). "Essentially, a court makes a prediction of the likelihood of future violations based on an assessment of the totality of the circumstances surrounding the particular defendant and the past violations that were committed." Bonastia, 614 F.2d at 912.

For the reasons shown above, these factors do not warrant a permanent injunction. In the first place, the SEC's own allegations demonstrate that the alleged violations are exceedingly technical. There is no admissible evidence that the BDCs knowingly violated §§ 13(a) or 14(a), still less that Mr. Kokesh knew of the alleged violations or that he substantially assisted the violations. The SEC might argue that Mr. Kokesh was negligent in discharging his duties as a control person of TFI and TFL, but there is no scienter. Secondly, Mr. Kokesh's changed circumstances and the new market realities today are relevant to the Court's evaluation of the likelihood of future violations. Bonastia, 614 F.2d at 912. In view of these circumstances, there is no "reasonable and substantial" likelihood that Mr. Kokesh will ever be in a position of violating §§ 13(a) or 14(a) in the future. Pros Intern., 994 F.2d at 769 (affirming district court's denial of SEC's claim for injunctive relief, noting that although the defendant's "actions were clearly

negligent, and probably reckless, there has been no showing that [he] intended to defraud investors"). Indeed, the evidence demonstrates the *improbability* of any such violations occurring in the future.

Respectfully submitted,

TAX ESTATE & BUSINESS LAW, LTD.

By   /s/  Clinton W. Marrs
　　　Clinton W. Marrs
　　　4811-A Hardware Dr, NE, Suite 4
　　　Albuquerque, NM 87109
　　　Telephone: (505) 830-2200
　　　*Attorneys for Charles R. Kokesh*

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2013, I electronically filed the foregoing document with the Clerk of the Court for the District of New Mexico, Santa Fe Division, by using the CM/ECF system which will send a notice of electronic filing to the following CM/ECF participants:

Timothy S. McCole
United States Securities and Exchange Comm'n
Email: McColeT@SEC.gov

Clinton W. Marrs: cmarrs@smidtlaw.com,
*Counsel for Defendant Charles R. Kokesh*