## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**SECURITIES AND EXCHANGE COMMISSION,**

       **Plaintiff,**

v.                                         **No. 09-cv-1021 SMV/LAM**

**CHARLES R. KOKESH,**

       **Defendant.**

## FIRST AMENDED PRETRIAL ORDER

THIS MATTER is before the Court pursuant to Fed. R. Civ. P. 16.  The parties conferred and submit the following Pretrial Order.

## I.  APPEARANCES

Attorneys who will try this action:

For Plaintiff:                 Timothy S. McCole
                                 Mississippi Bar No. 10628
                                 United States Securities and Exchange Commission
                                 Burnett Plaza, Suite 1900
                                 801 Cherry Street, Unit 18
                                 Fort Worth, Texas 76102
                                 Telephone:   (817) 978-6453
                                 Fax:         (817) 978-4927
                                 E-mail:     McColeT@SEC.gov

For Defendant:               Clinton W. Marrs
                                   New Mexico Bar No. 4637
                                 Tax Estate & Business Law, Ltd.
                                 4811-A Hardware Dr, NE, Suite 4
                                 Albuquerque, NM 87109
                                 Telephone:   (505) 830-2200
                                 Fax:         (505) 830-4400
                                 E-mail:     cmarrs@smidtlaw.com

## II.  JURISDICTION AND RELIEF SOUGHT

**A.**     **Subject Matter Jurisdiction.**

    **1.**     **Was this action removed or transferred from another forum?** ___ Yes _X_ No

    **2.**     **Is subject matter jurisdiction of this Court contested?**

  _X___ Uncontested _____ Contested _____ Party contesting

    **3.**     **Asserted basis for jurisdiction.**

  ___X___ Federal Question _____ Diversity _____ Other

Statutory Provision(s) Invoked:  Sections 37, 42, 44, and 57 of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. §§ 80a-36, 80a-41, 80a-43, 80a-56]; Sections 13(a), 14(a), 21(d), 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78m, 78n, 78u(d), and 78aa] and Rules 12b-20, 13a-1, 13a-13, and 14a-9 thereunder [17 C.F.R. §§ 240.12b-20, 13a-1, 13a-13, and 14a-9]; and Sections 205, 206(1), 206(2), 209(d), and 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-5, 80b-6(1), 80b-6(2), 80b-9(d), and 80b-14].

**B.**     **Personal Jurisdiction and Venue.**

    **1.**     **Is personal jurisdiction contested?**

  _X___ Uncontested _____ Contested

    **2.**     **Is venue contested?**

  _X___ Uncontested _____ Contested _____ Party Contesting

**C.**     **Are the proper parties before the Court?**

  ___X___ Uncontested _____ Contested

**D.      Identify the affirmative relief sought in this action.**

1.      Plaintiff seeks a final judgment against Defendant Kokesh:

a.      Permanently enjoining him from violating Section 37 of the Investment Company [15 U.S.C. § 80a-36] or, in the alternative, Section 57 of the Investment Company Act [15 U.S.C. § 80a-56], and from aiding and abetting violations of Sections 13(a) and 14(a) of the Exchange Act [15 U.S.C. §§ 78m and 78n] and Rules12b-20, 13a-1, 13a-13, and 14a-9 [17 C.F.R. §§ 240.12b-20, 13a-1, 13a-13, and 14a-9] thereunder and Sections 205, 206(1), and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-5, 80b-6(1), and 80b-6(2)];

b.      Ordering him to disgorge an amount equal to the funds and benefits he obtained illegally, or to which he is otherwise not entitled, as a result of the foregoing violations, plus prejudgment interest on that amount;

c.      Ordering him to pay civil monetary penalties in an amount determined appropriate by the Court under Section 42(e) of the Investment Company Act [15 U.S.C. §80a-41(e)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] for the foregoing violations; and

d.       Ordering him subject to all equitable, ancillary, and other relief deemed just and proper by the Court.

2.      Defendant seeks a final judgment against Plaintiff Securities and Exchange Commission:

a.      Dismissing the complaint with prejudice;

b.      Awarding him costs and attorney's fees to the extent permitted by law;

c.      Granting him all equitable, ancillary, and other relief deemed just and proper by the Court.

### III.  BRIEF DESCRIPTION OF NATURE OF CLAIMS/DEFENSES

**A.  Plaintiff's claims:**

From at least 1995 through July 2007, Kokesh misappropriated approximately $45 million from four Commission-registered business-development companies ("BDCs")—Technology Funding Medical Partners I ("P1"); Technology Funding Partners III, L.P. ("P3"); Technology Funding Partners IV, L.P ("P4"); and Technology Funding Partners V, L.P. ("P5"). Kokesh controlled two now-defunct Commission-registered investment-adviser firms, Technology Funding Ltd. ("TFL") and Technology Funding, Inc. ("TFI") (collectively, the "Kokesh Advisers"), which, in turn, controlled and provided investment advice to the BDCs pursuant to advisory contracts.  Acting by and through TFL and TFI, Kokesh misappropriated the funds by causing the BDCs to pay distributions, performance fees, and expense reimbursements to TFL and TFI in violation of the advisory contracts.  To conceal the scheme, Kokesh caused TFL and TFI to distribute misleading proxy statements to BDC investors and to file false Commission reports on behalf of the BDCs.

**B.  Defendant's defenses:**

Mr. Kokesh did not misappropriate any money from the BDCs. Neither TFL nor TFI controlled the BDCs. TFL and TFI furnished investment advice to the BDCs pursuant to advisory contracts and managed their day-to-day affairs, subject to the BDCs' Individual General Partners (in the case of P1 and P5) or Management Committees (in the case of P3 and P4), which retained full, exclusive, and complete discretion in the management and control of the BDC's affairs.  Mr. Kokesh never served as an Individual General Partner of any of the BDCs. No other representative of TFI or TFL ever served as an Individual General Partner. Neither Mr. Kokesh,

TFI, nor TFL ever held or controlled any majority voting power on the Management Committees.

Mr. Kokesh did not cause, and did not have the power or authority to cause, the BDCs to pay distributions, performance fees, and expense reimbursements to TFL and TFI in violation of the advisory contracts. TFI and TFL made recommendations to the BDCs Individual General Partners or Management Committees for approval, and in each instance the Individual General Partners and Management Committees possessed the exclusive power and authority to accept or reject the recommendations.

Mr. Kokesh did not aid or abet any alleged violation by the BDCs of the securities laws and did not himself violate any such laws.  He had no contemporaneous knowledge of any violations by the BDCs of their reporting and proxy solicitation obligations and, in any event, did not furnish any substantial assistance with any such alleged violations. The four BDCs engaged a nationally ranked law firm based in Washington, D.C. to serve as their legal counsel for corporate and securities law compliance matters.  The BDCs also engaged KPMG LLP and Arthur Andersen LLP, nationally ranked accounting firms, to serve as their independent public accounts and independent auditors.  Additionally, the BDCs' Individual General Partners retained a nationally ranked law firm in Washington, D.C. to serve as their independent legal counsel. The BDCs' independent lawyers drafted the proxy solicitations and periodic reports at issue in this action. Mr. Kokesh did not play any substantive role in preparing the proxy solicitations and periodic reports, but electronically signed them at the direction of the Individual General Partners and Management Committees.  When he did so, he relied on the opinions of the BDCs' and Individual General Partners' lawyers that the proxy solicitations were proper and the

written opinions of KPMG and Arthur Andersen that the proxy solicitations accurately presented the companies' financial position in all material respects.

All the claims asserted against Mr. Kokesh, based on conduct that allegedly occurred as long ago as 1995, including the claims for a civil monetary penalty and disgorgement, are barred by the five-year statute of limitations in 28 U.S.C. § 2462.  In view of Mr. Kokesh's insolvency, meager prospects for a financial recovery, the substantial passage of time since 1995, no equitable purpose can be served by plaintiff's assertion of a disgorgement claim.  The amount claimed by plaintiff for disgorgement is grossly overstated, and consequently barred, because it includes money that was allegedly paid to TFI and TFL, but in any event was never paid to him. Consequently, in substance the disgorgement claim is punitive and, consequently, time barred. The time bar is not tolled by the doctrine of fraudulent concealment because Mr. Kokesh took no steps beyond the allegedly wrongful activity itself to conceal his activity from plaintiff.

