IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE
COMMISSION,

  **Plaintiff,**

v.               **No. 09-cv-1021 SMV/LAM**

CHARLES R. KOKESH,

  **Defendant.**

## <u>FINAL JURY INSTRUCTIONS</u>

INSTRUCTION NO. 1

Members of the jury, you are about to begin your final duty, which is to decide the fact issues in this case.  Before you do that, I will instruct you on the law.  Please pay close attention to me.  I will go slowly and will be as clear as possible.

You have now heard all of the evidence in this case.  My duty at this point is to instruct you on the rules of law that you must follow and apply in arriving at your decision.  It is your duty to accept these instructions of law and to apply them to the facts as you determine them, just as it has been my duty to preside over the trial and to decide what testimony and evidence is relevant under the law for your consideration.

On these legal matters, you must take the law as I give it to you.  If any attorney has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.

You should not single out any instruction as alone stating the law, but you should consider my instructions as a whole when you retire to deliberate in the jury room.  You will receive a copy of these instructions to take with you into the jury room.

You should not be concerned about the wisdom of any rule that I state.  Regardless of any opinion that you may have as to what the law may be—or ought to be—it would violate your sworn duty to base a verdict upon any view of the law other than the one I give you.

Your role is to consider and decide the fact issues that are in this case.  You, the members of the jury, are the sole and exclusive judges of the facts.  You pass upon the evidence; you

16

determine the credibility or believability of the witnesses; you resolve whatever conflicts may be in the testimony; you draw whatever reasonable inferences and conclusions you decide to draw from the facts as you have determined them; and you determine the weight of the evidence.

In determining the facts, you must rely upon your own recollection of the evidence. What the lawyers have said in their opening statements, in their closing arguments, in their objections, or in their questions, is not evidence.  Nor is anything I may have said during the trial or may say during these instructions about a fact issue to be taken instead of your own independent recollection.  What I say is not evidence.  It is your own independent recollection of the evidence that controls.  Similarly, remember that a question put to a witness is never evidence.  Only the answer is evidence.  However, you may not consider any answer that I directed you to disregard or that I directed struck from the record.  If there is any difference or contradiction between what any lawyer has said and what you decide the evidence showed, or between anything I may have said and what you decide the evidence showed, it is your view of the evidence—not the lawyers' and not mine—that controls.

Because you are the sole and exclusive judges of the facts, I do not mean to indicate any opinion as to the facts or what your verdict should be.  The rulings I have made during the trial are not indicative of my views of what your decision should be as to whether the SEC or Mr. Kokesh has presented the more convincing evidence.

I also ask you to draw no inference from the fact that upon occasion I asked questions of certain witnesses.  These questions were intended only for clarification or to move things along.

17

They were not intended to suggest any opinions on my part as to the verdict you should render or whether any of the witnesses may have been more credible or less credible than any of the other witnesses.  It is important that you understand that I wish to convey no opinion as to the verdict you should render in this case, and that if I did convey such an opinion, you would not be obliged in any way to follow it.

In determining the facts, you must weigh and consider the evidence without regard to sympathy, prejudice, or passion for or against any party.  I will later discuss with you how to pass upon the credibility—or believability—of the witnesses.

After I instruct you on the law, the attorneys will have an opportunity to make their closing arguments.  Statements and arguments of the attorneys are not evidence and are not instructions on the law.  They are intended only to assist you in understanding the evidence and the parties' contentions.

18

INSTRUCTION NO. 2

The plaintiff in this case is the Securities and Exchange Commission, which I will refer to as the SEC. The SEC is an independent agency of the federal government charged with regulating the securities industry. It has the authority to issue rules that have the force of law. It has the authority to file lawsuits alleging violations of the federal securities laws.

The defendant is Mr. Charles Kokesh.

There are other entities, not named as defendants in this case, that you have heard about. Two of those entities were, during the time at issue in this case, registered with the SEC as investment adviser firms: Technology Funding Ltd. (which I will refer to as "TFL") and its subsidiary, Technology Funding, Inc. (which I will refer to as "TFI"). During the times in question, Mr. Kokesh was the Managing General Partner of TFL and President, CEO, CFO, and Chairman of TFI. Throughout these instructions, I will refer to TFL and TFI collectively as the Advisory Firms. You have also heard testimony related to an entity called Technology Funding Capital Corporation ("TFCC"). TFCC was a subsidiary of TFI.

The other entities were closed-end investment companies, or business development companies. They were known as: Technology Funding Medical Partners I (which you have heard referred to in this case as "P1"); Technology Funding Partners III, L.P. ("P3"); Technology Funding Partners IV, An Aggressive Growth Fund, L.P. ("P4"), and Technology Funding Partners V., An Aggressive Growth Fund, L.P. ("P5"). Each of these business development companies registered a class of securities with the SEC pursuant to Section 12 of the Securities

19

and Exchange Act of 1934.  In these instructions, as I did during the jury selection phase, I will refer to these business development companies collectively as the "Funds."

You should consider this case as a dispute between persons of equal standing in the community and of equal worth.  An individual, a corporation, and a government agency are equally entitled to a fair trial.  All persons, including individuals, corporations, and government agencies, stand equal before the law and are to be treated as equals.

20

INSTRUCTION NO. 3

As this is a civil case, the SEC has the burden of proving its claims by a preponderance of the evidence.  This means that the SEC must prove by a preponderance of the evidence every element of its claims.  If you find that the SEC has failed to establish a claim by a preponderance of the evidence, you must decide against it on that claim.  Evenly balanced evidence is not sufficient.

Establishing a fact by a preponderance of the evidence means proving that the fact is more likely true than not true.  A preponderance of the evidence means the greater weight of the evidence.  It does not mean the greater number of witnesses or the greater length of time taken by either side.  The phrase refers to the quality of the evidence, that is, its convincing quality, the weight, and the effect that it has on your minds.  The law requires that for the SEC to prevail on its claims, the evidence that supports its claims must appeal to you as more nearly representing what took place than the evidence opposed to the claim.  If it does not, or if it weighs so evenly that you are unable to say that there is a preponderance on either side, then you must decide the question in favor of Mr. Kokesh.  It is only if the evidence favoring an SEC claim outweighs the evidence opposed to that SEC claim that you can find in the SEC's favor on that claim.

Some of you have heard of proof "beyond a reasonable doubt," which is the proper standard of proof for a *criminal* trial.  However, the SEC is a plaintiff in a *civil* case and does not have to satisfy that requirement.  Therefore, you should put that standard out of your mind.  The

21

SEC must prove its claims only by the preponderance-of-the-evidence standard, not by the higher beyond-a-reasonable-doubt standard.

INSTRUCTION NO. 4

An investment adviser is a person or firm that is engaged in the business of providing investment advice to others for compensation. The parties have stipulated that TFL and TFI are investment advisers.

