**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

SECURITIES AND EXCHANGE
COMMISSION,

      **Plaintiff,**

v.                                      **No. 09-cv-1021 SMV/LAM**

CHARLES R. KOKESH,

      **Defendant.**

**MEMORANDUM OPINION AND ORDER**
**GRANTING PLAINTIFF'S MOTION FOR ENTRY OF FINAL JUDGMENT**

THIS MATTER is before the Court on Plaintiff's Motion for Entry of Final Judgment against Defendant Charles R. Kokesh [Doc. 176] ("Motion"), filed on December 2, 2014. Defendant filed his Response and Declaration on January 7, 2015. [Docs. 179, 180]. Plaintiff replied on January 21, 2015. [Doc. 181]. The Court heard oral argument on March 9, 2015. Having considered the motion, briefing, oral argument, record, and relevant law and being otherwise fully advised in the premises, the Court finds that the Motion is well-taken and will be GRANTED.

## I.  BACKGROUND

Defendant owned and controlled two SEC-registered investment-adviser firms, Technology Funding Ltd. ("TFL") and Technology Funding, Inc. ("TFI") (collectively, "the Advisers"). TFL and TFI were contracted to provide investment advice to four SEC-registered business development companies ("BDCs" or "Funds"). Plaintiff filed its Complaint [Doc. 1] on October 27, 2009, alleging that, *inter alia*, from 1995 through July 2007, Defendant

misappropriated more than $34.9 million from the Funds; caused the filing of false and misleading SEC reports and proxy statements to conceal the truth about his misappropriation scheme; and caused the execution, renewal, and performance of contracts with illegal performance-fee provisions.  [Doc. 166] at 11–16.  The Court presided over a five-day jury trial that began on November 3, 2014, [Doc. 168], and concluded with a jury verdict against Defendant on all claims, [Doc. 174].

## A.  Direct Violations

The jury rendered a verdict against Defendant, finding that he "knowingly and willfully" converted investment-company assets to his own use or to the use of another, in direct violation of § 37 of the Investment Company Act of 1940 ("Investment Company Act"), 15 U.S.C. § 80a-36.  [Doc. 174] at 2; [Doc. 166] at 30.   Specifically, the evidence established that, through two investment advisers he owned and controlled, TFL and TFI, Defendant converted $34,927,329 from the Funds as follows:

First, from 1995 through 2006, Defendant directed the Advisers' treasurer, Charlie Freeman, to take $23,807,091 from the Funds to pay salaries and bonuses to Defendant and other officers of the Advisers.  The contracts between the Advisers and the Funds contained no bonus provision and prohibited payments to the Advisers that were not expressly specified in the contracts.  Defendant signed the contracts.  Defendant did not disclose the bonus payments to the Funds' directors or in SEC filings he signed on the Funds' behalf.

Moreover, until a 2000 amendment, the contracts specifically prohibited reimbursements to cover salaries of the Advisers' "controlling persons," including Defendant and the other officers.  The 2000 amendment permitted reimbursement for controlling-person salaries.  But it

was based on misleading proxy statements signed by Defendant that falsely identified him as the only controlling person.  The proxy statements also falsely stated that Defendant's average annual salary from 1998 through 2000 was $221,000 when, in fact, it was $771,000.  Following the amendment, Defendant caused TFL and TFI to take average annual payments more than 15 times greater than the anticipated average annual payments disclosed in the proxy statements.

Second, from 1995 through 2006, Defendant directed Freeman to take $5,007,441 from the Funds to cover the Advisers' office rent.  Defendant knew the contracts specifically prohibited such rent reimbursement.  Defendant did not disclose the rent payments to the Funds' directors.

Third, in 2000, Defendant caused the Advisers to take $6,112,797 in payments falsely described in SEC reports he signed as "tax distributions."  The contracts required several conditions to be met before the Advisers could be paid a distribution to cover their tax obligations.  But the payments in 2000 did not satisfy the contracts' stated conditions for tax distributions and had nothing to do with any tax obligation.  Defendant personally received more than 90% of the money.  Defendant knew the money he received was not related to a tax liability, but he did not return the money to the Funds.  Defendant paid only $10,304 in federal taxes in 2000.

## B.  Aiding-and-Abetting Violations

From the same misconduct described above, the jury found that Defendant "knowingly and substantially assisted" the Advisers to employ a device, scheme, or artifice to defraud a client and to engage in a transaction, practice, or course of business that operated or would operate as a

fraud or deceit upon a client and that, in so doing, Defendant aided and abetted violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and (2). [Doc. 174] at 1; [Doc. 166] at 18, 21.  The jury further found that he aided and abetted violations of § 205 of the Advisers Act, 15 U.S.C. § 80b-5, by knowingly assisting an investment adviser to perform on a contract that provided for illegal profit sharing in an investment company.