## IV.  FACTUAL CONTENTIONS UNDERLYING CLAIMS/DEFENSES

**A.**     **Stipulated Factual Contentions.**

The parties agree to the following facts listed separately below:

### The Business Development Companies

1.     Four limited partnerships were organized between 1987 and 1992.  These four limited partnerships are:

    a.     Technology Funding Medical Partners I, L.P. ("P1");

    b.     Technology Funding Partners III, L.P. ("P3");

    c.     Technology Funding Venture Partners IV, An Aggressive Growth Fund, L.P. ("P4");

        d.        Technology Funding Venture Partners V, An Aggressive Growth Fund, L.P. ("P5").

2.        Each of the BDCs registered a class of securities with plaintiff pursuant to Section 12 of the Securities Exchange Act of 1934.  Between June 1987 and May 1995, P1, P3, P4, and P5 made public securities offerings, raising $7,929,744, $40,000,000, $39,994,896, and $40,000,000, respectively, from approximately 21,000 investors throughout the United States. The BDCs invested primarily in private start-up companies involved in technology, biotechnology, and medical diagnostics.

3.        The four limited partnerships were organized under the Delaware Revised Uniform Limited Partnership Act and elected the status of a "business development company" ("BDC") under § 54 of the Investment Company Act of 1940 [15 U.S.C. § 80a-54].

4.        Each BDC was governed by a written limited-partnership agreement.  Each limited-partnership agreement described how TFL and TFI were to be compensated for their services, specifying the distributions they could receive, the fees they could earn, and the expenses they could be reimbursed from the BDC.

5.        Under the terms of each BDC's limited-partnership agreement, from time to time the BDC's limited partners elected three Individual General Partners and two Managing General Partners, TFL and TFI.  Each BDC was governed by the three Individual General Partners (in the case of P5 and P1) or a Management Committee (in the case of P3 and P4) consisting of the three Individual General Partners and one representative from each of the two Managing General Partners (in the case of P3 and P4).  The Individual General Partners or the Management Committee in turn supervised TFI and TFL in their capacity as Managing General Partners. Subject to the Individual General Partners' or the Management Committee's supervision, the

Managing General Partners were responsible for the day-to-day management of the BDC's business and affairs.

6. Mr. Kokesh was never an Individual General Partner of any of the BDCs.

7. The limited-partnership agreement for P1, P4, and P5 provided that the company would terminate on or before December 31, 2002, subject to the right of the Individual General Partners to extend the term of a partnership. The limited partnership agreement for P3 provided that it would terminate in 1994, unless the term of the partnership was extended. The P1 was allowed to terminate as of December 31, 2002; for the remaining three BDCs, the Individual General Partners were authorized to extend the term up to, but not beyond, December 31, 2006.

8. P3's limited-partnership agreement vested governance of the partnership exclusively in a five-member Management Committee. Each Management Committee was composed of three Individual General Partners, one representative of Technology Funding, Inc., and one representative of Technology Funding, Ltd. The Individual General Partners were intended to function as independent directors of the BDCs.

9. Section 3.04 of the P3 partnership agreement prescribed the scope of the Management Committee's power and authority generally as follows:

> "[T]he Management Committee shall have full, exclusive, and complete discretion in the management and control of the affairs of the Partnership, shall make all decisions affecting Partnership affairs and shall have all of the rights, powers, and obligations of a general partner of a limited partnership under DRULPA [i.e., the Delaware Revised Uniform Limited Partnership Act] and otherwise as provided by law. The members of the Management Committee shall provide overall guidance and supervision with respect to the operations of the Partnership, shall have all of the responsibilities, obligations, and fiduciary duties imposed by the 1940 Act upon directors of a business development company in corporate form, and shall monitor the activities of Persons in which the Partnership has invested. Except as otherwise expressly provided in this Agreement, the Management Committee is hereby granted the right, power, and authority to do on behalf of the Partnership all things which, in its sole judgment, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership . . . ."

10. Under §§ 3.05(a) and –(b) of P3's limited-partnership agreement, the Managing General Partners were granted "exclusive power and authority" to manage P3's investment

portfolios, subject, however, to the Management Committee's supervision.  Section 3.05 of the agreement thus provided that "The grant of exclusive power and authority to the Managing General Partners under this Section 3.05 in no way limits the rights, powers, or authority of the Management Committee under this Agreement, DRULPA [i.e., the Delaware Revised Uniform Limited Partnership Act], or as otherwise provided by law."

11.    P3's limited-partnership agreement provided that the term of the partnership would end on December 31, 2004, subject to the right of the Individual General Partners to extend the term of a partnership to no later than December 31, 2006.  The limited partners held a Special Meeting and voted to terminate the partnership on July 7, 2006.

12.    The governance structure of P4's limited partnership agreement, including §§ 3.01, 3.04, and 3.05, is substantively identical to the governance structure of P3's agreement.

13.    The "Management Committee" governance structure of P3 and P4 was not incorporated into the limited partnership agreement for P5.  In place of a Management Committee, P5's partnership agreement vested governance of the partnership entirely in three Individual General Partners, each of whom was required to be a natural person.  Mr. Kokesh never served as an Individual General Partner.  Likewise, no other representative of TFI or TFL served as an Individual General Partner.

14.    Section 3.04 of P5's limited-partnership agreement prescribed the scope of the Individual General Partners' power and authority generally as follows:

"[T]he Individual General Partners shall have full, exclusive, and complete discretion in the management and control of the affairs of the Partnership, shall make all decisions affecting Partnership affairs and shall provide overall guidance and supervision with respect to the operations of the Partnership, shall perform the same functions and have the same duties, responsibilities and obligations imposed by the 1940 Act on the directors of business development companies organized in corporate form, and shall monitor the activities of Persons in which the Partnership has invested. . . . Except as otherwise expressly provided in this Agreement, the Individual General Partners are hereby granted the right, power, and authority to direct the Managing General Partners to do on behalf of the Partnership all things which, in their sole judgment, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership . . . ."

15.     Under §§ 3.05(a) and –(b) of the limited-partnership agreement, a Managing General Partner was granted "exclusive power and authority" to manage P5's investment portfolios, subject, however, to the Individual General Partners' supervision.  Section 3.05 of the agreement thus provided that "The grant of exclusive power and authority to the Managing General Partners under this Section 3.05 in no way limits the rights, powers, or authority of the Individual General Partners under this Agreement, DRULPA [i.e., the Delaware Revised Uniform Limited Partnership Act], or as otherwise provided by law."

16.     P5's limited-partnership agreement provided that the term of the partnership would end on December 31, 2002, subject to the right of the Individual General Partners to extend the term of a partnership to no later than December 31, 2006.  The limited partners subsequently voted to terminate the partnership on July 7, 2006.

17.     The governance structure of P1's limited-partnership agreement, including §§ 3.01, 3.04, and 3.05, is materially identical to the governance structure of P5's agreement.

18.     Pursuant to its limited-partnership agreement, P1's term as a partnership ended December 31, 2002 and in accordance with the provisions of §15.01 of the agreement, P1 was dissolved effective as December 31, 2002.  The partnership terminated November 8, 2004.

19.     The four BDCs engaged the national accounting firm originally known as Peat, Marwick, Mitchell and Co. (and subsequently reorganized and named KPMG Peat Marwick or KPMG LLP) ("KPMG") as the companies' independent auditor.  KPMG audited the BDCs' financial statements through the period ending December 31, 1999 that accompanied the BDCs' December 31, 2000 Forms 10-K and reviewed the BDCs' Forms 10-Q for the quarterly periods ended March 31, 2000.