Investment advisers owe what the law calls a "fiduciary duty" to their clients and their prospective clients. A fiduciary duty is the highest duty of good faith, loyalty, and fair dealing known to the law.

An investment adviser's fiduciary duty does not merely prohibit the adviser from making false and misleading statements to its clients and prospective clients, although, of course, those actions are prohibited. As a fiduciary, an investment adviser has an affirmative duty to act always for the benefit of the adviser's clients and prospective clients, to exercise the utmost good faith in dealing with them, to disclose all material facts to them, and to use reasonable care to avoid misleading them. As a fiduciary, an investment adviser is required to disclose all conflicts of interest that might encourage it consciously or unconsciously to give advice that is not disinterested.

The Advisory Firms were investment advisers, and therefore they had a fiduciary duty to act always for the benefit of their clients and prospective clients, to exercise the utmost good faith in dealing with them, to disclose all material facts to them, and to employ reasonable care to avoid misleading them. The Advisory Firms were also required to disclose all conflicts of

23

interest that might encourage them consciously or unconsciously to give advice that was not disinterested.

INSTRUCTION NO. 5

The Plaintiff in this case is the SEC or the Commission.  The SEC is the agency of the federal government that is responsible for enforcing the securities laws of the United States.  As part of its job, the SEC is responsible for protecting investors and ensuring fair dealing by securities-market participants such as investment advisers.  The SEC filed this case against Mr. Kokesh for violating and for aiding and abetting violations of anti-fraud and other provisions of the securities laws.  I am now going to summarize the SEC's claims and Mr. Kokesh's responses to those claims.  Later in these instructions, I will instruct you on the essential elements of each claim.

The SEC alleges that Mr. Kokesh violated several provisions of the federal securities laws based on a variety of conduct.  What follows is a brief description of what the SEC alleges that Mr. Kokesh did.

### 1.      Misappropriation and Other Improper Use of Funds

The SEC claims that, from 1995 through July 2007, Mr. Kokesh misappropriated more than $34.9 million from four SEC-registered business development companies ("BDCs")—specifically, P1, P3, P4, and P5.  A BDC is a type of closed-end investment company.  It is common to refer to BDCs by other names such as "funds"—in the sense of "mutual funds"—and, in this case, the BDCs were also commonly referred to as "partnerships," since each one was structured as a limited partnership.  In this case, the words "partnership," "limited

25

partnership," and "BDC" are often used interchangeably. And as I noted earlier, I will normally refer to them as the "Funds."

The SEC claims that Mr. Kokesh owned and controlled two SEC-registered investment-adviser firms named TFL and TFI. These two firms—which may be referred to in this case as the "investment advisers," the "advisory firms," or simply as the "advisers,"—provided investment advice to the four Funds. Written contracts, required by law, between the advisory firms and the Funds specified in detail the fees and expenses that the advisory firms were allowed to receive from the Funds for their services. The SEC claims that, in carrying out the misappropriation, Mr. Kokesh controlled the advisers and the Funds' bank accounts and caused the advisers to take money from the Funds in violation of the contracts and in breach of fiduciary duties the advisers owed the Funds.

The SEC claims that Mr. Kokesh misappropriated the money from the Funds as follows:

- First, from 1995 through 2000, Mr. Kokesh caused the advisers to take more than $5 million to cover salaries for Mr. Kokesh and other adviser officers. The contracts specifically prohibited reimbursements to cover salaries of the advisers' "controlling persons," including such officers.

- Second, from 1995 through 2005, Mr. Kokesh caused the advisers to take more than $5 million to cover office rent. The contracts specifically prohibited rent reimbursement.

- Third, in 2000, Mr. Kokesh caused the advisers to take more than $6.1 million in payments described as "tax distributions." The contracts provided that, under certain conditions, the advisory firms could be paid a "tax distribution" to cover the advisory firms' tax obligations. But these payments did not satisfy the contracts' stated conditions for tax distributions and had nothing to do with any tax obligation.

26

Mr. Kokesh, who was not a party to the contracts, took all but a small portion of the $6.1 million for himself.

- Fourth, from 2000 through 2005, Mr. Kokesh declared bonuses for himself and another adviser officer totaling more than $8.4 million. Mr. Kokesh personally received more than $6.2 million of these payments. The contracts provided for no such bonuses.

- Fifth, from 2001 through 2005, Mr. Kokesh caused the advisers to take more than $10.3 million to cover salaries for adviser officers, including more than $5.5 million for himself. Again, the contracts specifically prohibited reimbursements to cover salaries of the advisers' "controlling persons," including such officers.

### 2.    Misleading SEC Reports

The SEC alleges that Mr. Kokesh caused the Funds to file false and misleading SEC reports that concealed the truth about his misappropriation scheme. The Funds filed SEC reports for quarterly and annual periods from January 1, 1995, through December 31, 2006. Each report was signed by Mr. Kokesh or by another adviser officer acting under his direction. The reports indicated that the Funds were reimbursing the advisers for expenses, but they omitted to disclose that those payments included the foregoing reimbursements for rent and for officer salaries and bonuses that were prohibited by the contracts.

The SEC further claims that Mr. Kokesh caused the Funds to file SEC reports for quarterly and annual periods from January 1, 2000, through December 31, 2006, that falsely described payments totaling $6,112,797 from the Funds to the advisers as "tax distributions" and otherwise omitted material information about the payments. The reports omitted to disclose that the payments did not satisfy the contracts' tax-distribution requirements, that the advisers did not

27

use the payments to cover tax liabilities, that Mr. Kokesh himself received most of the funds, that Mr. Kokesh and the advisers owed the Funds $6,112,797 as a result of the improper distribution, and that the money had not been repaid.

### 3.     Misleading Proxy Statements

A proxy statement is a document that an entity, such as in this case the Funds, uses to allow shareholders (or, as is the case here, limited partners of the Funds) to vote on issues requiring shareholder approval without requiring all those persons to attend a meeting in person. The SEC claims that Mr. Kokesh used false and misleading proxy statements to further the scheme.  In 2000, Mr. Kokesh signed and disseminated false and misleading proxy statements to investors in an effort to persuade them to amend the contracts to allow the advisers to receive reimbursement for officer salaries.  The proxy statements, however, misrepresented the potential financial impact on the Funds.  First, they falsely stated that Mr. Kokesh had been the only controlling person since 1998, when in fact several people fell in that category and were having their salaries, in effect, paid for by the Funds.  Second, they omitted to disclose that the Funds had reimbursed TFL and TFI for compensation for other TFL and TFI controlling persons in the amounts of $947,841 in 1998, $661,297 in 1999, and $1,553,485 in 2000.  Finally, they collectively reported that Mr. Kokesh's compensation from TFI had been $663,776 from 1998 through 2000 but omitted to disclose that he had received additional compensation from TFL totaling at least $867,506 in the same period.