The jury also found that Defendant knowingly and substantially assisted the Funds in filing false and misleading quarterly and annual reports with the SEC and in soliciting proxies using false and misleading proxy statements, thereby aiding and abetting violations of § 13(a) and 14(a) of the Exchange Act, 15 U.S.C. §§ 78m and 78n, and Exchange Act Rules12b-20, 13a-1, 13a-13, and 14a-9, 17 C.F.R. §§ 240.12b-20, 13a-1, 13a-13, and 14a-9.

Under § 209(f) of the Investment Advisers Act of 1940 ("Advisers Act") and § 20(e) of the Securities Exchange Act of 1934 ("Exchange Act"), any person who aids and abets another person's violation shall be deemed to be in violation to the same extent as the person who committed the violation.  15 U.S.C. §§ 80b-9(f) and 78t(e).  Accordingly, having been found liable of aiding and abetting certain violations of the securities laws, Defendant is deemed to be in violation to same extent as the primary violators.

### C.  Plaintiff's Motion for Entry of Judgment

Based on the jury's verdict, Plaintiff filed the instant Motion seeking entry of final judgment ordering Defendant: (1)  to pay a civil money penalty, (2) to be permanently enjoined from violating specified provisions of federal securities laws, and (3) to disgorge the amounts that Defendant misappropriated in violation of securities laws.  [Doc. 176] at 1.  Defendant urges the Court to deny all of the requested relief.

## II. ANALYSIS

The statute of limitations at 15 U.S.C. § 2462 applies to the civil money penalty and, thus, limits the total amount of penalty that the Court may impose.  However, because some of the claims first accrued within the limitations period, § 2462 does not bar a civil money penalty in its entirety.  In light of the facts and circumstances, the Court finds that a third-tier, civil money penalty should be imposed against Defendant in the amount of $2,354,593.

The Court further finds that neither injunction nor disgorgement constitutes a "penalty" in this case because neither is unrelated to, or in excess of, the damages caused by Defendant.  In fact, they are tailored to the injury caused by Defendant.  Therefore, neither injunction nor disgorgement is subject to the statute of limitations at § 2462.

The Court further finds that there is a reasonable and substantial likelihood that Defendant, if not enjoined, will violate securities laws in the future.  Accordingly, he will be permanently enjoined from violating the securities laws.

Finally, the Court determines that $34,927,329 reasonably approximates the ill-gotten gains causally connected to Defendant's violations and will order him to disgorge that amount, plus prejudgment interest of $18,077,103.37.

A. The Court will impose a civil penalty against Defendant in the amount of $2,354,593.

There is no dispute that a civil money penalty generally would be available for the violations at issue in this case.  [Doc. 176] at 9 (citing 78u(d); 80b-9(e); and 80a-41(e)); [Doc. 179] at 5.  Similarly, there is no dispute that § 2462 applies to such a penalty and, thus, limits the time period during which Plaintiff may seek to enforce it.  The statute reads:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or

> forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

§ 2462.  The parties further agree that because Plaintiff filed its Complaint on October 27, 2009, the relevant limitations period begins on October 27, 2004.  Accordingly, there is no dispute that the claim for a civil money penalty must have "first accrued" on or later than October 27, 2004. If it "first accrued" on or prior to October 26, 2004, it would be barred.[1]

The parties dispute when the claim for the civil money penalty "first accrued."  Plaintiff maintains that the claim accrued for purposes of § 2462 when the monies at issue were taken by Defendant. [Doc. 181] at 1–3.  Plaintiff concedes that monies taken by Defendant on or before October 26, 2004, are barred by § 2462.  *Id.*  However, according to Plaintiff, Defendant took $5,004,773 and also signed and filed misleading reports with Plaintiff during the limitations period, i.e., on or after October 27, 2004.[2]  *Id.*  Therefore, Plaintiff urges the Court to impose a civil monetary penalty against him for $5,004,773.  *Id.*

Defendant argues that no monetary penalty should be imposed because the claim first accrued prior to the limitations period.  Defendant's position is that accrual occurred, not when he took funds, but rather when he submitted the first of certain filings with Plaintiff. Specifically, he argues that the claim related to his improper receipt of incentive payments accrued when "the registration statements originally containing the unauthorized incentive compensation plans were filed with the SEC."  [Doc. 179] at 3 (citing Exs. 2, 54, 165, 274), at 7

---

[1] The five-year limitations period may be subject to tolling under certain circumstances.  *SEC v. Jones*, 476 F. Supp. 2d 374, 381 (S.D.N.Y. 2007).  However, here, Plaintiff does not argue that it is entitled to tolling.  *See* [Doc. 181].