20.     After KPMG's resignation effective September 5, 2000, the BDCs appointed Arthur Andersen LLP ("*Arthur Andersen*") as their independent public accountant.   Arthur Andersen audited the BDCs' financial statements accompanying the companies' December 31, 2000 Forms 10-K.

21.     On or about September 28, 2000, the BDCs' Individual General Partners retained as their independent legal counsel the law firm of Patton Boggs, LLP ("Patton Boggs"), a national law firm with extensive experience in securities matters.   Patton Boggs did not represent the BDCs, Technology Funding, Inc., or Technology Funding, Ltd.

**The Investment Advisers**

22.     TFI, a California corporation, was organized in 1979 as a successor to business associations originally formed by Mr. Kokesh, Frank R. Pope, and several outside and unaffiliated investors.   Mr. Kokesh owned at least 25% of TFL in 1987.   His ownership interest in TFL gradually increased so that, by 2001, he owned at least 75% of TFL.   At all times material herein, Mr. Kokesh was TFI's president and a member of its board of directors.   On May 11, 1987, TFI registered with plaintiff as an investment adviser.   Its investment adviser registration terminated on January 9, 2007.

23.     In 1996, TFI formed a wholly-owned subsidiary Technology Funding Capital Corporation ("TFCC"), a California corporation with its principal place of business in New Mexico.   TFCC provided administrative services to the BDCs pursuant to a written agreement approved unanimously by the BDCs' Independent General Partners.

24.     In 1980, Technology Funding, Ltd. ("TFL") was organized as a limited partnership under California law.   At all times material herein, Mr. Kokesh was TFL's general partner.   TFI became a wholly-owned subsidiary of TFL in September 1993 when the

shareholders of TFI exchanged shares in TFI for partnership interests in TFL.  On May 11, 1987, TFL registered with the SEC as an investment adviser.  Its investment adviser registration terminated on January 9, 2007.

25.    Subject to the Management Committees' and Individual General Partners' supervision and control, TFL and TFI (a) conducted the day-to-day operations of the BDCs and (b) made recommendations regarding the BDC's venture capital investment portfolio for the Management Committees and Individual General Partners' approval.

### The 2000 Tax Distribution

26.    Section 9.01 of the BDCs' limited-partnership agreements provided the terms for the distribution of funds to the BDCs' investors, TFL, and TFI.  Under Section 9.02 of the limited-partnership agreements, the BDCs were permitted to distribute funds to TFL, TFI, and investors to meet the tax liability on any net profits allocated to them from the BDC.

27.    P3, P4, and P5 filed their Forms 10-K with plaintiff for the calendar year ended December 31, 2000, on March 30, 2001.  The Forms 10-K included the companies' financial statements that had been audited by KPMG in prior years as the companies' independent auditor and by Arthur Andersen for 2000 and later as the companies' independent public accountants.

28.    KPMG stated its opinion that the financial statements for P3, P4, P5, and P1 for the calendar years ended December 31, 1998 and December 31, 1999 "present fairly, in all material respects" the companies' "financial position" as of December 31, 1999 and the results of the companies' operations and cash flows for the 1998 and 1999.  In support of its opinion, KPMG stated in pertinent part that:

> We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. . . .  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audit provides a reasonable basis for our opinion."

29.     Arthur Andersen in turn stated its opinion that the financial statements for P3, P4, P5, and P1 for the calendar year ended December 31, 2000 "present fairly, in all material respects" the companies' "financial position" as of December 31, 2000 and the results of the companies' operations and cash flows for the year 2000.  Arthur Andersen included a statement virtually identical to KPMG's statement.

30.     The audited financial statements that accompanied the Forms 10-K for the year 2000 included Statements of Partners' Capital.  These statements reported "tax distributions" to P3, P4, and P5's General Partners (e.g., TFL and TFI) for 2000 in the total amount of $ 6,112,797.

**Proxy Statements**

31.      The first drafts of the November 8, 2000 proxy solicitation for each BDC, in the form known as a "PRE14A," were submitted to the SEC on or about August 16, 2000.

32.     Julie Anne Overton, an employee of TFCC, caused the definitive form of the proxy solicitations (*i.e.,* the DEF14As) to be prepared and filed electronically with the SEC from the BDCs' principal place of business in California on November 8, 2000.  At this time the definitive proxy solicitations were furnished to the BDCs' Individual General Partners and limited partners.  The proxy solicitations were signed electronically by Kokesh under the heading "By order of" the Management Committee or Individual General Partners.

33.     Each of the four November 8, 2000 proxy solicitations notified the limited partners that the companies' partners would meet on December 8, 2000 to consider and vote on a number of proposals, including a proposal known as "Proposal 4".

34.     In each of the four proxy solicitations, the limited partner meeting notice summarized Proposal 4 by stating that the BDCs partnership agreement would be amended:

"to delete references to 'Controlling Person' in the definition of 'General Partner Overhead' so that the salary and fringe benefits of a Controlling Person of a Managing General Partner directly involved in the carrying out of the business of the Partnership are expenses of the Partnership[.]"

35.     The body of the proxy solicitation included a detailed explanation of Proposal 4, entitled "Increase in Partnership Expenses by Redefining 'General Partner Overhead.'"  The explanation identified Mr. Kokesh as the only "Controlling Person" for each of the BDCs and stated that the Individual General Partners (in the case of P5 and P1) and the Management Committee (in the case of P3 and P4):

"propose to amend the definition of General Partner Overhead to delete references to 'Controlling Person' so that the Partnership is permitted to pay for the expertise, time, and management services directly provided to it by a Controlling Person in carrying out the business of the Partnership".

36.     Proposal 4's explanation stated further that:

"If the Limited Partners approve this proposed amendment, the Partnership will incur the expenses related to the management of the activities and investments of the Partnership by Mr. Kokesh or any other Controlling Person whose salary and fringe benefits are paid by TFI."

## B.     Contested Material Facts.

### 1.     <u>Plaintiff's Contentions</u>:

### The Investment Advisers and Business Development Companies

1.     TFL was registered with the Commission as an investment adviser from May 11, 1987, to January 9, 2007.  Kokesh owned at least 25% of TFL in 1987.  His ownership interest in TFL gradually increased so that, by 2001, he owned at least than 75% of TFL.  TFI was registered with the Commission as an investment adviser from May 11, 1987, to January 3, 2007.  TFI was a wholly-owned subsidiary of TFL.  Kokesh served as the managing general partner of TFL and as the president, CEO, CFO, and chairman of TFI—and exercised control over them—throughout their existence as registered investment advisers.

2.     In the 1980s and 1990s, Kokesh and others formed four other limited partnerships—Technology Funding Medical Partners I, L.P. ("P1"); Technology Funding Partners III, L.P. ("P3"); Technology Funding Venture Partners IV, An Aggressive Growth

Fund, L.P. ("P4"), and Technology Funding Venture Partners V, An Aggressive Growth Fund, L.P. ("P5").  TFL and TFI served as the managing general partners of each of the limited partnerships.

3.     Each of these limited partnerships registered a class of securities with the Commission pursuant to Section 12 of the Securities Exchange Act of 1934.  Each of the limited partnerships elected to be regulated by the SEC as a business-development company ("BDC") under the Investment Company Act of 1940.  From June 1987 through May 1995, P1, P3, P4, and P5 made public securities offerings, raising $7,929,744, $40,000,000, $39,994,896, and $40,000,000, respectively, from approximately 21,000 investors throughout the United States.

4.     TFL and TFI served as investment advisers to the BDCs, which invested primarily in private start-up companies involved in technology, biotechnology, and medical diagnostics.  Each BDC was governed by a limited-partnership agreement between TFL and TFI on the one hand, who served as managing general partners, and the limited partners on the other hand, who were the investors.  Each limited-partnership agreement described how TFL and TFI were to be compensated for their services, specifying the distributions they could receive, the fees they could earn, and the expenses they could be reimbursed from the BDC.