### 4.       Illegal Performance-Fee Contracts

The SEC claims that Mr. Kokesh caused the advisers to enter, extend, renew, or perform contracts with the Funds that contained illegal performance-fee provisions.  Each contract provided that the advisers were entitled to receive 20% of the Fund's net profit, which the contract defined to include "all items of Partnership income and gain."  Because the contracts did not exclude unrealized income and unrealized gain from the net-profit definition, they provided for performance fees exceeding limits allowed by the federal securities laws.  Moreover, each Fund had a profit-sharing plan and otherwise paid performance-based bonuses to Mr. Kokesh and others, which, as provided in the federal securities laws, served to prohibit the advisers from entering, extending, renewing, or performing the contracts with the Funds.

The SEC claims that, by reason of the conduct summarized above, Mr. Kokesh violated Section 37 of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. § 80a-36] and aided and abetted violations of Sections 13(a) and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78m and 78n] and Rules12b-20, 13a-1, 13a-13, and 14a-9 [17 C.F.R. §§ 240.12b-20, 13a-1, 13a-13, and 14a-9] thereunder and Sections 205, 206(1), and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-5, 80b-6(1), and 80b-6(2)].

Mr. Kokesh generally denies the SEC's claims.  Specifically, he denies misappropriating any money from the Funds.  He asserts that neither TFL nor TFI controlled the Funds.  He claims that TFL and TFI furnished investment advice to the Funds pursuant to advisory contracts and

29

managed their day-to-day affairs, subject to the Funds' Individual General Partners (in the case of P1 and P5) or Management Committees (in the case of P3 and P4), which retained full, exclusive, and complete discretion in the management and control of the Funds' affairs. Mr. Kokesh never served as an Individual General Partner of any of the Funds. No other representative of TFI or TFL ever served as an Individual General Partner. Mr. Kokesh claims that neither he, nor TFI, nor TFL ever held or controlled any majority voting power on the Management Committees.

Mr. Kokesh denies that he caused, or had the power or authority to cause, the Funds to pay distributions, performance fees, and expense reimbursements to TFL and TFI in violation of the advisory contracts. He claims that TFI and TFL made recommendations to the Funds' Individual General Partners or Management Committees for approval, and in each instance the Individual General Partners and Management Committees possessed the exclusive power and authority to accept or reject the recommendations.

Mr. Kokesh denies having any contemporaneous knowledge of any violations by the Funds of their reporting and proxy solicitation obligations and denies furnishing any substantial assistance with respect to any such alleged violations. Mr. Kokesh denies that he played any substantive role in preparing the proxy solicitations and periodic reports, but electronically signed them at the direction of the Individual General Partners and Management Committees.

30

INSTRUCTION NO. 6

Aiding and Abetting Violations of
Sections 206(1) and 206(2) of the Investment Advisers Act

The SEC alleges that Mr. Kokesh aided and abetted violations of Sections 206(1) and 206(2) of the Advisers Act through his conduct. For example, the SEC alleges that Mr. Kokesh improperly caused the Funds to pay the Advisory Firms money or funds to which they were not entitled and he concealed those payments by misleading the Funds, preparing and distributing misleading proxy statements, and preparing and filing misleading public reports with the SEC.

To prevail on its claim that Mr. Kokesh aided and abetted violations of Sections 206(1) and 206(2) of the Advisers Act, the SEC must prove each of the following elements by a preponderance of the evidence:

1.   That the Advisory Firms were investment advisers; and

2.   With the required state of mind, one or more of the Advisory Firms, directly or indirectly, engaged in fraudulent conduct; and

3.   Mr. Kokesh aided and abetted such violations.

The parties have stipulated as to the first element, namely that the Advisory Firms were investment advisers. Therefore, you should not consider that issue. I will now explain the remaining two elements in more detail.

31

INSTRUCTION NO. 7

The SEC may satisfy the fraudulent conduct element of a claim under Sections 206(1) and 206(2) of the Advisers Act by showing that, through their conduct, one or more of the Advisory Firms did one or both of the following:

1.     Employed a device, scheme, or artifice to defraud any client or prospective client; or

2.     Engaged in any transaction, practice, or course of business that operated or would operate as a fraud or deceit upon any client or prospective client.

You need only find that one or more of the Advisory Firms did one of these two types of fraudulent conduct in order to find that the SEC has met its burden of proof on this element.

The first type of fraudulent conduct is a "device, scheme or artifice to defraud."  A "device" in this context means a "trick" or "fraud."  A "scheme" is a design or plan formed to accomplish some purpose.  The phrase "device, scheme, or artifice to defraud" refers to any plan or course of action that involves false or fraudulent pretenses or representations or any pattern of conduct calculated to deceive.  Put another way, a "scheme to defraud" means conduct that has the principal purpose and effect of creating a false appearance of fact.

The second type of fraudulent conduct is an "act, practice, or course of business" that "operated or would operate as a fraud or deceit upon any person."  The phrase "would operate" means that the act, practice, or course of business has the capacity to defraud a purchaser or seller, but it is not necessary that anyone was actually defrauded.

32

INSTRUCTION NO. 8

The SEC may satisfy the state-of-mind element of a claim under Sections 206(1) and 206(2) of the Advisers Act in one of two ways.

First, for purposes of its claim under Sections 206(1) and 206(2), the SEC may prove that one of the Advisory Firms acted with "intent to defraud" or "reckless disregard for the truth." To act with intent to defraud means to act knowingly and with a specific intent to deceive, manipulate, or defraud. An intent to defraud may be inferred from a defendant's statements or conduct.

As noted above, the SEC may also show that one of the Advisory Firms acted with a high degree of recklessness. Recklessness is not mere ordinary negligence. Recklessness is an extreme departure from the standards of ordinary care, which presents a danger of misleading other persons, and which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Second, for purposes of its claim under Section 206(2), the SEC may prove that an Advisory Firm acted negligently. Negligence is different from the states of mind I previously instructed you about, namely "intent" and "recklessness."

"Negligence" is the failure to use ordinary care under the circumstances. "Ordinary care" is not an absolute term but a relative one. "Ordinary care" is the care that reasonably prudent people exercise in the management of their own affairs in order to avoid injury to themselves or their own property, or to avoid injury to other persons or their property. In other words,

33

negligence is doing something that a reasonably prudent person would not do, or not doing something that a reasonably prudent person would do, given the circumstances.

One of the circumstances here, as I explained before, is that the Advisory Firms owed a fiduciary duty to their advisory clients and prospective clients.  An investment adviser has an affirmative duty to exercise the utmost good faith in dealing with them, to use reasonable care to avoid misleading them, and to disclose all material facts to them, including all conflicts of interest that might incline the adviser consciously or unconsciously to give advice that is not disinterested and to use reasonable care to avoid misleading them.

In determining whether one or more of the Advisory Firms was negligent, it is proper for you to consider whether, as investment advisers owing a fiduciary duty, they used reasonable care in obtaining and communicating information to their clients and prospective clients, and whether they undertook appropriate investigation before making statements to their clients and prospective clients.