[2] The monies included improper payments to "controlling persons," office-rent payments, and bonuses.  [Doc. 181] at 1–3.  The misleading reports are contained in Exhibits 117, 119, 122, 127, 131, 134, 139, 156, 232, 233, 239, 243, 245, 247, 252, 268, 323, 325, 330, 334, 338, 340, and 346.  [Doc. 181] at 3, n.4.

(such statements were filed between 1986 and 1992). He argues further that the claim related to the wrongful tax distributions accrued when the quarterly 10Qs and annual 10Ks were filed with SEC in May of 2000. [Doc. 179] at 7; at 4 (citing Exs. 83, 195, 295, (10Qs) 91, 203, 299 (10Ks)). Finally, the claim related to the improper payments to "controlling persons" accrued when the related definitive proxy solicitations were filed with Plaintiff on Nov. 8, 2000. [Doc. 179] at 3 (citing Exs. 29, 90, 202, 298), at 7. Defendant makes no argument regarding the accrual of the claim related to the improper rent payments. *See* [Doc. 179].

A claim "accrues" under § 2462 when the fraud occurs (as opposed to when it is discovered). *Gabelli v. SEC*, 133 S. Ct. 1216, 1220 (2013). In this case, Defendant's fraud spanned 12 years and continued into the limitations period. Therefore, his fraud accrued both before and after October 27, 2004, the limitations cut-off for the purposes of § 2462. Under *Gabelli*, the fraud that accrued before the cut-off would be barred by § 2462, while the fraud accruing after would not. Accordingly, some of the illegally obtained funds—those distributed after on or after October 27, 2004—are not barred by the statute of limitations.

Having found that some of the illegally obtained funds would not be barred by § 2462, the Court must still evaluate whether to impose a civil money penalty, and if so, how much. The relevant statutes set forth a three-tier penalty structure in which each tier provides for a penalty that shall not exceed the greater of either a specific enumerated statutory amount or "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. §§ 78u(d)(3)(B), 80b-9(e)(2), 80a-41(e)(2). A first-tier penalty cannot exceed the greater of $5,000 or the gross amount of pecuniary gain; a second-tier penalty cannot exceed the greater of $50,000 or the gross amount of pecuniary gain; and a third-tier penalty cannot exceed the greater

of $100,000 or the gross amount of pecuniary gain.  *Id.*[3]  The first-tier penalty appears to be the default penalty amount.  A second-tier penalty is appropriate if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard for a regulatory requirement." §§ 78u(d)(3)(B)(ii), 80b-9(e)(2)(B), 80a-41(e)(2)(B).  A third-tier penalty is appropriate if the requirements for a second-tier penalty are met and the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." §§ 78u(d)(3)(B)(iii), 80b-9(e)(2)(C), 80a-41(e)(2)(C).

Courts determine the amount of the civil penalty, if any, "in light of the facts and circumstances" of the particular case.  §§ 78u(d)(3)(B), 80b-9(e)(2), 80a-41(e)(2).  In determining the amount of a civil penalty, courts have looked to various factors, including: (1) the egregiousness of the violations at issue; (2) the degree of the defendant's scienter; (3) whether the violations were isolated or recurrent; (4) a defendant's failure to admit wrongdoing; (5) whether the defendant's conduct created substantial losses or the risk of substantial losses to investors; (6) defendant's lack of cooperation and honesty with authorities; and (7) whether an otherwise appropriate penalty should be reduced due to the defendant's demonstrated current and future financial condition.  *SEC v. United Amer. Ventures, LLC*, 2012 U.S. Dist. LEXIS 51978, *24 (D.N.M. Mar. 2, 2012) (citing *S.E.C. v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 568 (S.D.N.Y. 2009) (listing factors)).  The purpose of a civil penalty is to punish the wrongdoer and discourage future violations of the securities laws.  *See, e.g.*, *id.* at *27 (considering punishment and deterrence in imposing civil money penalties).

---

[3] Although the statute itself provides for enumerated penalties not to exceed $5,000, $50,000, and $100,000, respectively, this statutory amount has been adjusted for inflation pursuant to the Debt Collections Improvement Act of 1996, Pub. L. No. 104-134, § 31001 (April 26, 1996).  *See* 17 C.F.R. § 201.1003.  Accordingly, the actual statutory amounts have increased.  However, the specific amounts are not ultimately consequential here because the Court does not rely on them in awarding the civil money penalty.  *See infra.*

In this case, Defendant was found liable for numerous "knowing" violations of securities laws, and the circumstances were egregious.  He misappropriated nearly $35 million over an 11-year period, abusing his roles in several adviser and investment firms for his own personal benefit and to the detriment of investors.  He specifically targeted smaller investors (those investing $5,000 or less) because they would be less likely to sue if they discovered his schemes. *See* Trial Transcript dated Nov. 4, 2014 [Doc. 163] at 43–44.  Based on these circumstances, the Court finds that Defendant's violations were egregious.