5.     As to each BDC, TFL and TFI were responsible for:  (i) management of the BDC; (ii) making all decisions regarding the BDC's venture capital investment portfolio; (iii) negotiation and structuring of investments in portfolio companies; (iv) oversight of the portfolio companies including providing, or arranging for the provision of, managerial assistance to portfolio companies; and (v) day-to-day administration of BDC affairs.

6.     P1 and P5 each had a supervisory body consisting of three "independent general partners" ("IGPs"), who performed the various duties imposed on boards of directors of BDCs

by the Investment Company Act of 1940.  TFL and TFI carried out their responsibilities to P1 and P5 subject to the supervision of the three IGPs.

       7.     P3 and P5 each had a supervisory body consisting of a five-member management committee.  Each management committee was made up of three IGPs, one TFL representative, and one TFI representative.  TFL and TFI carried out their responsibilities to P3 and P5 subject to the supervision of a management committee.

### The 2000 Tax Distribution

       8.     Each limited-partnership agreement provided in Section 9.01 that the BDC was required to pay 99% of any distribution to investors and 1% to TFL and TFI until investors received a complete return of their initial investment.  Thereafter, TFL and TFI were entitled to receive up to 20% of distributions, with the balance to investors.  Under Section 9.02 of each advisory agreement, the BDC was permitted to distribute funds to TFL and TFI and investors to meet the tax liability on any net profits allocated to them from the BDC.

       9.     In the first half of 2000, P3, P4, and P5 paid distributions of $2,862,928, $1,314,295, and $1,935,574, respectively, to TFL and TFI, for a total of $6,112,797.  TFL and TFI paid a very small portion of the $6,112,797 to Peter Bernardoni and paid the rest to Kokesh. The BDCs paid no corresponding distributions to investors and allocated no net profits in 2000.

       10.     On March 30, 2001, P3, P4, and P5, filed Form 10-K annual reports with the SEC containing financial statements identifying the $6,112,797 in payments to TFL and TFI as tax distributions.  Kokesh signed each 10-K on March 30, 2001, before filing.

       11.     As he signed the 10-Ks, Kokesh knew that P3, P4, and P5 had allocated no net profits in 2000.  He knew that the BDCs paid no corresponding distributions to investors.  And he knew that neither he nor any other TFL or TFI principal had incurred any actual tax liability

on net profits corresponding to the tax distributions that TFL and TFI received from the BDCs in 2000.  Kokesh did not use the money he received from the tax distribution to make quarterly estimated income-tax payments.

12.     Kokesh knew or was reckless in not knowing that the statements in the Form 10-K reports identifying the payments as tax distributions were false.  He knew that the Form 10-K reports omitted to disclose that, in fact, no corresponding tax liability had been incurred, that no net profit had been allocated, that TFL and TFI owed the BDCs $6,112,797 as a result of the improper tax distribution, and that TFL and TFI had not re-paid the BDCs.  These omitted facts were material and were necessary to make the statements made in the Form 10-K reports regarding the tax distribution not misleading.

13.     Kokesh signed Form 10-Q quarterly reports filed with the Commission on behalf of P3, P4, and P5 in 2001 and Form 10-K annual reports for 2001 and 2002.  These reports likewise identified the payments in 2000 as tax distributions.  Kokesh knew or was reckless in not knowing that the statements in the Form 10-Q reports identifying the payments as tax distributions were false and that the reports otherwise omitted to disclose that no corresponding tax liability had been incurred, that no net profit had been allocated, that TFL and TFI owed the BDCs $6,112,797 as a result of the improper tax distribution, and that TFL and TFI had not re-paid the BDCs.  These omitted facts were material and were necessary to make the statements made in the Form 10-q reports regarding the tax distribution not misleading.

14.     In each of the 2002 Form 10-K annual reports, Kokesh certified that he had reviewed them, that, based upon his knowledge, they did not contain untrue or misleading statements as to material facts, and that they "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods

presented in this annual report."  Kokesh knew or was reckless in not knowing that his certifications were false.  He knew that no tax liability existed even before he signed the first annual report in 2001.  Therefore, he knew or was reckless in not knowing that the payments were, in reality, not tax distributions.

15.     In each Form 10-K report filed by P3, P4, and P5 for each annual period from January 1, 2000, through December 31, 2005—each of which Kokesh signed—the financial statements reflected a negative capital account for the general partners (i.e., TFL and TFI).  The negative capital account signified the amount of money that TFL and TFI owed to the BDC money to bring the capital-account balance back to zero.  As Kokesh knew or was reckless in not knowing, the reports did not disclose that the negative amount in the TFL and TFI capital accounts was caused, at least in part, by the 2000 tax distributions to TFL and TFI.  As Kokesh knew or was reckless in not knowing, they further did not disclose that TFL, TFI, Kokesh, or any other TFL or TFI principal had incurred any actual tax liability on net profits corresponding to the tax distributions that TFL and TFI received from the BDCs in 2000.

**Prohibited Reimbursements**

16.     Each BDC limited-partnership agreement prohibited TFL and TFI from receiving reimbursement from the BDC for "rent" or for "salaries and fringe benefits incurred by or allocated to any Controlling Persons."  "Controlling Person" was defined in the advisory agreements as "[a]ny person, whatever his or her title, who performs functions for the Managing General Partners or their Affiliates similar to those of the chairman or member of the board of directors; executive management, such as a president, executive vice president or senior vice president, corporate secretary, or treasurer; or who holds a 5% or more equity interest in the Managing General Partners or their Affiliates or a Person having the power to direct or cause the

direction of the Managing General Partners or their Affiliates, whether through the ownership of voting securities, by contract, or otherwise."

17.     Kokesh knew or was reckless in not knowing the contractual prohibitions on rent and controlling-person salary and fringe-benefit reimbursements.  Kokesh directed TFL and TFI to take reimbursements from the BDCs for rent and for controlling-person salaries and fringe benefits.  As a result Kokesh's actions, TFL and TFI breached their fiduciary duty to the BDCs by taking payments from the BDCs not provided for in the limited-partnership agreements.

### Rent Reimbursements

18.     From 1995 through 2005, TFL and TFI took $5,007,441 from P1, P3, P4, and P5, combined, in reimbursement for office-rent payments that TFL and TFI made in this period. Because of the contractual exclusion prohibiting such reimbursements, TFL and TFI received the payments in violation of the advisory agreements.  Kokesh directed TFL and TFI to take these reimbursements.  By his actions, TFL and TFI breached their fiduciary duty to the BDCs by taking payments from the BDCs not provided for in the limited-partnership agreements.

### Controlling-Person Salary and Fringe-Benefits Reimbursements

19.     From 1995 through 2000, TFL and TFI took $6,040,298 from the BDCs in reimbursement for salaries and fringe benefits paid to Kokesh, Frank Pope, Gregory George, Charles Freeman, Deborah Giambruno, Peter Bernardoni, Thomas Toy, and Jane Starrett. Kokesh, Pope, and George were Controlling Persons.  Freeman and Giambruno were also Controlling Persons because they were the Treasurer and Secretary, respectively, of TFI.

20.     In addition, Bernardoni, Toy, and Starrett, were Controlling Persons.  Bernardoni and Toy were vice-presidents and executive officers of TFI and partners of TFL and "affiliated persons of TFI and/or TFL" and listed among the TFI and TFL's "key personnel."  From 2000 to

2002, Starrett she served as a TFI corporate officer, holding the title "Controller" and having the authority to sign TFI tax returns and represent TFI before the BDCs' management-committee and IGP meetings.

21.     Kokesh directed TFL and TFI to take these reimbursements.  By his actions, TFL and TFI breached their fiduciary duty to the BDCs by taking undisclosed payments from the BDCs not provided for in the limited-partnership agreements.

**Proxy Statements**

22.     In November 2000, Kokesh directed the distribution of a proxy statement to investors on behalf of each BDC's management committee or IGP panel.  Kokesh signed each proxy statement.  Each proxy statement contained a proposal to amend the limited-partnership agreement to include controlling-person salaries and fringe benefits as BDC expenses.  Each proxy statement provided that the proposed amendment would result in additional expense reimbursements from the BDC to TFL and TFI.  But each proxy statement grossly misrepresented the extent of the changes and the potential financial impact on the BDCs.