34

INSTRUCTION NO. 9

In order to find that Mr. Kokesh aided and abetted a violation of Section 206(1) and/or 206(2), the SEC must establish by a preponderance of the evidence that:

(1)     Another person or entity committed one or more violations of those provisions as I instructed above; and

(2)     Mr. Kokesh had a general awareness that his role was part of an overall activity that was improper; and

(3)     Mr. Kokesh knowingly and substantially assisted the primary violation.

Inaction may be a form of "substantial assistance" if you find that the silence or inaction of Mr. Kokesh was intended to aid a violation.

In addition, general awareness of one's overall role in the primary violator's illegal activity is sufficient knowledge for aiding-and-abetting liability.  In addition, the Defendant's knowledge is satisfied if you find that his conduct was reckless, that is, that such conduct constituted highly unreasonable omissions or misrepresentations that involved not merely simple or even inexcusable negligence, but rather an extreme departure from the standards of ordinary care; and that the danger of misleading buyers or sellers was either known to him or so obvious that he must have been aware of it.

If you find that each of the above elements, on which the SEC has the burden of proof, has been proven as to Mr. Kokesh, then your verdict should be for the SEC and against him as to this claim.

35

If, on the other hand, you find that the SEC has failed to prove any one or more of these elements, then your verdict should be for Mr. Kokesh and against the SEC as to this claim.

INSTRUCTION NO. 10

<u>Aiding and Abetting Violations of</u>
<u>Section 13(a) of the Exchange Act and</u>
<u>Rules 12b-20, 13a-1, and 13a-3</u>

The SEC claims that Mr. Kokesh aided and abetted violations of Section 13(a) and Rules 12b-20, 13a-1 and 13a-13 of the Exchange Act.  Section 13(a) and Rules 13a-1 and 13a-13 require entities that file periodic reports, such as annual reports on Form 10-K and quarterly reports on Form 10-Q, with the SEC to make those reports factually accurate.  Rule 12b-20 likewise requires that such reports also include such further material information as may be necessary to make the statements that are made, in light of the circumstances under which they are made, not misleading.  A "material" fact (or omission) is a fact relating to a matter that would be of some importance to the reasonable investor when deciding how to invest.

The SEC alleges that the periodic reports filed by the Funds for the time periods 1995 through 2005 were not factually accurate and omitted necessary information.

A company can violate Section 13(a) and Rules 12b-20, 13a-1 and 13a-13 even if it did not make the false statements knowingly or recklessly.

Therefore, in order to find that any of the Funds violated Section 13(a) and Rules 12b-20, 13a-1 and 13a-13, the SEC must establish by a preponderance of the evidence that any of the Funds filed one or more Forms 10-Q or 10-K with the SEC that contained false statements of material fact, or failed to include material information that was necessary, under the circumstances, to make the statements made not misleading.

37

As I noted above, the SEC claims that Mr. Kokesh aided and abetted violations of these provisions.  To prove its claim against Mr. Kokesh for aiding and abetting violations of these provisions, the SEC must establish by a preponderance of the evidence:

    (1)       Another person or entity committed one or more violations of those provisions as I instructed above; and

    (2)       Mr. Kokesh had a general awareness that his role was part of an overall activity that was improper; and

    (3)       Mr. Kokesh knowingly and substantially assisted the primary violation.

Inaction may be a form of "substantial assistance" if you find that the silence or inaction of Mr. Kokesh was intended to aid a violation.

In addition, general awareness of one's overall role in the primary violator's illegal activity is sufficient knowledge for aiding-and-abetting liability.  In addition, the Defendant's knowledge is satisfied if you find that his conduct was reckless, that is, that such conduct constituted highly unreasonable omissions or misrepresentations that involved not merely simple or even inexcusable negligence, but rather an extreme departure from the standards of ordinary care; and that the danger of misleading buyers or sellers was either known to him or so obvious that he must have been aware of it.

If you find that each of the above elements, on which the SEC has the burden of proof, has been proven as to Mr. Kokesh, then your verdict should be for the SEC and against him as to this claim.

If, on the other hand, you find that the SEC has failed to prove any one or more of these elements, then your verdict should be for Mr. Kokesh and against the SEC as to this claim.

INSTRUCTION NO. 11

<u>Aiding and Abetting Violations of</u>
<u>Section 14(a) of the Exchange Act and Rule 14a-9</u>

The SEC alleges that Mr. Kokesh aided and abetted violations of Section 14(a) and Rule 14a-9 of the Exchange Act.  Section 14(a) requires issuers, such as the Funds in this case, to send proxy statements to shareholders whenever their votes are being solicited for proposals from the entity.  A proxy is simply an authorization granted by the holder of a voting security to vote that security.  Because shareholders in general cannot attend shareholder meetings in person, most of the votes cast at those meetings are cast through proxies that have been obtained from the shareholders through a proxy solicitation.  A proxy solicitation is a communication to shareholders under circumstances reasonably calculated to obtain a proxy or vote.  Proxy statements are required to be sent to shareholders whenever their votes are solicited.  Proxy statements generally contain proposals to be voted upon by the shareholders, information about compensation of corporate officers, and ownership of securities and securities options by company officers and directors.

Section 14(a) and Rule 14a-9 require that that a proxy solicitation may not contain any statement that is false or misleading with respect to any material fact, or omit to state any material fact necessary in order to make the statements not false or misleading.

The SEC alleges that, in violation of these provisions, in November 2000 the Funds filed proxy statements that failed to accurately describe the number and identity of the persons

who were controlling persons of the Advisory Firms and that provided materially misleading information about the amount of compensation paid to controlling persons and Mr. Kokesh in the past.  And, the SEC alleges that Mr. Kokesh aided and abetted those violations.

In order to prove a violation of these provisions, the SEC must establish by a preponderance of the evidence that:  (1) one or more of the Funds, by means of a proxy statement, solicited shareholder votes or allowed its name to be used to solicit a proxy vote with respect to a security; (2) the proxy statement contained an untrue statement of material fact or omitted a material fact that, under the circumstances, was needed to make statements contained in the proxy statement not false or misleading; (3) that the Fund acted negligently; and (4) Mr. Kokesh aided and abetted a violation of these provisions.

A statement or omitted fact is material, in the context of a proxy solicitation, if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote or that the disclosure of an omitted fact would have been viewed by the reasonable shareholder as having significantly altered the total mix of information available to them.  It is not necessary to show that accurate disclosure would have caused a shareholder to act or vote differently.

Negligence in the context of this claim means to fail to exercise "ordinary care."  The phrase "ordinary care" means that degree of care that an ordinarily careful person would use under the same or similar circumstances.  The degree of care used by an ordinarily careful person depends upon the circumstances which are known or should be known and varies in

proportion to the harm that person reasonably should foresee.  In deciding whether a person was negligent or failed to use ordinary care, you must consider what that person knew or should have known and the harm that should reasonably have been foreseen.  To establish a violation of Section 14(a) and Rule 14a-9, the SEC is not required to establish any knowledge, evil motive, or even reckless disregard of the facts, only negligence.