Defendant was aware of his wrongdoing, which supports a higher civil penalty.  Scienter, according to the Supreme Court, is knowing or intentional misconduct designed to deceive or defraud investors.  *Rolf v. Blyth, Eastman Dillon & Co., Inc*., 570 F.2d 38, 45 (2nd Cir. 1978) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)); *see also SEC v. Wall Street Pub. Institute, Inc.*, 591 F. Supp. 1070, 1084 (D.D.C. 1984) (scienter established by showing intentional, knowing, or reckless conduct resulting in the alleged fraud or deceit).  Tenth Circuit authority has reasoned that illegal conduct that is knowing and willful satisfies the scienter requirement.  *Edward J. Mawod & Co. v. SEC*, 591 F.2d 588 (10th Cir. 1979).  Defendant is highly educated and by all accounts highly intelligent and knowledgeable about advising and investing.  These circumstances, coupled with the vast extent of the fraud, tend to show that Defendant acted with a high degree of scienter.

The fourth and fifth factors support a higher civil penalty, but the sixth and seventh do not.  Defendant has never admitted any wrongdoing.  Even in the face of a unanimous jury verdict, Defendant has not recognized his wrongful conduct.  In his Declaration, [Doc. 180], filed concurrently with the Response, [Doc. 179], Defendant blames the dissolution of the Funds

on market conditions and certain market collapses.  *Id*.  Defendant also blames the "profound changes in the capital markets" since 2000 rather than take any responsibility for his own conduct.  [Doc. 179] at 9.  He even blames those in control of the very funds he pilfered.  *See* Final Jury Instructions [Doc. 166] at 15–17.  His conduct created substantial losses to investors.  However, Defendant has cooperated with Plaintiff's investigations.  Defendant strenuously emphasizes the seventh factor.  He insists that he is insolvent and has no prospect of recovering from insolvency, which if true, may support a lower civil penalty.

Balancing these factors, and pursuant to 78u(d)(3)(B)(iii), 80b-9(e)(2)(C), and 80a-41(e)(2)(C), the Court finds that Defendant meets the statutory requirements for third-tier penalties.  In furtherance of the dual purposes of punishment and deterrence, and on careful consideration of all the circumstances, the Court finds that a civil money penalty equal to the amount of funds that Defendant himself received during the limitations period, or $2,354,593, is warranted.[4]  *See* [Doc. 179] at 4 (Defendant's calculated total).

B.  The Court will permanently enjoin Defendant from violating the securities laws and order him to disgorge $34,927,329 plus prejudgment interest of $18,077,103.37.

The parties agree that the violations at issue in this case could result in an injunction barring further violations, as well as a disgorgement order.  [Doc. 176] at 4–5 (citing 15 U.S.C. §§ 78u(d), 80b-9(d), 80a-41(d)); *see* [Doc. 179] at 8–11.  Additionally, the parties agree that an injunction or disgorgement order, being an equitable remedy, would not be subject to the five-year statute-of-limitations found in § 2462.  [Doc. 179] at 8–11; [Doc. 181] at 3–7.  They also agree that if an injunction or disgorgement order did amount to a "penalty," those remedies

---

[4] This finding should not be interpreted as a legal determination on whether civil money penalties may be imposed for monies paid to third-parties.  Although Defendant has raised such argument, [Doc. 179] at 4–6, the Court need not reach the issue because, here, a penalty exceeding the amount that Defendant himself received is not warranted anyway.

would then become subject to the § 2462 limitations period.   [Doc. 179] at 8–11; [Doc. 181] at 3–7.

The dispute here is whether the injunction or disgorgement order requested by Plaintiff constitutes a "penalty" such that § 2462 would apply.   Plaintiff argues that neither remedy amounts to a "penalty," and therefore, § 2462 does not apply.   Plaintiff urges the Court to permanently enjoin Defendant from violating the securities law and to order him to disgorge all of his ill-gotten gains, in the amount of $34,927,329.   [Docs. 176, 181].

Defendant argues that neither an injunction nor a disgorgement order—apparently in any amount—is permissible.   He makes the same § 2462 statute-of-limitations argument here that he makes against a civil penalty.   *See* n.4, *supra*.   With respect to these (traditionally) equitable remedies, however, he makes a necessary additional argument.   He insists that an injunction or disgorgement order would constitute a civil penalty under § 2462.   If he is correct, and if either constitutes a civil penalty, then § 2462's statute-of-limitations period applies.   As he did with the civil-money-penalty argument, Defendant posits that all of Plaintiff's claims "first accrued" prior to October 27, 2004.   Therefore, any injunction or disgorgement order would be barred by § 2462.   To support his theory, he points to *SEC v. Graham*, 21 F. Supp. 3d 1300 (S.D. Fla. 2014), and *Gabelli*, 133 S. Ct. at 1220–21.