23.     Each proxy statement said that, since January 1, 1998, Kokesh had been the only "controlling person" under the original terms of the agreements.  In reality, before the proxy statements, the Controlling Persons included Kokesh, Pope, George, Freeman, Giambruno, Bernardoni, Toy, and Starrett.  Second, each proxy statement omitted to disclose that, in 1998, 1999, and 2000, the BDCs had reimbursed TFL and TFI for compensation paid to these controlling persons, including $593,952 to reimburse TFL and TFI for compensation paid to Kokesh in 2000.  Collectively, they reimbursed TFL and TFI for Controlling Person pay in the amounts of $1,013,575 in 1998, $692,658 in 1999, and $1,629,464 in 2000.

24.     Third, the proxy statements dramatically understated Kokesh's compensation in prior years.  Collectively, they listed Kokesh's salary and fringe-benefit payments as $200,783 in 1998 and $165,774 in 1999 and provided an estimate that Kokesh's salary and fringe-benefit payments in 2000 would be $297,219.  These figures, however, included only Kokesh payments from TFI, and did not include his payments from TFL.  If the proxy statements had accurately included Kokesh's salary and fringe-benefit payments from TFL, then Kokesh's compensation would have been listed as $644,091 in 1998, and $492,813 in 1999.  Kokesh's actual salary and fringe-benefit payments from TFL and TFI in 2000 totaled $1,164,725.  The proxy under-estimated Kokesh's actual payments by $867,506.  Kokesh knew or was reckless in not knowing these misrepresentations when he signed the proxies.

25.     Following the misleading proxy solicitations, the amendments were approved, allowing the BDCs to reimburse Controlling Person salary and fringe benefits.  The proxy solicitations and the resulting amendments were invalid, however, because the proxy statements were misleading.  From 2001 through 2005, TFL and TFI took $15,153,257 under the invalid amendments in reimbursements from the BDCs for salary and fringe benefits paid to Controlling Persons Kokesh, Bernardoni, Freeman, Giambruno, Starrett, and Ken Stevens, who served as Controller for TFL and TFI after Starrett's departure.  Of the $15,153,257, Kokesh received $8,830,973.

26.     Neither Kokesh nor TFL and TFI disclosed to the IGPs that TFL and TFI had received reimbursement for salary and fringe-benefit payments to Controlling Persons before the 2000 amendment.  Moreover, after the amendments, they did not disclose to the IGPs any of the reimbursements taken from 2001 through 2005 for any Controlling Person other than Kokesh.  By omitting these disclosures, TFL and TFI breached their fiduciary duties to the BDCs.  Kokesh

was aware of this breach of fiduciary duty and aided and abetted it by failing to disclose the
omitted facts.  Finally, the BDCs SEC reports did not include disclosure of any Controlling
Person payment reimbursements, except those relating to Kokesh.

**Performance Fees**

27.     Section 205 of the Advisers Act generally prohibits investment advisers from
entering into advisory agreements that provide for compensation based on a share of capital
gains upon, or capital appreciation of, a client's assets ("performance fees").  15 U.S.C. § 80b-5.
Under Section 205(b)(3) of the Advisers Act, however, an investment adviser may enter into a
contract with a BDC that provides for performance fees if "the compensation provided for in
such contract does not exceed 20 per centum of the realized capital gains upon the funds of the
business development company, computed net of all realized capital losses and unrealized capital
depreciation."  15 U.S.C. §§ 80b-5(b)(3)

28.     Here, the advisory agreements provided that TFL and TFI were entitled to receive
20% of the "Net Profit of the Partnership."  The advisory agreements defined net profit to
include "all items of Partnership income and gain."  Because the advisory agreements did not
exclude unrealized income and unrealized gain from the net-profit definition, they provided for
performance fees exceeding limits provided for Section 205(b)(3) of the Advisers Act.

29.     In an application for exemptive relief, TFL and TFI represented to the SEC that
they would obtain an opinion of counsel that the allocations provided for in the advisory
agreements were permissible under Section 205 and Rule 205-3.  TFL and TFI never obtained
such an opinion.  As the most senior officer of TFL and TFI, Kokesh knew or was reckless in not
knowing that TFL and TFI promised but did not obtain the opinion.  He was also knowingly or

recklessly caused TFL and TFI to enter the agreements containing the illegal performance-fee provisions.

**TFL and TFI Took Bonus Payments from the BDCs that were not listed in the advisory agreements.**

30.     From 1998 through 2005, TFL and TFI took money from P3, P4, and P5 to cover more than $8.75 million in bonuses paid to Kokesh, Bernardoni, and TFL and TFI.  Kokesh determined the amount of the bonus payments, decided when to take the bonuses, and personally received at least $4,416,979 of the payments.  The limited partnership agreements did not mention bonuses as a component of TFL and TFI's compensation or otherwise as a reimbursable expense payable by the BDCs, a fact Kokesh knew or was reckless in not knowing.  Kokesh did not disclose to the IGPs that the bonus payments were reimbursed by the BDCs.

31.     The BDCs' SEC reports, which Kokesh signed, did not disclose these bonus payments.  Kokesh knew or was reckless in not knowing that the bonus reimbursements were not disclosed to the IGPs or described in the BDCs' SEC reports.  As a result of Kokesh's actions related to these bonuses, TFL and TFI breached their fiduciary duty to the BDCs.

2.     **Defendant's Contentions:**     Mr. Kokesh contends the following statements of fact are true:

1.     The Management Committee structure for P3 and P4 was the result of discussions with the SEC when the company's initial registration statement was filed.

2.     Between 1988, when P4 was organized, and 1990, when P5 was organized, the SEC changed its approach to the management of BDCs organized in partnership form (as opposed to corporate form).

3.     Prior to his resignation in 1995, Mr. Pope, in his capacity as Executive Vice President of TFI and General Partner of TFL, was primarily responsible for handling the

BDCs' filings with the SEC, including their Forms 8-K, 10-Q, and 10-K. Mr. Pope was assisted by John Grady, a securities attorney for the BDCs who was a partner in the Washington, D.C.-based law firm of Morgan, Lewis & Bockius ("*Morgan Lewis*"). After Mr. Pope resigned, his responsibility for handling the BDCs' securities compliance matters passed to a number of TFCC's employees, including TFCC's controller and in-house legal counsel. None of these responsibilities passed to Mr. Kokesh.

4.   Periodically Morgan Lewis sent a team of lawyers to TFI and TFL for purposes of conducting a "spot-audit" of TFI and TFL's conduct of the BDCs business and affairs, including the accounting functions involved with BDCs' reimbursements to TFI and TFL for those companies' expenses.

5.   The four BDCs engaged Morgan Lewis as their legal counsel, among other things, for corporate and securities law compliance matters. [KOKESH DECL. ¶ 23; App. at 33.1 (64:12-23).] Morgan Lewis was, and remains, a global law firm with offices in the United States, Europe, and Asia employing more than a thousand attorneys with a national and international legal practice.

6.   Among other Morgan Lewis lawyers, the BDCs relied particularly on the advice of Kathryn B. McGrath, an investment management company attorney who, before joining Morgan Lewis in 1990, served as Director of the SEC's Division of Investment Management and as an Associate General Counsel for the SEC. Ms. McGrath was the Morgan Lewis partner in charge of the engagement.

7.   In reliance on the advice and direction of Morgan Lewis, the Management Committees for P3 and P4 and the Individual General Partners for P5 and P1 directed that drafts of the proposed proxy solicitation for each BDF, in the "PRE14A" form, be filed with plaintiff.

8.     At or about that time the PRE14As were circulated to the BDCs' Individual General Partners and to KPMG for review. At a September 2000 quarterly meeting, the Individual General Partners were provided an update regarding the SEC's comments to Morgan Lewis on the PRE14A filings.