If the issuer has previously made false or inaccurate statements in the proxy solicitation regarding material facts, there is a duty to correct those statements if it is later discovered that those statements were not true when made and those statements remain material to a shareholder's investment decision.

The term solicitation is defined broadly to include any communication to shareholders under circumstances reasonably calculated to result in the procurement, withholding, or revocation of a proxy.

If you find that each of the above elements on which the SEC has the burden of proof has been proven as to a Fund, then the SEC has proven that the Fund violated Section 14(a) and Rule 14a-9.  If, on the other hand, the SEC has failed to prove any of these elements, then the SEC has failed to prove that a Fund violated Section 14(a) and Rule 14a-9.

In order to find that Kokesh aided and abetted a violation of Section 14(a) and Rule 14a-9, the SEC must establish by a preponderance of the evidence that:

> (1) Another person or entity committed one or more violations of those provisions as I instructed above; and

42

(2) Mr. Kokesh had a general awareness that his role was part of an overall activity that was improper; and

(3) Mr. Kokesh knowingly and substantially assisted the primary violation.

Inaction may be a form of "substantial assistance" if you find that the silence or inaction of Kokesh was intended to aid a violation.

In addition, general awareness of one's overall role in the primary violator's illegal activity is sufficient knowledge for aiding and abetting liability.  In addition, the Defendant's knowledge is satisfied if you find that his conduct was reckless, that is, that such conduct constituted highly unreasonable omissions or misrepresentations that involved not merely simple or even inexcusable negligence, but rather an extreme departure from the standards of ordinary care; and that the danger of misleading buyers or sellers was either known to him or so obvious that he must have been aware of it.

If you find that each of the above elements on which the SEC has the burden of proof has been proven as to Mr. Kokesh, then your verdict should be for the SEC against him as to this claim.

If, on the other hand, you find that the SEC has failed to prove any one or more of these elements, then your verdict should be for Mr. Kokesh and against the SEC as to this claim.

43

INSTRUCTION NO. 12

### Violations of Section 37 of the Investment Company Act

The SEC alleges that Mr. Kokesh violated Section 37 of the Investment Company Act, which imposes liability on anyone who steals, unlawfully abstracts, unlawfully and willingly converts to his own use or to the use of another, or embezzles any of the moneys, funds, securities, credits, property, or assets of any registered investment company.

For purposes of this case, in order to find Mr. Kokesh liable for violating Section 37, you must find by a preponderance of the evidence that:

1. Mr. Kokesh converted assets of any registered investment company to his own use or to the use of another; and
2. He did so knowingly and willfully.

I will now explain a few of these concepts in more detail.

As I have explained earlier, the Funds in this case (P1, P3, P4, and P5) were business development companies, which means they were registered investment companies.

For purposes of Section 37, conversion includes all instances under which one may obtain wrongful advantages from another's property. Conversion may be completed without any intent to keep. Conversion may include misuse or abuse of property. And it also includes use of in an unauthorized manner or to an unauthorized extent of the investment company's moneys, funds, or assets placed in one's custody for only limited use.

44

In the context of Section 37, you may find that Mr. Kokesh acted willfully if he acted:

    i)      with a bad purpose,

    ii)     without ground for believing his conduct was lawful, OR

    iii)    with careless disregard for whether or not he had the right to so act.

The word "knowingly" in the context of the securities laws means more than accidentally, or that a person was negligent. You may find that Mr. Kokesh acted knowingly if he acted with severe recklessness. Severe recklessness means conduct that is such an extreme departure from standards of ordinary care that the defendant must have been aware of it.

The question of whether a person acted knowingly because he either intended to defraud or was severely reckless is a question of fact for you to determine, like any other fact question. It is a question involving the state of mind of the defendant. Direct proof of state mind is almost never available, and it is not required. Therefore, whether the defendant acted knowingly may be established by circumstantial evidence based on a person's words, conduct, acts, and all the surrounding circumstances and the reasonable inferences that may be drawn from them.

45

## THIS PAGE IS INTENTIONALLY LEFT BLANK

INSTRUCTION NO. 13

<u>Section 205 of the Investment Advisers Act</u>

The SEC alleges that Mr. Kokesh aided and abetted violations of Section 205(a) of the Advisers Act by causing the Advisory Firms to enter contracts with the Funds that allowed the Advisory Firms to earn compensation based on the performance of the Funds.  For purposes of this case, Section 205(a) prohibits investment advisers from willfully entering into an advisory contract that provides for compensation based on a share of capital gains upon or capital appreciation of the assets or any portion of the assets of a client.  Such contract provisions are commonly referred to as performance-based compensation or performance-based fee provisions.

There is an exception to this rule, set out in Section 205(b)(3), which provides that an investment adviser may enter into an advisory contract with a business development company for a performance-based fee if:  (1) the compensation provided for in the contract does not exceed 20% of the of the realized capital gains upon the funds of the business development company over a specified period or as of definite dates (calculated without including all realized capital losses and unrealized capital depreciation); and (2) the investment adviser does not have a profit sharing plan or bonus program based on the profits of the business development company. This formula does not allow an investment adviser to include unrealized capital appreciation in calculating a performance-based fee.  In other words, in determining whether a fee exceeds the 20% threshold noted above, it is improper to consider unrealized appreciation of the business development funds' individual securities or the portfolio as a whole.

47

Section 205 does not require that the investment adviser acted with scienter.  It is enough that it acted willfully.  And in this context, willfully only means intentionally committing the act that constitutes the violation, not intentionally violating the law.  Therefore, to find that the Advisory Firms violated Section 205, you must find by a preponderance of the evidence, that:

1. The Advisory Firms were investment advisers; and
2. One or both of the Advisory Firms willfully entered, extended, renewed, or in any way performed a contract with one or more of the Funds that allowed the Firm to be paid based on the performance of the funds of the Fund that exceeded 20% of the realized capital appreciation of the Fund over a specified period or as of definite dates, computed net of all realized capital losses an unrealized capital depreciation.

If you find that there was a contract providing for performance-based compensation or a performance-based fee, but that the compensation was lower than 20% of the realized capital appreciation, you must still find a violation if the SEC demonstrates by a preponderance of the evidence that the Advisory Firm had a profit-sharing plan or bonus program based on the profits of the business development company.

If you find a violation of Section 205, you must then consider whether Mr. Kokesh aided and abetted that violation.  As I have explained before, to make such a finding, you must find by a preponderance of the evidence that:

(1)    An Advisory Firm committed one or more violations of Section 205 as I instructed above; and

(2)    Mr. Kokesh had knowledge of this primary violation and of his role in furthering it; and

(3)    Mr. Kokesh provided substantial assistance in the primary violation.