In *Graham*, the Honorable Lawrence King, United States District Judge for the Southern District of Florida, held that an injunction barring future violations of securities laws and a disgorgement order would be "penalties" subject to § 2462's statute of limitations.   21 F. Supp 3d at 1310–11.   In *Graham*, all of the alleged wrongdoings had occurred outside of § 2462's five-year limitations period, which was the heart of Judge King's ruling.   *Id.* at 1305.   Relying

heavily on the Supreme Court's decision in *Gabelli*, which reaffirmed the fundamental importance and necessity of statutes of limitations, Judge King rejected the notion that equitable remedies for violations of securities laws might *not* be subject to § 2462 and thus might have no statute of limitations. *Id.* at 1310–11. He reasoned that under *Gabelli*, there simply must be *some* method of repose. After all, finding that § 2462 did not apply to equitable remedies "would make the Government's reach to enforce such claims akin to its unlimited ability to prosecute murderers and rapists." *Id.* at 1310. Accordingly, he found that enjoining the defendants from any future violations of securities laws "can be regarded as nothing short of a penalty 'intended to punish,' especially where [there was] no evidence (or allegations) of any continuing harm or wrongdoing [within the limitations period]." *Id.* at 1310. With respect to the proposed disgorgement order, Judge King found that it would be essentially the same as a civil penalty (which is clearly subject to § 2462) because ordering the disgorgement of all ill-gotten gains would be tantamount to a forfeiture. *Id.* at 1310–11.

Although the *Graham* opinion does not expressly mention the term, Judge King's reasoning is referred to as the concurrent remedy rule. "The concurrent remedy rule provides: when legal and equitable relief are available concurrently (*i.e.*, when an action at law or equity could be brought on the same facts), equity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy." *United States v. Telluride Co.*, 146 F.3d 1241, 1249 n.12 (10th Cir. 1998) (internal quotation marks omitted) (citing *Cope v. Anderson*, 331 U.S. 461, 464 (1947)). As Plaintiff points out, the Tenth Circuit has spoken on this issue and has reached a different result than *Graham*. *Id.*

In *Telluride*, the Tenth Circuit held that equitable remedies *are* available to the government even where legal relief on the same facts is barred by the statute of limitations. *Id.* at 1248–49. The court explained that "a suit by the United States in its governmental capacity is not subject to a time limitation unless Congress explicitly imposes one and any statute of limitations sought to be applied against the United States must receive a strict construction in favor of the Government." *Id.*

In addition to rejecting the concurrent remedy rule, the court also determined whether the equitable relief sought—enjoining the defendant from continuing to illegally fill wetlands and requiring the defendant to restore damaged wetlands or create new wetlands to replace those that could not be restored—amounted to a penalty and, thus, whether § 2462 applied. *Id.* at 1243, 1245–46. The court held that the injunction did not constitute a penalty under § 2462 because it sought only to restore the damaged wetlands. *Id.* at 1246. It "did not seek compensation unrelated to or in excess of the damage caused by the defendant's acts." *Id.*

On careful analysis of the case law, this Court is not persuaded that the reasoning in *Graham* should apply here. First, *Graham* is factually distinct. In *Graham*, none of the alleged wrongdoing had occurred within the limitations period. Here, however, the Court has found that some of Defendant's wrongs did occur within the limitations period. Therefore, even if the concurrent remedy rule were to apply in this case, it would not preclude all equitable relief. Second, the Court finds *Graham* to be an outlier. Plaintiff cites numerous cases in which other courts have addressed, and rejected, *Graham's* reasoning. *See* [Doc. 181] at 10 (collecting cases). Finally, and most importantly, this Court is bound by *Telluride* and, accordingly, shall not apply the concurrent remedy rule.