9.     The financial disclosures in the drafts of what became the November 8, 2000 proxy statements were circulated to Patton Bogg for its own independent review on behalf of its clients—the BDCs' Individual General Partners. Patton Boggs did not communicate any concerns regarding the changes in the form of the proxy solicitation from the August 2000 PRE14A filings to the final November 8, 2000 filing.

10.     Morgan Lewis lawyers acting under the supervision of Ms. McGrath and others at Morgan Lewis prepared the August 2000 draft proxy solicitations and subsequent drafts of the solicitations and submitted these drafts to the SEC for consideration by the reviewing staff of the SEC's Division of Investment Management. The reviewing staff commented on these drafts and Morgan Lewis lawyers responded to the comments. This comment-response process culminated in the SEC's acceptance of the definitive (*i.e.,* final) version of the proxy solicitation, known as a "DEF14A".

11.     The comment-response process concluded in early November 2000 when the SEC's reviewing staff informed Morgan Lewis that it had no further comments and the Commission had no objection to the BDCs filing the definitive version of the proxy solicitation.

12.     The definitive form of the proxy solicitations (*i.e.*, the DEF14As) that were filed electronically with plaintiff on November 8, 2000 were furnished to Patton Boggs and Arthur Andersen at this same time.

13.     At the December 8, 2000 meeting of the BDCs' limited partners, the Management Committees for P3 and P4, the Individual General Partners for P5 and P1, and the limited partners for all four BDCs approved all the proposals, including Proposal 4.

14.     The financial disclosures in the proxy solicitations, including those in connection with Proposal 4, were prepared by the accounting staff of TFCC and circulated for review by the BDCs' Individual General Partners, Patton Boggs, Morgan Lewis, and Arthur Andersen for their independent review.

15.     Mr. Kokesh played no substantive role in preparing the initial proxy filings (the PRE14As) or the November 8, 2000 proxy solicitations (the DEF14As). He had no contact with the SEC's reviewing staff regarding their comments on the drafts of the form of proxy solicitation. He did not direct any of the Morgan Lewis lawyers in preparing replies to the SEC's comments. He did not prepare any of the financial disclosures in the November 8, 2000 proxy solicitations. He did not communicate with the BDCs' Individual General Partners or Patton Boggs or Arthur Andersen regarding their respective reviews of the financial disclosures.

37.     Mr. Kokesh is not a tax expert. As the chief executive for TFI and TFL, he relied on the companies' controllers, accounting personnel, and their independent auditors (*e.g.*, KPMG or Arthur Andersen) to ensure that the BDCs' financial transactions and disclosures were correct. To this end, he directed the outside "audit manager and the audit partner" to satisfy themselves "that they had no reservations" about the BDCs' SEC filings that were submitted to him for his signature. His direction included instructing the auditors to ensure that BDC reimbursements to TFI and TFL were handled correctly.

38.     To Mr. Kokesh's knowledge, prior to December 8, 2000 the BDCs did not reimburse TFI or TFL for the salary that was paid to him and the other control persons of TFI and TFL for prior periods. If any portion of his or any other control person's salary was reimbursed, Mr. Kokesh was unaware of it at the time and remains unaware of it today.

39.     Mr. Kokesh was not involved in the preparation of the Forms 10-K, but reviewed them. The financial data disclosed in the Forms 10-K was prepared by Arthur Andersen using workpapers prepared by TFCC's accounting staff. Mr. Kokesh did not review this data.

40.     The distributions in 2000 by P3, P4, and P5 and their characterization as "tax distributions" were made on the advice of KPMG for 1998 and 1999 and on the advice of Arthur Andersen for 2000. In Mr. Kokesh's understanding, the distributions were made on an interim basis to satisfy his and TFI or TFL's other principals' quarterly estimated income tax payment obligations under the Internal Revenue Code.

41.     Mr. Kokesh relied on KPMG and Arthur Andersen to fulfill their respective audit and accounting roles, believed that they in fact had fulfilled these roles, and relied on their opinions that the financial disclosures in the Forms 10-K were accurate and not false or misleading. The distributions would not have been made, and would not have been characterized as tax distributions, without Arthur Andersen's concurrence. KPMG and Arthur Andersen in turn would not have issued their opinions if, in their opinion as independent auditor and public accountant, the distributions or their characterization were false or misleading or otherwise improper.

42.     In the course of winding up the business and affairs of the three BDCs, including the liquidation of their assets and payment of the companies' final expenses, TFI and TFL's capital accounts in respect of each BDC were adjusted. Amounts distributable to TFI and TFL in liquidation were allocated to their capital accounts in order to repay the amounts distributed to them in 1998, 1999, and 2000 as tax distributions. At the end of the winding up process, TFI and TFL still owed P3 and P5 approximately $95,000 to $100,000, which was repaid in cash.

43.     The Forms 10-K for the year ended December 31, 2000 for P3, P4, and P5 disclosed that TFI and TFL's year-end capital account balances were negative. These balances would have been negative even in the absence of the tax distributions, as follows:

|                                          | **P3**        | **P4**        | **P5**        |
|------------------------------------------|---------------|---------------|---------------|
| Negative Capital (Year-End)              | ($3,189,411)  | ($2,225,520)  | ($3,285,924)  |
| Tax Distribution                         | 2,862,928     | 1,314,295     | 1,935,574     |
| Negative Capital Excluding Tax Distribution | ( 326,483) | ( 911,225)    | ( 1,350,350)  |

44.     No limited partner of P3, P4, P5, and P1 ever commenced a state or federal action asserting any securities or other claims against TFI, TFL, or Mr. Kokesh.

## V.  APPLICABLE LAW

**A.**      **Do the parties agree which law controls the action?**

   __X__ Yes  (as indicated below)      __X___ No (as indicated below)

**If yes, identify the applicable law:**        Sections 42, 44, and 57of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. §§ 80a-41, 80a-43, 80a-56]; Sections 13(a), 14(a), 21(d), 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78m, 78n, 78u(d), and 78aa] and Rules12b-20, 13a-1, 13a-13, and 14a-9 thereunder [17 C.F.R. §§ 240.12b-20, 13a-1, 13a-13, and 14a-9]; and Sections 205, 206(1), 206(2), 209(d), and 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-5, 80b-6(1), 80b-6(2), 80b-9(d), and 80b-14].

**If no, identify the dispute and set forth each party's position regarding the applicable law.**

1.      Plaintiff: Plaintiff contends Section 37 of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. §§ 80a-36 creates a claim for civil monetary and/or equitable relief.

2.      Defendant: Section 37 of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. §§ 80a-36]. Mr. Kokesh contends this criminal statute does not create an express or implied claim for civil monetary or equitable relief.

## VI.  CONTESTED ISSUES OF LAW

**Identify the specific issues of law which are contested.**

1.      Plaintiff:      See Part V(A), above. Additionally, plaintiff contends that a disgorgement amount may be calculated on TFI and TFL's gross receipts not paid directly to Mr. Kokesh or on all the advisers' receipts attributable to the alleged misconduct.

2.     Defendant:     See Part V(A), above. Mr. Kokesh contends that a disgorgement amount may not be calculated on TFI or TFL's gross receipts not paid to him or for amounts not attributable to the alleged misconduct.

The parties contest whether any applicable limitations period is or is not tolled by the doctrine of fraudulent concealment.

Additionally, the parties contest whether the limitations period can be applied to bar injunctive relief or a disgorgement amount on the ground that the relief is punitive in nature.