48

Inaction may be a form of "substantial assistance" if you find that the silence or inaction of Mr. Kokesh was intended to aid a violation.

In addition, general awareness of one's overall role in the primary violator's illegal scheme is sufficient knowledge for aiding-and-abetting liability.  In addition, the Defendant's knowledge is satisfied if you find that his conduct was reckless, that is, that such conduct was more than merely simple or even inexcusable negligence, but rather an extreme departure from the standards of ordinary care.

SCIENTER IS A LEGAL TERM THAT REFERS TO INTENT OR KNOWLEDGE OF WRONGDOING. IT MEANS THAT A PERSON HAS KNOWLEDGE OF THE "WRONGFULNESS" OF AN ACT PRIOR TO COMMITING IT.

49

INSTRUCTION NO. 14

You are to determine solely whether Mr. Kokesh is liable for violating, or for aiding and abetting violations of, the securities laws.

This is not the kind of case in which the jury also decides what legal relief is appropriate. That will be my job if you find Mr. Kokesh liable.  In considering whether Mr. Kokesh is liable, you should not consider what order, if any, I may enter against Mr. Kokesh stemming from a finding a liability.

Further, in considering whether Mr. Kokesh is liable, you should not consider whether persons other than Mr. Kokesh may also be liable.  You are only to decide whether Mr. Kokesh is liable based on the facts presented.

INSTRUCTION NO. 15

For the fraud claims that I have discussed, the SEC does not need to prove that any person actually relied upon the fraudulent conduct or statements, or that any person actually suffered any harm as a result of their fraudulent statements or conduct. When you consider whether any act of fraud was committed as alleged by the SEC, you should not consider or speculate about whether the conduct or statement caused economic harm or other harm to any other person.

INSTRUCTION NO. 16

Each of the fraud claims I have discussed contains a state-of-mind requirement.  I want to explain a couple of points for you to consider when deliberating on state of mind.

First, the Advisory Firms and the Funds are business entities that can only act when an individual acts on their behalf.  As a result, for purposes of determining whether the Advisory Firms or the Funds acted with a certain state of mind, Mr. Kokesh's state of mind is the business entity's state of mind.

Second, the question of whether the Advisory Firms or the Funds acted with intent to defraud, with reckless disregard for the truth, or with negligence is a question of fact for you to determine, like any other fact question.  The state of mind of a defendant can be proven by either direct evidence or circumstantial evidence.  Direct proof of state of mind is often not available, and it is not required.  You may infer a defendant's state of mind from the defendant's acts and words in light of all the circumstances at that time.

You cannot peer into Mr. Kokesh's head to see what he was thinking at some time in the past.  Therefore, you may determine whether Mr. Kokesh acted knowingly, recklessly, or negligently based upon circumstantial evidence about his actions and the surrounding context, and based upon the reasonable inferences that you may draw.  Whether you consider direct or circumstantial evidence, it is the SEC's burden to prove by a preponderance of the evidence that Mr. Kokesh acted with the state of mind that is required for each claim.

INSTRUCTION NO. 17

A stipulation is an agreement between both sides that certain facts are true.  A stipulation means simply that the Plaintiff and the Defendant accept the truth of a particular proposition or fact.  Since there is no disagreement, there is no need for evidence apart from the stipulation.

INSTRUCTION NO. 18

The SEC and Mr. Kokesh have stipulated—that is, they have agreed—to certain facts in this case.  You should, therefore, treat those facts as true.  Those facts include each of the following:

**The Business Development Companies**

1.      Four limited partnerships (or "Funds") were organized between 1987 and 1992. These four limited partnerships are:

      a.      Technology Funding Medical Partners I, L.P. ("P1");

      b.      Technology Funding Partners III, L.P. ("P3");

      c.      Technology Funding Venture Partners IV, An Aggressive Growth Fund, L.P. ("P4");

      d.      Technology Funding Venture Partners V, An Aggressive Growth Fund, L.P. ("P5").

2.      Each of the Funds registered a class of securities with Plaintiff pursuant to Section 12 of the Securities Exchange Act of 1934.  Between June 1987 and May 1995, P1, P3, P4, and P5 made public securities offerings, raising $7,929,744; $40,000,000; $39,994,896; and $40,000,000; respectively, from approximately 21,000 investors throughout the United States. The Funds invested primarily in private start-up companies involved in technology, biotechnology, and medical diagnostics.

3.      The four limited partnerships were organized under the Delaware Revised Uniform Limited Partnership Act and elected the status of a "business development company" ("BDC") under § 54 of the Investment Company Act of 1940 [15 U.S.C. § 80a-54].

4.      Each Fund was governed by a written limited-partnership agreement.  Each limited-partnership agreement described how TFL and TFI were to be compensated for their services, specifying the distributions they could receive, the fees they could earn, and the expenses they could be reimbursed from the Fund**.**

5.      Under the terms of each Fund's limited-partnership agreement, from time to time the Fund's limited partners elected three Individual General Partners and two Managing General Partners, TFL and TFI.  Each Fund was governed by the three Individual General Partners (in the case of P5 and P1) or a Management Committee (in the case of P3 and P4) consisting of the three Individual General Partners and one representative from each of the two Managing General Partners (in the case of P3 and P4).  The Individual General Partners or the Management Committee in turn supervised TFI and TFL in their capacity as Managing General Partners.  Subject to the Individual General Partners' or the Management Committee's supervision, the Managing General Partners were responsible for the day-to-day management of the Fund's business and affairs.

6.      Mr. Kokesh was never an Individual General Partner of any of the Funds.

7.      The limited-partnership agreements for P1, P4, and P5 provided that the company would terminate on or before December 31, 2002, subject to the right of the Individual General Partners to extend the term of a partnership.  The limited partnership agreement for P3 provided that it would terminate in 1994, unless the term of the partnership was extended.  P1 was allowed

to terminate as of December 31, 2002; for the remaining three Funds, the Individual General Partners were authorized to extend the term up to, but not beyond, December 31, 2006.

8.      P3's limited-partnership agreement vested governance of the partnership exclusively in a five-member Management Committee.   Each Management Committee was composed of three Individual General Partners, one representative of TFI, and one representative of TFL.   The Individual General Partners were intended to function as independent directors of the Funds.

9.      Section 3.04 of the P3 partnership agreement prescribed the scope of the Management Committee's power and authority generally as follows:

> "[T]he Management Committee shall have full, exclusive, and complete discretion in the management and control of the affairs of the Partnership, shall make all decisions affecting Partnership affairs and shall have all of the rights, powers, and obligations of a general partner of a limited partnership under DRULPA [i.e., the Delaware Revised Uniform Limited Partnership Act] and otherwise as provided by law. The members of the Management Committee shall provide overall guidance and supervision with respect to the operations of the Partnership, shall have all of the responsibilities, obligations, and fiduciary duties imposed by the 1940 Act upon directors of a business development company in corporate form, and shall monitor the activities of Persons in which the Partnership has invested. Except as otherwise expressly provided in this Agreement, the Management Committee is hereby granted the right, power, and authority to do on behalf of the Partnership all things which, in its sole judgment, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership . . . ."