*Graham* and the concurrent remedy rule notwithstanding, Defendant still argues that the injunction and disgorgement sought in this case are actually "penalties" subject to § 2462. A permanent injunction or a disgorgement order would be a punitive measure, and thus subject to § 2462, if it is imposed as "a form of punishment" that "goes beyond remedying" the damage allegedly caused by the defendant. *Johnson v. SEC*, 87 F.3d 484, 488 (D.C. Cir. 1996). A § 2462 penalty is a "sanction or punishment imposed for violating a public law which goes beyond compensation for the injury caused by the defendant." *Telluride*, 146 F.3d at 1246. In other words, there may be a penalty where the "sanction seeks compensation unrelated to, or in excess, of the damages caused by the defendant." *Id.*

i.   Injunction

Defendant urges the Court to ignore *Telluride* in determining whether the proposed injunction would amount to a penalty. Defendant argues that the injunction would constitute a penalty because there is minimal likelihood that the injunction would restore the *status quo ante* Defendant's wrongs, and because there is "no reasonable prospect of future harm." [Doc. 179] at 9–10; *see SEC v. Jones*, 476 F. Supp. 2d 374, 384 (S.D.N.Y. 2007) (holding that where the SEC adduced no positive proof, aside from the defendants' past wrongdoing, to suggest some cognizable danger of recurrent violation, an injunction barring future violations of securities laws would constitute a "penalty" under § 2462).

The Court is not persuaded. The Court finds that the requested injunction—barring Defendant from any future violations of the securities laws—is not a penalty under § 2462 because it does not seek compensation unrelated to or in excess of the damage caused by

Defendant.   *See Telluride*, 146 F.3d at 1246.   In fact, enjoining Defendant from future securities-laws violations is precisely tailored to Defendant's wrongs.

Additionally, even assuming *arguendo* that the injunction were a penalty, § 2462 would not bar it.  Because the Court finds that some of Defendant's violations occurred within the five-year window, injunctive relief—even if tantamount to a "penalty"—would not be barred by the statute of limitations.

Even though the Court has found that the injunction requested in this case is not a penalty and is not barred by the statute of limitations, those findings do not mean, *ipso facto*, that an injunction is warranted.  "An injunction based on the violation of securities laws is appropriate if the SEC demonstrates a reasonable and substantial likelihood that the defendant, if not enjoined, will violate securities laws in the future."  *SEC v. Pros Int'l, Inc*., 994 F.2d 767, 769 (10th Cir. 1993).   The relevant factors for determining the likelihood of future violations are the seriousness of the violation, the degree of scienter, whether the defendant's occupation will present opportunities for future violations, and whether the defendant has recognized his wrongful conduct and gives sincere assurances against future violations.  *Id.*   While no single factor is determinative, "the degree of scienter bears heavily on the decision." *Id*.

The first factor, the seriousness of Defendant's violations, was established at trial. Defendant was found liable for numerous "knowing" violations of securities laws, and the circumstances were egregious.  He misappropriated nearly $35 million over an 11-year period, abusing his roles in several adviser and investment firms for his own personal benefit and to the detriment of investors.  He specifically targeted smaller investors (those investing $5,000 or less) because they would be less likely to sue if they discovered his schemes.  *See* Trial Transcript

dated Nov. 4, 2014 [Doc. 163] at 43–44.   Based on these circumstances, the Court finds that Defendant's violations were quite serious.   Consequently, this factor weighs in favor of an injunction.

The second factor, Defendant's degree of scienter, also weighs in favor of an injunction. Scienter, according to the Supreme Court, is knowing or intentional misconduct designed to deceive or defraud investors.   *Rolf*, 570 F.2d at 45 (citing *Ernst & Ernst*, 425 U.S. at 199); *see also Wall Street Pub.*, 591 F. Supp. at 1084 (scienter established by showing intentional, knowing, or reckless conduct resulting in the alleged fraud or deceit).   Tenth Circuit authority has reasoned that illegal conduct that is knowing and willful satisfies the scienter requirement. *Edward J. Mawod & Co.*, 591 F.2d 588.

Defendant is highly educated and by all accounts highly intelligent and knowledgeable about advising and investing.   The jury found that his violations were committed "knowingly." [Doc. 174].   These circumstances, coupled with the vast extent of the fraud, tend to show that Defendant acted with a high degree of scienter.

The third factor is whether Defendant's occupation will present opportunities for future violations.   Defendant testified at trial that he owned and controlled investment-adviser firms and operated investment companies for decades.   [Doc. 165] at 48–58; [Doc. 166] at 38–69.   He holds a law degree and a master's degree in business administration.   At trial, he expounded on his vast business experience, knowledge, and training in business formation and securities markets.   *Id*.   Defendant attests that he does not intend to engage in business activity that would present opportunities for future violations, citing his age (67 years old), his alleged insolvency, loss of his residence in foreclosure proceedings, and "fundamental market changes" precluding

investment opportunities in high tech initial public offerings. [Doc. 180]. However, his occupation has historically been in business formation and securities markets. *Id.* Moreover, the evidence at trial establishes that Defendant has been accustomed to an extravagant lifestyle, and in light of his demeanor, the Court is not persuaded that Defendant would refrain from pursuing a business opportunity that could lead to violating the securities laws. Although Defendant attests that he is not currently employed, [Doc. 180] at 3, the Court finds this third factor favors issuance of an injunction.