## VII.  MOTIONS

**A.**    **Pending Motions (indicate the date filed):**

1.     Plaintiff:     None.

2.     Defendant:     None.

**B.**    **Motions that may be filed:**

1.     Plaintiff:     Motion in Limine

2.     Defendant:     Motions in Limine

## VIII.  DISCOVERY

**A.**    **Has discovery been completed?**  ___X___ Yes _____ No

**B.**    **Are there any discovery matters of which the Court should be aware?**

1.     Plaintiff:     No.

2.     Defendant:     No.

## IX.  ANTICIPATED WITNESSES

*Each party is under a continuing duty to supplement this list and the description of anticipated testimony.  This does not, however, apply to a rebuttal witness.  Indicate if the witness will testify in person or by deposition, and include a brief description of the anticipated testimony.  If the testimony is by deposition, identify the deposition by page number and line number.  A witness who has not been identified and whose testimony has not been disclosed may not testify at trial unless good cause is shown.*

**A.**      **Plaintiff's Witnesses:**

1.      Plaintiff will call or have available at trial the following witnesses:

**Charles R. Kokesh** will testify about his role and that of others at TFI, TFL, and the BDCs, payments to him and to others by TFI, TFL and the BDCs, the limited-partnership agreements, and all matters addressed in his testimony before the Commission.

**Peter Bernardoni** will testify about his role and that of others at TFI, TFL, and the BDCs, payments to him and to others by TFI, TFL, and the BDCs, the limited-partnership agreements, and all matters addressed in his testimony before the Commission.

**Stacey Humphrey** will testify about her role and that of others at TFI, TFL, and the BDCs, accounting practices at TFI, TFL, and the BDCs, and all matters addressed in her testimony before the Commission.

**Amanda Innes** will testify about her role and that of others at TFI, TFL, and the BDCs, payments by the BDCs to TFI, TFL, Kokesh and others, meetings of the IGPs, the limited-partnership agreements, bonuses, and all matters addressed in her testimony before the Commission.

**Richard Alexander Marcum** will testify about his role and that of others at TFI, TFL, and the BDCs, payments by the BDCs to TFI, TFL, Kokesh and others, meetings of the IGPs, the limited-partnership agreements, bonuses, and all matters addressed in his testimony before the Commission.

**Julie Ann Overton** will testify about her role and that of others at TFI, TFL, and the BDCs, payments by the BDCs to TFI, TFL, Kokesh and others, meetings of the IGPs, capital structure and governance, the limited-partnership agreements, bonuses, and all matters addressed in her testimony before the Commission.

**Amy Pell** will testify about her role and that of others at TFI, TFL, and the BDCs, payments by the BDCs to TFI, TFL, Kokesh and others, meetings of the IGPs, capital structure and governance, the limited-partnership agreements, distributions, bonuses, and all matters addressed in her testimony before the Commission.

**Annalee Prentiss** will testify about her role and that of others at TFI, TFL, and the BDCs, payments by the BDCs to TFI, TFL, Kokesh and others, meetings of the IGPs, capital structure and governance, bonuses, and all matters addressed in her testimony before the Commission.

**Jane E. Starrett** will testify about her role and that of others at TFI, TFL, and the BDCs, payments by the BDCs to TFI, TFL, Kokesh and others, meetings of the IGPs, capital structure and governance, the limited-partnership agreements, accounting, distributions, bonuses, and all matters addressed in her testimony before the Commission.

**Charlie Freeman** will testify about his role and that of others at TFI, TFL, and the BDCs, payments by the BDCs to TFI, TFL, Kokesh and others, meetings of the IGPs, capital structure and governance, the limited-partnership agreements, accounting, distributions, and bonuses and about the payments he made from the BDCs bank accounts to Kokesh and others at Kokesh's direction.

**Frank Pope** will testify about his role and that of others at TFI, TFL, and the BDCs, payments by the BDCs to TFI, TFL, Kokesh and others, meetings of the IGPs, the limited-

partnership agreements, and bonuses, all relevant matters arising at trial about which he has personal knowledge.

**Gregory George** will testify about his role and that of others at TFI, TFL, and the BDCs, payments by the BDCs to TFI, TFL, Kokesh and others, meetings of the IGPs, the limited-partnership agreements, and bonuses, all relevant matters arising at trial about which he has personal knowledge.

**Thomas Toy** will testify about his role and that of others at TFI, TFL, and the BDCs, payments by the BDCs to TFI, TFL, Kokesh and others, meetings of the IGPs, the limited-partnership agreements, and bonuses, all relevant matters arising at trial about which he has personal knowledge.

**Ken Stevens** will testify about his role and that of others at TFI, TFL, and the BDCs, payments by the BDCs to TFI, TFL, Kokesh and others, meetings of the IGPs, the limited-partnership agreements, and bonuses, all relevant matters arising at trial about which he has personal knowledge.

**Carol Stumbaugh (Formerly Lowen)** (Commission CPA) will testify regarding payments of distributions, fees, bonuses, and reimbursements from the BDCs to TFI and TFL.

**2.**  Plaintiff may call the following witnesses:

**Michael S. Gunst** (Commission Attorney) may testify about his investigation of TFI and TFL on behalf of the Commission.

**J. Kyle Holmberg** (Former Commission Examiner) may testify about his examination of TFI and TFL on behalf of the Commission.

The Commission may call the following individuals who served as IGPs for one or more of the BDCs to testify about their role and that of others at TFI, TFL, and the BDCs, payments

by the BDCs to TFI, TFL, Kokesh and others, meetings of the IGPs, the limited-partnership agreements, and bonuses and the disclosures the IGPs received regarding the same.

**Harold M. Ginsberg, M.D.**

**Selena A. Lantry, M.D.**

**Carroll J. Schroeder**

**G. Whitney Baines, Ph.D.**

**A. Logan Craft**

**Michael S. Tempesta, Ph.D.**

**John Patrick O'Grady, M.D.**

**William J. Raduchel, Ph.D.**

**John W. Muncaster**

**Donald W. Frommer II**

**Ben H. Crawford, Ph.D.**

**Harry E. Kitch, P.E.**

**Alfred E. Osborne, Jr., Ph.D.**

**B.      Defendant's Witnesses:**

1.      In addition to his cross examination of witnesses that plaintiff calls at trial, Mr. Kokesh will call or have available at trial the following witnesses:

a.      Mr. Kokesh, who will testify about the governance and management in the ordinary course of the four BDCs, TFI, and TFL, the BDCs Individual General Partners and Management Committee functions, the role of outside legal counsel to the BDCs and Individual General Partners, the BDCs independent public accountants and independent auditors and his

reliance on their opinions and work, the BDCs payments to TFI and TFL and TFI's and TFL's payment to him, the plaintiff's administrative investigation of him, and his present financial condition and prospects of financial rehabilitation.

      b.     Marla Kokesh, who will testify about Mr. Kokesh's present financial condition and prospects of financial rehabilitation.

      2.     Defendant may call the following witnesses: Mr. Kokesh may call the witnesses on plaintiff's may-call list.

## X.  TRIAL PREPARATION

### A.    Pretrial Motions Hearing and Pretrial Conference

A Pretrial Motions Hearing will be held on   July 7, 2014   .  Counsel shall set aside the entire day for the pretrial motions hearing.  The parties need not be present.  All pending pretrial motions, including motions in limine, will be heard throughout the course of the day.  The parties will also submit their respective exhibit books (as explained below) at the Pretrial Motions Hearing.  A Pretrial Conference will be held on   July 28, 2014   .  Lead trial counsel must be present for the Pretrial Conference.  The parties need not be present.

### B.    Exhibits.

The parties must confer over all trial exhibits.  This does not apply to rebuttal exhibits that cannot be anticipated before trial.  Counsel are strongly encouraged to stipulate to exhibits wherever possible, particularly regarding their authenticity.

1. **Exhibit Lists**

Using the format found at the end of this order, the parties, together, must file the following two exhibit lists no later than __July 7, 2014__ :

      a. Consolidated Exhibit List Identifying All Exhibits that the Parties Have Stipulated Are Admissible and

      b. Consolidated Exhibit List Identifying All Exhibits that the Parties Have Stipulated Are Authentic, but to Which There are Other Objections.

Additionally, for those exhibits on which a stipulation could not be reached, the offering party must file the following, no later than __July 7, 2014__ :

      c. Contested Exhibit List.