10.      Under §§ 3.05(a) and -(b) of P3's limited-partnership agreement, the Managing General Partners were granted "exclusive power and authority" to manage P3's investment portfolios, subject, however, to the Management Committee's supervision.   Section 3.05 of the

agreement thus provided that "The grant of exclusive power and authority to the Managing General Partners under this Section 3.05 in no way limits the rights, powers, or authority of the Management Committee under this Agreement, DRULPA [i.e., the Delaware Revised Uniform Limited Partnership Act], or as otherwise provided by law."

11.     P3's limited-partnership agreement provided that the term of the partnership would end on December 31, 2004, subject to the right of the Individual General Partners to extend the term of a partnership to no later than December 31, 2006.  The limited partners held a Special Meeting and voted to terminate the partnership on July 7, 2006.

12.     The governance structure of P4's limited partnership agreement, including §§ 3.01, 3.04, and 3.05, is substantively identical to the governance structure of P3's agreement.

13.     The "Management Committee" governance structure of P3 and P4 was not incorporated into the limited partnership agreement for P5.   In place of a Management Committee, P5's partnership agreement vested governance of the partnership entirely in three Individual General Partners, each of whom was required to be a natural person.   Mr. Kokesh never served as an Individual General Partner.   Likewise, no other representative of TFI or TFL served as an Individual General Partner.

14.     Section 3.04 of P5's limited-partnership agreement prescribed the scope of the Individual General Partners' power and authority generally as follows:

> "[T]he Individual General Partners shall have full, exclusive, and complete discretion in the management and control of the affairs of the Partnership, shall make all decisions affecting Partnership affairs and shall provide overall guidance

57

and supervision with respect to the operations of the Partnership, shall perform the same functions and have the same duties, responsibilities and obligations imposed by the 1940 Act on the directors of business development companies organized in corporate form, and shall monitor the activities of Persons in which the Partnership has invested. . . . Except as otherwise expressly provided in this Agreement, the Individual General Partners are hereby granted the right, power, and authority to direct the Managing General Partners to do on behalf of the Partnership all things which, in their sole judgment, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership . . . ."

15.   Under §§ 3.05(a) and (b) of the limited-partnership agreement, a Managing General Partner was granted "exclusive power and authority" to manage P5's investment portfolios, subject, however, to the Individual General Partners' supervision.  Section 3.05 of the agreement thus provided that "The grant of exclusive power and authority to the Managing General Partners under this Section 3.05 in no way limits the rights, powers, or authority of the Individual General Partners under this Agreement, DRULPA [i.e., the Delaware Revised Uniform Limited Partnership Act], or as otherwise provided by law."

16.   P5's limited-partnership agreement provided that the term of the partnership would end on December 31, 2002, subject to the right of the Individual General Partners to extend the term of a partnership to no later than December 31, 2006.  The limited partners subsequently voted to terminate the partnership on July 7, 2006.

17.   The governance structure of P1's limited-partnership agreement, including §§ 3.01, 3.04, and 3.05, is materially identical to the governance structure of P5's agreement.

18.     Pursuant to its limited-partnership agreement, P1's term as a partnership ended December 31, 2002, and in accordance with the provisions of §15.01 of the agreement, P1 was dissolved effective as December 31, 2002.  The partnership terminated November 8, 2004.

**The Investment Advisers**

19.     TFI, a California corporation, was organized in 1979 as a successor to business associations originally formed by Mr. Kokesh, Frank R. Pope, and several outside and unaffiliated investors.  Mr. Kokesh owned at least 25% of TFL in 1987.  His ownership interest in TFL gradually increased so that, by 2001, he owned at least 75% of TFL.  At all times material herein, Mr. Kokesh was TFI's president and a member of its board of directors.  On May 11, 1987, TFI registered with Plaintiff as an investment adviser.  Its investment adviser registration terminated on January 9, 2007.

20.     In 1996, TFI formed a wholly-owned subsidiary Technology Funding Capital Corporation ("TFCC"), a California corporation with its principal place of business in New Mexico.  TFCC provided administrative services to the Funds pursuant to a written agreement approved unanimously by the Funds' Independent General Partners.

21.     In 1980, TFL was organized as a limited partnership under California law.  At all times material herein, Mr. Kokesh was TFL's general partner.  TFI became a wholly-owned subsidiary of TFL in September 1993 when the shareholders of TFI exchanged shares in TFI for partnership interests in TFL.  On May 11, 1987, TFL registered with the SEC as an investment adviser.  Its investment adviser registration terminated on January 9, 2007.

59

22.     Subject to the Management Committees' and Individual General Partners' supervision and control, TFL and TFI (a) conducted the day-to-day operations of the Funds and (b) made recommendations regarding the Fund's venture capital investment portfolio for the Management Committees and Individual General Partners' approval.

**The 2000 Tax Distribution**

23.     Section 9.01 of the Funds' limited-partnership agreements provided the terms for the distribution of funds to the Funds' investors, TFL, and TFI.   Under Section 9.02 of the limited-partnership agreements, the Funds were permitted to distribute funds to TFL, TFI, and investors to meet the tax liability on any net profits allocated to them from the Fund.

24.     P3, P4, and P5 filed their Forms 10-K with Plaintiff for the calendar year ended December 31, 2000, on March 30, 2001.   The Forms 10-K included the companies' financial statements.

25.     The financial statements that accompanied the Forms 10-K for the year 2000 included Statements of Partners' Capital.   These statements reported "tax distributions" to P3, P4, and P5's General Partners (e.g., TFL and TFI) for 2000 in the total amount of $ 6,112,797.

**Proxy Statements**

26.     The first drafts of the November 8, 2000 proxy solicitation for each Fund, in the form known as a "PRE14A," were submitted to the SEC on or about August 16, 2000.

27.     Julie Anne Overton, an employee of TFCC, caused the definitive form of the proxy solicitations (*i.e.,* the DEF14As) to be prepared and filed electronically with the SEC from

60

the Funds' principal place of business in California on November 8, 2000.  At this time the definitive proxy solicitations were furnished to the Funds' Individual General Partners and limited partners.  The proxy solicitations were signed electronically by Mr. Kokesh under the heading "By order of" the Management Committee or Individual General Partners.

28.     Each of the four November 8, 2000 proxy solicitations notified the limited partners that the companies' partners would meet on December 8, 2000 to consider and vote on a number of proposals, including a proposal known as "Proposal 4".

29.     In each of the four proxy solicitations, the limited partner meeting notice summarized Proposal 4 by stating that the Funds partnership agreement would be amended:

> "to delete references to 'Controlling Person' in the definition of 'General Partner Overhead' so that the salary and fringe benefits of a Controlling Person of a Managing General Partner directly involved in the carrying out of the business of the Partnership are expenses of the Partnership[.]"

30.     The body of the proxy solicitation included a detailed explanation of Proposal 4, entitled "Increase in Partnership Expenses by Redefining 'General Partner Overhead.'"  The explanation identified Mr. Kokesh as the only "Controlling Person" for each of the Advisory Firms and stated that the Individual General Partners (in the case of P5 and P1) and the Management Committee (in the case of P3 and P4):

> "propose to amend the definition of General Partner Overhead to delete references to 'Controlling Person' so that the Partnership is permitted to pay for the expertise, time, and management services directly provided to it by a Controlling Person in carrying out the business of the Partnership".

61

31.     Proposal 4's explanation stated further that:

"If the Limited Partners approve this proposed amendment, the Partnership will incur the expenses related to the management of the activities and investments of the Partnership by Mr. Kokesh or any other Controlling Person whose salary and fringe benefits are paid by TFI."

32.     Through their conduct, the Funds, the Advisory Firms, and Mr. Kokesh used the

instrumentalities of interstate commerce or the mails.

62

INSTRUCTION NO. 19

As stated earlier, it is your duty to determine the facts and in so doing you must consider only the evidence I have admitted in the case.  The evidence consists of the testimony of the witnesses and the exhibits admitted into evidence by the Court, any facts admitted or agreed to by counsel, and any facts which the court instructs you to accept as true.

You may draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.  You may make deductions and reach conclusions that reason and common sense lead you to make from the testimony and evidence.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence consists of proof of facts or circumstances that give rise to a reasonable inference of the truth of the fact sought to be proved from which you could find another fact.   You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.

INSTRUCTION NO. 20

Now, I have said that you must consider all of the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or "believability" of each witness and the weight to be given to the witness' testimony.  In weighing the testimony of a witness you should consider the witness' relationship to the plaintiff or to the defendant; the witness' interest, if any, in the outcome of the case; manner of testifying; opportunity to observe or acquire knowledge concerning the facts about which the witness testified; candor, fairness and intelligence; and the extent to which the witness has been supported or contradicted by other credible evidence or previous statements inconsistent with the witness' present testimony.  You may, in short, accept or reject the testimony of any witness in whole or in part.

Also, the weight of the evidence is not necessarily determined by the number of witnesses testifying as to the existence or non-existence of any fact.  You may find that the testimony of a smaller number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

64

INSTRUCTION NO. 21

A witness may be discredited or impeached by contradictory evidence or inconsistent conduct, or by evidence that at other times the witness has made material statements, under oath or otherwise, that are inconsistent with the present testimony of the witness.

If you believe that any witness has been impeached or discredited, it is up to you to give the testimony of that witness only such credit as you may think it deserves.

65

INSTRUCTION NO. 22

The production of evidence in court is governed by rules of law.  From time to time it has been my duty, as judge, to rule on the evidence.  You must not concern yourselves with the reasons for these rulings.  You should not consider what would or would not have been the answers to the questions that the Court ruled could not be answered.

INSTRUCTION NO. 23

An attorney has the right to interview a witness for the purpose of learning what testimony the witness will give.  The fact that the witness has talked to an attorney does not reflect adversely on the truth of such testimony.

INSTRUCTION NO. 24

Some evidence is admitted for a limited purpose only.  When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that purpose and for no other.

INSTRUCTION NO. 25

The law of this case is contained in these instructions, and it is your duty to follow them. You must consider these instructions as a whole, not picking out one instruction, or parts thereof, and disregarding others.

Faithful performance by you of your duties is vital to the administration of justice.

INSTRUCTION NO. 26

The jury acts as a body.  Therefore, on every question that the jury must answer it is necessary that all jurors participate.  Before a question can be answered, all of you must agree upon each answer.  In other words, your verdict must be unanimous.

INSTRUCTION NO. 27

Any notes that you have taken during this trial are only aids to your memory.  If your memory differs from your notes, you should try to rely on your memory and not on the notes. The notes are not evidence.  If you have not taken notes, you should rely on your independent recollection of the evidence and should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

INSTRUCTION NO. 28

After these instructions on the law governing the case, the lawyers may make closing arguments, or statements, on the evidence and the law.  These summaries can be of considerable assistance to you in arriving at your decision, and you should listen carefully.  You may give them such weight as you think proper.  However, neither these final decisions nor any other remarks or arguments of the attorneys made during the course of the trial are to be considered by you as evidence or as a correct statement of the law, if contrary to the law given in these instructions.

INSTRUCTION NO. 29

Faithful performance by you of your duties is vital to the administration of justice.

Any verdict must represent the considered judgment of each juror.  In order to return a verdict, it is necessary that each juror agree to it.   In other words, your verdict must be unanimous.

It is your duty as jurors to consult with one another, and to deliberate in an effort to reach an agreement if you can do so without giving up your individual judgment.  Each of you must decide the case for yourself, but only after an impartial consideration of all of the evidence in the case with your fellow jurors.  In the course of your deliberations, do not hesitate to re-examine your own views, and change your opinion, if convinced that it is erroneous.  But do not surrender your honest conviction as to the weight or effect of the evidence, solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember at all times you are not partisans.  You are judges—judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

INSTRUCTION NO. 30

Upon retiring to the jury room, and before commencing your deliberations, you will first elect a foreperson. The foreperson will preside over your deliberations and will be your spokesperson here in court.

You will be given the Court's instructions and a verdict form. In this case it will be necessary for you to answer the preliminary questions presented to you on the verdict form.

If you recess during your deliberations, follow all of the instructions that I have given you about your conduct during the trial.

If, during your deliberations, you should desire to communicate with me, please put your message or question in writing on one of the forms that my court staff will provide to you. Your note should be signed by the foreperson and then passed to the court security officer who will bring it to my attention. Never attempt to communicate with me except by a written note signed by your foreperson. I will respond as promptly as possible, either in writing or by having you returned to the courtroom. I will always first disclose to the attorneys your question and my response before I answer your question. If I reply to you in writing, please leave both the message and the reply in the jury room. These documents should not be thrown away, even at the conclusion of your deliberations.

Bear in mind always that you are not to reveal to me or to any person how you stand, numerically or otherwise, until you have reached a unanimous verdict. Do not disclose any vote count in any communications with the Court.

74

After you have reached your unanimous verdict, your foreperson is to fill in the answers to the questions on the verdict form and date and sign the form.  The completed, signed verdict form should then be placed in the envelope that will be provided to you.  After completing the verdict form, please also send a note to the court security officer indicating that you have reached a verdict and are ready to return to the courtroom.  Again, any notes you pass to the court security officer should not state what your verdict is or how you have voted.

DATED this  6th  day of November, 2014.

_____
**STEPHAN M. VIDMAR**
**United States Magistrate Judge**
**Presiding by Consent**

75