The final factor the Court considers is whether Defendant has recognized his wrongful conduct or given assurances against future violations. Even in the face of a unanimous jury verdict, Defendant has not recognized his wrongful conduct. Defendant's Declaration, [Doc. 180], filed concurrently with his Response, [Doc. 179], blames the dissolution of the Funds on market conditions and certain market collapses. *Id.* Defendant also blames the "profound changes in the capital markets" since 2000 for his financial circumstances rather than take any responsibility for his own conduct. [Doc. 179] at 9. His claims that he does not intend to engage in his prior business activities are self-serving. Defendant has not recognized his wrongful conduct, nor has he given any credible assurances against future violations. Therefore, the final factor also weighs in favor of an injunction.

All of the factors set forth by the Tenth Circuit weigh in favor of issuing a permanent injunction. Therefore, the Court finds that there is a reasonable and substantial likelihood that Defendant will again violate the securities laws. Accordingly, an injunction is warranted and shall issue.

ii. Disgorgement

The question of disgorgement is slightly different from the question of an injunction. Although the Court finds that some of the violations occurred within the five-year period, not all did. Nevertheless, Plaintiff requests disgorgement of all funds that were misappropriated, even those outside the five-year window. Therefore, the Court first analyzes whether disgorgement in this case would constitute a penalty such that § 2462 would apply. Finding that it does not apply, the Court next evaluates whether and to what extent disgorgement is warranted.

a. Disgorgement in this case is not a penalty.

In *Telluride*, the Tenth Circuit explained that an equitable remedy, like disgorgement, would not amount to a "penalty" under § 2462 where it "did not seek compensation unrelated to or in excess of the damage caused by the defendant's acts." 146 F.3d at 1246. The court specifically described disgorgement as "remedial" even though it "sanction[s] past conduct. *Id.* at 1247. Under *Telluride*, equitable disgorgement should apply to "ill-gotten gains earned by the defendant while in violation of securities laws." *Id.* (internal quotation marks omitted).

Nevertheless, relying upon other, out-of-circuit cases, namely *Johnson*, *Bartek*, and *Commonwealth Chemical*, Defendant urges the Court to find that disgorgement would constitute a penalty because of the "crushing financial consequences" to Defendant, and because there is no evidence of the likelihood of recurrence of violations. [Doc. 179] at 10. Therefore, Defendant argues that no equitable purpose could be served by ordering disgorgement of all of the misappropriated funds, including those taken outside the five-year window. *Id.*

However, neither *Johnson* nor *Bartek* nor *Commonwealth Chemical* supports his position. Disgorgement was not at issue in any of these cases. *See Johnson* 87 F.3d at 491; *Bartek*, 484 F.

App'x at 950–57; *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 95–96, 102 (2d Cir. 1978).   In fact, the *Johnson* court refers to "disgorgement of ill-gotten gains" to illustrate a "strictly remedial" measure without respect for the consequences of disgorgement on the defendant.   *Johnson* 87 F.3d at 491.   Disgorgement is not mentioned at all in *Bartek*.   And the court in *Commonwealth Chemical* seems to suggest that the effect of a disgorgement order on a defendant is irrelevant to its equitable nature.   574 F.2d at 96.   The authorities cited by Defendant actually seem consistent with the rule in *Telluride*.   Applying the *Telluride* rule, the Court finds that the disgorgement sought by Plaintiff is remedial, equitable, and thus, not subject to § 2462.

Defendant makes one final argument as to why disgorgement amounts to a penalty.   He states in his Response (with no citation to authority) that an order for disgorgement of funds paid to third parties, instead of paid directly to Defendant, would constitute a penalty.   [Doc. 179] at 2.   The implication is that Defendant should not be ordered to disgorge funds that were paid to landlords or other controlling persons to whom Defendant was not related.   *See id.*   Plaintiff replies that the question is not what amount of illegally obtained funds was *received* by Defendant but, rather, what amount of illegally obtained funds was *distributed* under Defendant's control.   [Doc. 181] at 11 (citing *United Amer. Ventures,* 2012 U.S. Dist. LEXIS 51978, at *16).

A "person who controls the distribution of illegally obtained funds is liable for the funds he or she dissipated as well as the funds he or she retained."   *United Amer. Ventures*, 2012 U.S. Dist. LEXIS 51978, *16 (quoting *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1098 (9th Cir. 2010)).   Moreover, defendants "should not be allowed to deduct referral fees, payroll, or other expenses from the net proceeds to reduce their liability for ill-gotten gains, because it

would be 'unjust to permit the defendants to offset against investor dollars the expenses of running the very business created to defraud those investors.'" *Id.* at *17 (quoting *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1114 (9th Cir. 2006) (ellipsis omitted). These rules make sense considering that disgorgement is designed both to prevent the wrongdoer's unjust enrichment and to deter others' violations of the securities laws, especially in cases of securities fraud. *See United States v. Nacchio*, 573 F.3d 1062, 1080 (10th Cir. 2009).

Defendant's argument—that any disgorgement of monies that he distributed to third parties would not be equitable—holds water only on the most superficial review. The Court is persuaded that *all* of the funds misappropriated by Defendant should be disgorged. Requiring Defendant to give up his ill-gotten gains—even those he received many years ago and those he caused to be paid to third parties—is quintessentially equitable. The requested disgorgement is for the precise damage caused by Defendant's acts and, thus, does not amount to a penalty. Therefore, the limitations period in § 2462 does not apply to the request for disgorgement.

b. <u>Disgorgement in the amount of $34,927,329 is appropriate.</u>

Although disgorgement does not amount to a penalty in this case and is not barred by the statute of limitations, the Court must still evaluate whether and what amount of disgorgement is appropriate. Plaintiff argues that Defendant should be ordered to disgorge all of the profits causally connected to his violations. [Doc. 176] at 8 (citing *First Pacific Bancorp*, 142 F.3d at 1192 n.6.). Plaintiff contends that such order would total $34,927,329. *Id.*

Disgorgement is "an equitable remedy as to which a trial court is vested with broad discretionary powers." *SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006). When the Court is calculating the proper amount of disgorgement for violation of securities laws, it need

not make "an exact calculation of the defendant's profits, but only a reasonable approximation of profits causally connected to the violation.   Because such calculations are not capable of exactitude, any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty."   *S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373, 384 (S.D.N.Y. 2007) (internal quotations and modifications omitted); *see SEC v. Fisher*, 2008 US Dist. LEXIS 37838, at *25 (N.D. Ill. May 13, 2008) (unpublished) (holding that disgorgement of all ill-gotten gains would be available if the SEC "prove[d] that its disgorgement figure reasonably approximate[d] the amount of unjust enrichment")).

In this case, the Court is satisfied that $34,927,329 reasonably approximates the ill-gotten gains causally connected to Defendant's violations.  Indeed, Defendant does not argue otherwise. He argues that portions of the amount should not be ordered disgorged for other reasons, which have already been addressed above.  However, he does not dispute the calculation.  The Court will order Defendant to disgorge $34,927,329, plus prejudgment interest of $18,077,103.37.

### III.  CONCLUSION

The statute of limitations at 15 U.S.C. § 2462 applies to the civil money penalty and, thus, limits the total amount of penalty the Court may impose.  However, because some of the claims first accrued within the limitations period, § 2462 does not bar a civil money penalty in its entirety.  In light of the facts and circumstances, the Court finds that a third-tier, civil money penalty should be imposed against Defendant in the amount of $2,354,593.

The Court further finds that neither injunction nor disgorgement, as Plaintiff requests, amounts to a "penalty" in this case because neither is unrelated to, or in excess, of the damages

caused by Defendant.  In fact, they are tailored to the injury caused by Defendant.  Therefore, neither injunction nor disgorgement is subject to the statute of limitations at § 2462.

There is a reasonable and substantial likelihood that Defendant, if not enjoined, will violate securities laws in the future.  Accordingly, he will be permanently enjoined from violating the securities laws.  Finally, the Court determines that $34,927,329 reasonably approximates the ill-gotten gains causally connected to Defendant's violations and will order him to disgorge that amount plus prejudgment interest of $18,077,103.37.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that Plaintiff's Motion for Entry of Final Judgment against Defendant Charles R. Kokesh [Doc. 176] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant shall pay a civil penalty in the amount of $2,354,593 pursuant to Section 21(d) of the Exchange Act, Section 209(e) of the Advisers Act, and Section 42(e) of the Investment Company Act, 15 U.S.C. §§ 78u(d); 80b-9(e), and 80a-41(e), **within 30 days** of entry of this Order.

**IT IS FURTHER ORDERED** that a permanent injunction will issue enjoining Defendant from violating Section 206(1) and (2) of the Investment Advisers Act; Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, and 13a-13; Section 14(a) of the Exchange Act and Exchange Act Rule 14a-9; Section 37 of the Investment Company Act, and Section 205(a) of the Investment Advisers Act, directly or indirectly.

**IT IS FURTHER ORDERED** that Defendant shall disgorge $34,927,329, together with prejudgment interest thereon in the amount of $18,077,103.37, **within 30 days** of entry of this Order.

**IT IS SO ORDERED.**

_____
**STEPHAN M. VIDMAR**
**United States Magistrate Judge**
**Presiding by Consent**