2. **Exhibit Binders**

All exhibits must be marked, and each side shall present two identical copies of its exhibit binder to the Court at the Pretrial Motions Hearing on __July 7, 2014__ . Plaintiff's exhibits shall be identified with yellow labels and numbers, and Defendant's shall be identified with blue labels and letters (e.g., A, B, C, . . . AA, AB, AC). The identification number or letter will remain the same whether the exhibit is admitted or not. Charts, plats, diagrams, etc., will be marked and ready as to measurements, landmarks, and other identifying factual material before trial.

B. **Witness Lists.**

Each party's witness list must be filed by __July 7, 2014__ . Witnesses should be listed in the order to be called. The list shall indicate whether the witness is testifying by deposition or in person, whether the witness *will* be called or *may* be called, and whether the witness will testify

as an expert.  Objections must be filed by __July 14, 2014__.  If a party objects to the use of deposition testimony, the objecting party must mark those portions of the proposed deposition testimony to which the party objects.  Marking must comply with D.N.M.LR-Civ. 10.6. Regardless of whether an objection is to the use of deposition or in-person testimony, the parties **must** confer about any disputes prior to filing objections.

**C.      Voir Dire.**

      1.      If allowed, do the parties which to participate in voir dire?

              Plaintiff                 ___X__Yes  _____ No

              Defendant              ___X__ Yes  _____ No

      2.      Each party wishing to participate in voir dire must file "Proposed Voir Dire Questions" no later than __July 7, 2014__.  The filing must identify the specific areas about which the party wishes to inquire and must set forth proposed voir dire questions.  If a party objects to another party's proposed voir dire questions, counsel must confer in good faith to resolve the objection.  If the parties cannot come to a resolution, objections may be filed no later than July 14, 2014__.

      3.      During voir dire, counsel may not argue the case or cite legal principles.

**D.      Jury Instructions and Verdict.**

      **1.      In General.**  The parties must confer about proposed jury instructions that set forth the elements and definitions of the claims and defenses.

      **2.      Sources for Instructions.**  The Judge does not follow any set of pattern jury instructions.  However, as a starting place, the parties may refer to New Mexico's state

uniform jury instructions or the Fifth Circuit Court of Appeals' pattern jury instructions for civil matters.

**3.      Submission of Proposed Instructions.**   The parties must file one mutually approved set of jury instructions no later than __July 7, 2014__.  For those instructions on which the parties were unable to agree, each party must file its own proposed instructions, explaining the legal basis for its position, at the same time as submission of the mutually agreed instructions.

**4.      Form of Instructions.**

a.      Instructions must be double-spaced.   Only one instruction should be included on each page, and each instruction must identified by number.   Accordingly, each instruction page should be titled "[Plaintiff's or Defendant's] Instruction Number ___."  Each instruction page should include the appropriate legal citation(s).  All deviations from pattern instructions must be identified as "modified" in the citation, and the modification must be highlighted in the body of the instruction.  **Carefully proofread each instruction for errors in spelling, grammar, punctuation, and citations, and for unintended deviations from pattern instructions used as sources.**

b.  Each set of instructions shall be filed on record and additionally emailed to chambers at smvproposedtext@nmcourt.fed.us in a format compatible with MS Word. An appropriate cover sheet must be included on each and every set of instructions.

**5.      Verdict Forms**

Counsel must confer regarding proposed verdict forms.   Agreed-upon proposed verdict forms should be emailed in MS Word format to chambers at smvproposedtext@nmcourt.fed.us.

**E.**     **Trial Briefs**

Trial briefs outlining the basic legal theories, anticipated evidence in support of such theories, and the legal basis of any anticipated evidentiary disputes may be filed no later than July 25, 2014 .  Although trial briefs are encouraged, they are not required.

**F.**     **Joint Statement of Case.**

The parties must confer and file an agreed-upon, clear, concise statement of the case that will be read to the jury panel during jury selection.  If counsel are unable to agree to a consolidated statement of the case, they shall file separate statements of the case.  The statement(s) must filed no later than  July 7, 2014   .

**G.**     **Submission for Bench Trials.**

Not applicable

## XI. OTHER MATTERS

**A.**     **Settlement Possibilities.**

1.     The possibility of settlement in this case is considered:

_____ Poor     X   Fair _____ Good _____ Excellent     _____ Unknown

2.     Do the parties have a settlement conference set with the assigned Magistrate Judge?

_____ Yes     X    No   If yes, when? _____

If a settlement conference has already been held, indicate approximate date:

_December 14, 2010_____

Would a follow-up settlement conference be beneficial?  _____ Yes  __X__ No

3.      Does either party wish to explore any alternatives for dispute resolution such as mediation or a summary jury trial?  **No.**

If yes, please identify: _____

If no, explain why not: _____


**B.      Length of Trial and Trial Setting.**

1.      This action is a        _____ Bench Trial   __X__ Jury Trial  _____ Both

2.      The case is set for trial on ___August 4, 2014_____. If there is no setting, the parties estimate they will be ready for trial by _____.

3.      The estimated length of trial is ___10_____ day(s).


**C.      Decorum and Courtroom Management**

***Trial Counsel****, your compliance with the following is required:*

1.      Trials will begin at 9:00 a.m.  Be on time for each court session.  Trial engagements take precedence over any other business.  If you have matters in other courtrooms, make other arrangements in advance for the handling of such matters.

2.      A multi-day jury trial will recess at about 5:00 p.m.

3.      No recess to locate a missing witness will be allowed, unless the witness has been timely subpoenaed.  Clients and witnesses are to be on time.

4.      Clients and witnesses are expected to be on time, and counsel should always have witnesses available to fill a full trial day (i.e., 8:30 a.m.to 5:00 p.m.).  Counsel who do not have a witness available may be penalized.

5.      Stand when you speak.  Do not refer to any party or attorney by their first name.  Always use surnames.  Do not argue with opposing counsel in the presence of the jury.

6.      In opening statement, present a concise summary of the facts. Do not argue the facts nor discuss law.  Do not describe in detail what particular witnesses will say.  The time for opening statement will be limited.

7.      When you object in the presence of the jury, make it short and to the point.  Do not argue its merits in the presence of the jury.  Do not argue the ruling in the presence of the jury.

8.      Stand a respectful distance from the jury at all times.

9.      In final argument, you may paraphrase an instruction but do not quote extensively from any instruction.  Do not tell the jurors they can have the exhibits or instructions.

10.     Parties should notify the Court at least <u>two</u> weeks in advance of trial if they require audio-visual or other special equipment.  Parties are responsible for operating any of this equipment.

11.     Throughout these instructions, the term "trial" refers to the initial jury selection date. **Counsel must seek leave of the Court in the form of a written motion to extend any pretrial deadline**.

## XII. EXCEPTIONS

1.      Plaintiff:       None.

2.      Defendant: None.

## XIII. MODIFICATIONS-INTERPRETATION

The Pretrial Order when entered will control the course of trial and may only be amended sua sponte by the Court or by consent of the parties and Court approval.  The pleadings will be deemed merged herein.

The foregoing proposed Pretrial Order (prior to execution by the Court) is hereby approved this _____13th_____ day of __May_____, 20_14___.


Timothy S. McCole
Mississippi Bar No. 10628
United States Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, Texas 76102
Telephone:     (817) 978-6453
Fax:               (817) 978-4927
E-mail:          McColeT@SEC.gov
*Attorney for Plaintiff*


_____
*Attorney for Defendant*

_____
Address


Dated: ___May 13, 2014_____

_____
UNITED STATES MAGISTRATE JUDGE

# WITNESS/EXHIBIT LIST

| [INSERT NAME OF PARTY SUBMITTING EXHIBITS – Plaintiff or Defendant] | | [Party] v. [Party] |
|---|---|---|
| Presiding Judge: **Stephan M. Vidmar** | Court Reporter: | Courtroom Deputy: |

| Pl. No. | Def. Ltr. | Witness | Date Off. | Obj. | Adm. | Description of Exhibits |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |